**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNA RIES, et al.,

                   Plaintiffs,

       v.

McDONALD's USA, LLC, et al.,

                  Defendants.

Case No. 1:20-cv-0002

Hon. Hala Y. Jarbou

Hon. Ray Kent, Magistrate Judge

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MCDONALD'S USA, LLC'S AND MCDONALD'S CORP.'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 2

 A. The Franchise Business Model ............................................................... 2

 B. The Franchise Relationship Between McDonald's USA and Dickerson ............. 4

 C. Additional Resources Made Available to Dickerson ............................... 7

 D. The Dickerson Organization's Employment Practices at the Mason Restaurant ......................................................................................... 8

III. ARGUMENT .................................................................................................... 11

 A. McDonald's Was Not Plaintiffs' Joint Employer ................................. 11

  1. The Dickerson Organization Alone Selected, Interviewed, and Hired Plaintiffs .......................................................................... 13

  2. The Dickerson Organization Alone Had Authority to Discipline and Fire Plaintiffs ................................................................... 14

  3. The Dickerson Organization Alone Set and Paid Plaintiffs' Compensation and Benefits ..................................................... 16

  4. The Dickerson Organization Alone Trained and Promoted Plaintiffs ................................................................................. 16

  5. The Dickerson Organization Alone Scheduled and Supervised Plaintiffs ................................................................................. 18

 B. McDonald's Was Not Plaintiffs' Employer Under an Agency or Integrated Enterprise Theory ................................................................................. 20

  1. MLMLM and M.A.A.K.S Were Not McDonald's Agents ....................... 21

  2. McDonald's, MLMLM, and M.A.A.K.S. Were Not an Integrated Enterprise ............................................................................... 21

 C. Plaintiffs' "Apparent Agency" Theory Does Not Apply Under Title VII or the ELCRA .......................................................................................... 23

  1. Title VII and the ELCRA Do Not Create Liability for an "Apparent" Employer or "Apparent" Employment Relationship ............. 24

  2. The Restatement's Definition of "Apparent Authority" Does Not Apply Where There Is No Link Between the Alleged Apparent Authority and the Tortious Conduct ........................................... 27

 D. McDonald's Is Not Liable Under an Apparent Agency Theory ...................... 29

  1. Plaintiffs Cannot Show McDonald's Made a Manifestation Regarding MLMLM's or M.A.A.K.S.' Authority as an Employer ........ 30

## TABLE OF CONTENTS
(continued)

**Page**

    2.      Plaintiffs Did Not Reasonably Believe or Rely on Any Alleged McDonald's Manifestation ........................................................................ 32

   E.    Plaintiffs Lack Standing to Seek Injunctive Relief................................. 37

CONCLUSION........................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Alberter v. McDonald's Corp*.,
70 F. Supp. 2d 1138 (D. Nev. 1999)................................................................21, 22

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998)...........................................................................25, 27, 29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................11

*Covington v. Int'l Ass'n of Approved Basketball Officials*,
710 F.3d 114 (3d Cir. 2013)....................................................................27

*Cropp v. Golden Arch Realty Corp.*,
2009 WL 10710585 (D.S.C. Mar. 31, 2009) ...........................12, 14, 16, 31, 32, 36

*D.L.S. v. Maybin*,
130 Wash. App. 94 (Wash. Ct. App. 2005) ...............................................32

*Doelle v. Nemeth*,
2018 WL 4927147 (Mich. App. Ct. Oct. 9, 2018)....................................30, 31, 35

*Dotson v. McDonald's Corp.*,
1998 WL 164871 (N.D. Ill. Apr. 2, 1998) ...............................................26

*Evans v. McDonald's Corp.*,
936 F.2d 1087 (10th Cir. 1991) .............................................................20, 23

*Gray v. McDonald's USA, LLC*,
874 F. Supp. 2d 743 (W.D. Tenn. May 30, 2012) ...............................20, 23, 26, 32

*In re Domino's Pizza Inc*.,
2018 WL 4757944 (S.D.N.Y. Sept. 30, 2018)..........................................12

*In re Jimmy John's Overtime Litigation*,
2018 WL 323127 (N.D. Ill. June 14, 2008)............................................12, 20

*Jansen v. Packaging Corp. of Am.*,
123 F.3d 490 (7th Cir. 1997) ................................................................28

*Lett v. Dean Transp.*,
    2021 WL 140936 (W.D. Mich. Jan. 15, 2021) (Jarbou, J.) ...................................................11

*Lewis v. Casey*,
    518 U.S. 343 (1996).............................................................................................................37

*Little v. Howard Johnson Co.*,
    183 Mich. App. 675 (1990) .............................................................................................29, 32

*Loewen v. Grand Rapids Med. Educ. Partners*,
    2012 WL 1190145 (W.D. Mich. Apr. 9, 2012) ....................................................................11

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983)...............................................................................................................37

*Mann v. Prudential Real Estate Affiliates, Inc.*,
    1990 WL 205286 (N.D. Ill. Dec. 10, 1990)....................................................................32, 36

*McClenton v. Office Evolutions, Inc.*,
    2006 WL 522389 (W.D. Tenn. Mar. 2, 2006) ......................................................................12

*McFarland v. Breads of the World, LLC*,
    2011 WL 801815 (S.D. Ohio Feb. 1, 2011)..........................................................................12

*Morris v. Oldham Cnty. Fiscal Ct.*,
    201 F.3d 784 (6th Cir. 2000) ...............................................................................................24

*Mullendore v. City of Belding*,
    872 F.3d 322 (6th Cir. 2017) ...............................................................................................11

*Nethery v. Quality Care Investors, L.P.*,
    814 F. App'x 97 (6th Cir. 2020) .................................................................1, 11, 20, 24, 25

*O'Banner v. McDonald's Corp.*,
    173 Ill.2d 208 (1996) ...........................................................................................................32

*Ochoa v. McDonald's Corp.*,
    133 F. Supp. 3d 1228 (N.D. Cal. 2015) ...............................................................................12

*Perry v. Pediatric Inpatient Critical Care Servs., P.A.*,
    __F. Supp. 3d__, 2020 WL 1248263 (W.D. Tex. 2020) ........................................................24

*Rosen v. Tenn. Comm'r of Fin. And Admin.*,
    288 F.3d 918 (6th Cir. 2002) ...............................................................................................37

*Rotkiske v. Klemm*,
 140 S. Ct. 355 (2019) ..................................................................................25

*Salazar v. McDonald's Corp.*,
 944 F.3d 1024 (9th Cir. 2019) ................................................................1, 12

*Satterfield v. Tennessee*,
 295 F.3d 611 (6th Cir. 2002) .......................................................................25

*Savas v. William Beaumont Hosp.*,
 216 F. Supp. 2d 660 (E.D. Mich. 2002)......................................................24

*Seabrook v. Mich. Nat'l Corp.*,
 520 N.W.2d 650 (Mich. Ct. App. 1994) .....................................................24

*Staub v. Proctor Hosp.*,
 562 U.S. 411 (2011)................................................................................27, 28

*Swallows v. Barnes & Noble Book Stores, Inc.*,
 128 F.3d 990 (6th Cir. 1997) ............................................................21, 22, 23

*United States. v. Fitzgerald*,
 906 F.3d 437 (6th Cir. 2018) .......................................................................26

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
 570 U.S. 338 (2013)......................................................................................27

*Viches v. MLT, Inc.*,
 127 F. Supp. 2d 828 (E.D. Mich. 2000).......................................................36

*Wadlington v. Credit Acceptance Corp.*,
 76 F.3d 103 (6th Cir. 1996) .........................................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)......................................................................................37

*Walsh v. Nevada Dept. of Human Resources*,
 471 F.3d 1033 (9th Cir. 2006) .....................................................................37

*Walton v. May*,
 2020 WL 5578422 (M.D. Ga. July 8, 2020).................................................31

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
 900 F.3d 250 (6th Cir. 2018) .......................................................................37

*Whitfield v. McDonald's*,
    2010 WL 6593297 (Mich. Cir. Ct. July 28, 2010)....................................................29

*Wright v. Mountain View Lawn Care, LLC*,
    2016 WL 1060341 (W.D. Va. Mar. 11, 2016)..........................................12, 15, 18, 24, 26, 32

STATUTES

42 U.S.C § 2000e ..........................................................................................11, 24, 25

MCL § 37.2201 ..........................................................................................................25

MCL § 37.2202 ..........................................................................................................11

MCL § 445.1504b .........................................................................................................3

OTHER AUTHORITIES

Fed. R. Civ. P. 56 ......................................................................................................11

Restatement (Second) of Agency.................................................................................25

Restatement (Third) of Agency ..............................................24, 25, 27, 28, 29, 30, 31

Restatement (Third) of Employment Law .................................................................28

David Kaufmann, et al., *A Franchisor is Not the Employer of its Franchisees or
    Their Employees*, 34 Franchise L.J. 439 (2015) ....................................................2, 3

Roger Blair & Francine Lafontaine, THE ECONOMICS OF FRANCHISING 117 (2005)......................3

PriceWaterhouseCoopers, THE ECONOMIC IMPACT OF FRANCHISED BUSINESSES,
    Vol. IV, 6 (2016).........................................................................................................3

## I.        INTRODUCTION

McDonald's Corporation and McDonald's USA, LLC ("McDonald's") do not employ franchisee employees.  Yet Plaintiffs, former franchisee employees, seek to hold McDonald's liable under Title VII and the Elliott Larsen Civil Rights Act ("ELCRA") for the alleged sexual harassment they experienced during their employment at a franchised restaurant, claiming that McDonald's jointly employed them.  This effort fails, because absent the ability to hire, fire, or affect the essential terms and conditions of employment, a franchisor may not be held liable for its franchisees' employment decisions.  *See, e.g.*, *Nethery v. Quality Care Investors, L.P.*, 814 F. App'x 97, 103 (6th Cir. 2020).  In applying this standard, courts across the country have found as a matter of law that McDonald's is not liable for the employment actions or omissions of McDonald's USA's franchisees because it does not have the requisite control over employment matters at franchisee restaurants.  *See, e.g.*, *Salazar v. McDonald's Corp.*, 944 F.3d 1024 (9th Cir. 2019).

This case is no exception.  The undisputed evidence compels summary judgment for McDonald's on both of Plaintiffs' claims.  Michael Dickerson ("Dickerson")—who, through his companies MLMLM Corporation and M.A.A.K.S., Inc., operated the McDonald's-brand franchise restaurant where Plaintiffs worked—and his management staff, (collectively, the "Dickerson Organization"), all testified that the Dickerson Organization alone controlled the terms and conditions of Plaintiffs' employment.  The Dickerson Organization alone interviewed, hired, trained, and disciplined Plaintiffs, controlled Plaintiffs' pay and benefits, set Plaintiffs' schedules and work assignments, and directed and supervised Plaintiffs' performance.  Plaintiffs' own sworn testimony confirms these salient facts.  The undisputed evidence demonstrates that McDonald's did not control, or have authority to control, any essential terms or conditions of Plaintiffs' employment and did not jointly employ them.

Plaintiffs also seek to hold McDonald's liable as their "employer" under Title VII and the ELCRA through an "apparent agency" theory, based on their mistaken belief that McDonald's—and not MLMLM—employed them.  This theory also fails because the apparent agency doctrine does not apply.  The statutory definition of "employer" under Title VII (and the ELCRA) does not encompass an "apparent employer" or "apparent agent"; nor does the Restatement of Agency and applicable law contemplate apparent-agency liability for a franchisor based solely on logos, branding, and the like.  And, even if they did, the undisputed evidence shows that the Dickerson Organization informed Plaintiffs verbally, via pay stubs and posters in the restaurant, and through documentation that Plaintiffs received and acknowledged when hired, that MLMLM was their sole employer and was not McDonald's agent.

Thus, McDonald's is entitled to judgment as a matter of law on all of Plaintiffs' claims.

## II.     BACKGROUND

### A.     The Franchise Business Model.

Franchising is a system of marketing and distribution in which the franchisee has the right to use the franchisor's brand name and proven system of operation.  As one article in the Franchise Law Journal explained:

> [F]ranchising is a means of establishing a network of independently owned businesses…, which are licensed to sell products or services under a common brand name.  It is a system of marketing and distribution in which an independent business (the franchisee) is granted—in return for a fee—the right to market the goods and services of another (the franchisor) in accordance with the franchisor's established standards and practices.

*See* David Kaufmann, et al., *A Franchisor is Not the Employer of its Franchisees or Their Employees*, 34 Franchise L.J. 439, 452 (2015) (cleaned up).  Franchising is "center[ed] around brand names and the public's perception of quality and uniformity associated with those brand names."  *Id*. at 453.  Brand standardization is critical to the franchise model because "the

consistency of [a] system's operation, service, and product quality [is what] attracts customers and induces loyalty: customers become loyal if the experiences they enjoy at diverse units of these chains routinely meet their expectations."  *See* Roger Blair & Francine Lafontaine, THE ECONOMICS OF FRANCHISING 117 (2005) (cleaned up).

Crucially, "a franchised business is an independently owned establishment" such that a franchisee is responsible for its own business, including employment-related matters.  Kaufmann, 34 Franchise L.J. at 456.  Michigan law enshrines this separation with respect to employment relationships.  The Michigan Franchise Act provides that, "[t]o the extent allocation of employer responsibilities between the franchisor and franchisee is permitted by law, the franchisee shall be considered the sole employer of workers for whom it provides a benefit plan or pays wages except as otherwise specifically provided in the franchise agreement."  MCL § 445.1504b.

The economic benefits of franchising are well documented.  According to the U.S. Census Bureau and the International Franchise Association, between 2004 and 2007, franchising companies and their franchisees accounted for nearly $1.3 trillion in annual U.S. retail sales, $304 billion in payroll, and $802 billion of output.  Kaufmann, 34 Franchise L.J. at 452.  As of 2016, franchised business provided nearly 9 million jobs, met an annual payroll of $351.1 billion, produced output worth $868.1 billion, and contributed $541.1 billion to the GDP.  *See* PriceWaterhouseCoopers, THE ECONOMIC IMPACT OF FRANCHISED BUSINESSES, Volume IV, 6 (2016), *available at* https://bit.ly/2TE3z4F.  The success of the franchise business model is due to allocation of responsibility at the appropriate level—with the franchisee responsible for day-to-day management and the franchisor responsible for protecting the brand.  *See* Kaufmann, 34 Franchise L.J. at 454.

**B.     The Franchise Relationship Between McDonald's USA[1] and Dickerson.**

McDonald's USA has a franchise business model under which independent small business owners enjoy the benefits of McDonald's-branded products and services and their own autonomous ownership and operation.  (ECF 154-2, PageID.3073–3074, Bonta Declaration ¶¶ 5–6.)  This model allows McDonald's to widely disseminate McDonald's-branded products and services in markets around the world and allows small and local business owners to maintain control over their business operations, including, marketing, pricing, and employment decisions, while benefitting from the strength of McDonald's global brand and operating system.  (*Id.*, PageID.3074, Bonta Declaration ¶¶ 6–8.)

McDonald's USA's relationship with each franchisee is governed by the terms of an individual franchise agreement, which typically has a 20-year term.  (ECF 154-4, PageID.3106 Bonta Deposition 105:14–19; ECF 154-3, PageID.3092–3093, Franchise Agreement ¶ 18.)  Under the franchise agreements, McDonald's USA grants franchisees a license to use the McDonald's brand name, trademark, and business practices, including the established method of operating a successful restaurant.  (ECF 154-2, PageID.3074, Bonta Declaration ¶¶ 7–8.)  The provision of operational systems, which are necessary to maintain consistent quality across McDonald's-brand franchise restaurants, improves franchisees' chances of success and minimizes the risk that a franchisee will damage the brand.  (*Id.*)  While the franchise relationship provides access to information about the McDonald's restaurant system, the franchisee's business operations, including the execution of a business plan, remain within the franchisee's exclusive control.  (*Id.*)

---

[1] McDonald's USA is the franchisor of McDonald's-brand franchise restaurants in the United States.  (ECF 154-2, PageID.3073, Bonta Declaration ¶¶ 3–4.) McDonald's Corporation is the parent company of McDonald's USA.  (*Id.*)  McDonald's Corporation has no contractual franchise relationship with any United States franchisee.  (*Id.*)

Starting in 1993, Dickerson operated multiple McDonald's-brand franchise restaurants in Michigan pursuant to separate franchise agreements, including the restaurant located at 730 N. Cedar Street in Mason, Michigan (the "Mason Restaurant"), until he sold his restaurants to other operators effective August 15, 2020.[2]  (ECF 154-7, PageID.3136–3137, Dickerson Deposition 71:2–75:9; ECF 154-3, PageID.3082–3099, Franchise Agreement.)  The Mason Restaurant franchise agreement ("Franchise Agreement") defined the relationship between Dickerson and McDonald's USA and made clear that Dickerson had "no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose."  (*Id.*, PageID.3091, Franchise Agreement ¶ 16.)  The Franchise Agreement also stated that McDonald's USA and Dickerson were "not and do not intend to be partners, associates, or joint employers in any way and McDonald's [USA] shall not be construed to be jointly liable for any acts or omissions of [Dickerson] under any circumstances."  (*Id.*)

The Franchise Agreement set forth requirements and standards for both Dickerson and McDonald's USA.  Dickerson bore the franchise investment costs and agreed to pay an initial fee and monthly service fees, based on gross sales, and rent.  (*Id.*, PageID.3085–3086, Franchise Agreement ¶¶ 7–9; ECF 154-7, PageID.3141, Dickerson Deposition 144:10–145:18.)  In return, McDonald's USA agreed to provide certain resources to Dickerson to assist him as an independent business owner, including business manuals (ECF 154-3, PageID.3084, Franchise Agreement ¶ 4) that outline required procedures and practices related to, for example, product specifications and

---

[2] Dickerson assigned his rights and obligations under the Franchise Agreement to his company, Defendant M.A.A.K.S. Inc. (ECF 154-4, PageID.3105, Bonta Deposition 99:7–100:9.) Dickerson set up another company, Defendant MLMLM Corporation, as a payroll company that employed and paid the restaurant-level employees at the Mason Restaurant, and another company, Mingtia'n, that paid and employed his mid management team. (ECF 154-7, PageID.3142, Dickerson Deposition 150:22–152:3.)

food safety, as well as optional policies and practices related to personnel, crew management and scheduling, and training that Dickerson could adopt if he so chose.  (*Id*.; ECF 154-7, PageID.3153, Dickerson Deposition 266:1–10; ECF 154-4, PageID.3103, Bonta Deposition 56:22–57:22; ECF 154-2, PageID.3076–3080, Bonta Declaration Exhibit A.)

McDonald's USA also made its principal training center, Hamburger University, available to the Dickerson Organization and required each restaurant be managed by a Hamburger University graduate.  (ECF 154-3, PageID.3085, Franchise Agreement ¶ 6.)  Dickerson, however, selected which of his employees attended and paid for their expenses, including their compensation.  (*Id*.)  Beyond that, the Franchise Agreement did not vest McDonald's USA with any rights or responsibilities as to the Dickerson Organization's employees.  Instead, Dickerson was obligated to "devot[e] full time and best efforts to the operation of the Restaurant," (*Id*., PageID.3089, Franchise Agreement ¶ 13), and to "employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency."  (*Id*., PageID.3087–3088, Franchise Agreement ¶ 12(g); ECF 154-4, PageID.3104, Bonta Deposition 75:2–77:9.)

The Franchise Agreement required McDonald's USA to provide field support staff who visited the Mason Restaurant to consult on operational, marketing, and general business subjects, and to ensure McDonald's USA's quality, service, and cleanliness standards were met.  (ECF 154-3, PageID.3084, Franchise Agreement ¶ 3; ECF 154-6, PageID.3129, Thelen Deposition 50:20–51:25, 52:22–53:22.)  The field support staff did not advise the Dickerson Organization regarding personnel matters.  (ECF 154-9, PageID.3171, Pyers Deposition 102:13–17; ECF 154-10, PageID.3179, Haller Deposition 94:14-16.)  Rather, the Dickerson Organization communicated with field support staff regarding operations, technology issues, and product development.  (ECF 154-8, PageID.3164, Bitner Deposition 222:1–224:19; ECF 154-10, PageID.3179, Haller

Deposition 94:22–95:12.)  Dickerson was free to reject any business or operational advice from field support.  (ECF 154-4, PageID.3106, Bonta Deposition 103:17–105:13.)

Field support staff periodically reviewed Dickerson's restaurants against the National Franchising Standards ("NFS"), a set of metrics used to guide future franchising decisions, including whether to expand McDonald's USA's relationship with a franchisee to include additional restaurants ("growth") and whether to enter into a new franchise agreement ("rewrite") upon expiration of the franchise term.  (ECF 154-4, PageID.3102, 3107, Bonta Deposition 53:7–14, 118:11–22.)  The NFS are not part of the franchise agreement, and are not intended to, and do not necessarily, address whether a franchisee is in compliance with its franchise agreement.  (ECF 154-2, PageID.3075, Bonta Declaration ¶ 10.)  Indeed, a franchisee may be ineligible for growth and rewrite under the NFS while still operating existing franchise locations through the end of the franchise term.  (ECF 154-4, PageID.3103, Bonta Deposition 54:17–55:2.)

### C.    Additional Resources Made Available to Dickerson.

McDonald's USA made other resources available to Dickerson as a benefit of the franchise relationship, but McDonald's USA could not and did not compel Dickerson to use them.  (ECF 154-7, PageID.3153, Dickerson Deposition 266:1–10; ECF 154-4, PageID.3106, Bonta Deposition 103:17–105:13.)  Dickerson had discretion to use or not use the resources as he saw fit, or to use them in conjunction with other business resources not recommended by McDonald's USA.  (ECF 154-4, PageID.3106, Bonta Deposition 103:17–105:13; ECF 154-5, PageID.3120, Mullaney Deposition 48:17–21 ("They are independent owner-operators. They can choose to utilize the tools that [McDonald's USA] provide[s], or they can use something else.").)  For example, McDonald's USA made available an optional template employee handbook (ECF 154-5, PageID.3126, Mullaney Deposition 206:19–207:20), but Dickerson created his own employee

handbook and his lawyers updated his policies.  (ECF 154-7, PageID.3148, 3153, Dickerson Deposition 206:12–21, 268:13–24; ECF 154-8, PageID.3160, Bitner Deposition 122:15–123:24.)

McDonald's USA also offers franchisees a variety of online and in-person training modules to help them train their employees and improve their restaurant operations.  Franchisees can access an online learning library called FRED and a learning management system called CAMPUS, where franchisees or their employees can access e-Learning modules and course content if they choose, including optional e-Learning modules related to the prevention of sexual harassment. (ECF 154-5, PageID.3119, 3124–3125, Mullaney Deposition 43:14–22, 159:10–160:12; ECF 154-8, PageID.3167, Bitner Deposition 266:17–23.)  While McDonald's USA could recommend the training materials on CAMPUS and FRED to Dickerson, he was free to reject such recommendations and/or implement his own training methods.  (ECF 154-7, PageID.3140, Dickerson Deposition 132:4–23; ECF 154-8, PageID.3166–3167, Bitner Deposition 265:21–266:5; ECF 154-5, PageID.3123, Mullaney Deposition 141:8–9, 142:13–143:11.)  Indeed, the Dickerson Organization conducted its own six-week swing manager class, separate from training made available by McDonald's USA.  (*Id.*)

D.    **The Dickerson Organization's Employment Practices at the Mason Restaurant.**

McDonald's had no role in hiring Mason Restaurant employees.   (ECF 154-7, PageID.3153, Dickerson Deposition 266:11–16.)  At times, the Dickerson Organization used optional internet hiring platforms and tools made available by McDonald's USA to receive employment applications (*Id.*, PageID.3149, Dickerson Deposition 211:24–213:6; ECF 154-5, PageID.3122, Mullaney Deposition 60:7–61:15), but the Dickerson Organization alone selected, interviewed, and hired Mason Restaurant employees.  (ECF 154-7, PageID.3153, Dickerson Deposition 266:11–16; ECF 154-8, PageID.3165, Bitner Deposition 226:22–227:11, 229:5–11;

ECF 154-9, PageID.3173, Pyers Deposition 120:19–121:12.)   Once hired, the Dickerson Organization—not McDonald's—set each employees' wages.   (ECF 154-7, PageID.3153, Dickerson Deposition 267:6–11.)  Defendant MLMLM, not McDonald's, paid Mason Restaurant employees.   (ECF 154-8, PageID.3161, Bitner Deposition 192:12–193:1; ECF 154-12, PageID.3192, Robertson Deposition 173:8–16; ECF 154-13, PageID.3197–3198, Ries Deposition 77:14–78:7.)  McDonald's had no access to or control over the Dickerson Organization's payroll system or bank accounts.   (ECF 154-7, PageID.3153, Dickerson Deposition 267:12–20.) Orientations for Mason Restaurant employees were conducted by Dickerson Organization personnel at Dickerson's restaurants, where new hires reviewed the policies and rules contained in the MLMLM Corporation Employee Handbook, signed employment paperwork, and received uniforms.  (ECF 154-11, PageID.3187–3188, Niezgoski Deposition 51:4–11, 61:3–9; ECF 154-13, PageID.3195, Ries Deposition 68:24–69:13; ECF 154-16, PageID.3254, Bishop Deposition 62:1–65:24.)

McDonald's had no role in supervising the day-to-day activities of the Mason Restaurant employees.   (ECF 154-7, PageID.3153, Dickerson Deposition 268:7–10.)   The Dickerson Organization—and not McDonald's—set staffing goals (*Id*., PageID.3146, Dickerson Deposition 196:13–23; ECF 154-6, PageID.3131, Thelen Deposition 134:16–25; ECF 154-4, PageID.3104, Bonta Deposition 75:2–76:18); assigned employees to their work positions (ECF 154-7, PageID.3153, Dickerson Deposition 268:1–12; ECF 154-14, PageID.3214–3215, Barber Deposition 45:10–46:16); trained employees (ECF 154-7, PageID.3138, Dickerson Deposition 89:15–20; ECF 154-8, PageID.3167, Bitner Deposition 266:6–16, 266:24–267:5; ECF 154-13, PageID.3205, Ries Deposition 208:5–19); set employees' work schedules (ECF 154-13, PageID.3206–3207, Ries Deposition 213:19–214:2; ECF 154-14, PageID.3212, Barber

Deposition 28:2–29:3); addressed issues with employees' pay (ECF 154-8, PageID.3162, Bitner Deposition 196:24–197:12; ECF 154-13, PageID.3207, Ries Deposition 214:6–10); set up a bonus plan to incentivize employees (ECF 154-7, PageID.3139, Dickerson Deposition 98:16–22; ECF 154-8, PageID.3163, Bitner Deposition 206:13–208:13; ECF 154-10, PageID.3181, Haller Deposition 256:24–257:16); reviewed employees' performance (ECF 154-9, PageID.3170, Pyers Deposition 84:20–85:15); and promoted employees (ECF 154-7, PageID.3153, Dickerson Deposition 266:23–267:5).  In fact, Dickerson testified he became a franchisee so he could make these types of decisions for his employees.  (*Id*.)

McDonald's had no role in disciplining Mason Restaurant employees.  (*Id*., Dickerson Deposition 266:17–22.)  The Dickerson Organization alone enforced its rules and policies and disciplined Mason Restaurant employees. (ECF 154-10, PageID.3180, Haller Deposition 114:10–116:16; ECF 154-9, PageID.3172, Pyers Deposition 107:1–15; ECF 154-12, PageID.3191, Robertson Deposition 26:18–27:19.)  McDonald's did not provide human resources advice to the Dickerson Organization.  (ECF 154-12, PageID.3191, Robertson Deposition 29:2–4; ECF 154-9, PageID.3171, Pyers Deposition 102:13–17; ECF 154-10, PageID.3179, Haller Deposition 94:14–16.)  "[T]he [Dickerson Organization] Supervisors were the human resources people for the store," and they addressed all employee concerns and conducted investigations into personnel complaints. (ECF 154-7, PageID.3147, Dickerson Deposition 202:8–22; *see also* ECF 154-8, PageID.3159, Bitner Deposition 105:8–10; ECF 154-10, PageID.3178–3179, Haller Deposition 93:4–94:13; ECF 154-9, PageID.3175, Pyers Deposition 226:3–11.)  Dickerson Organization Supervisors could discipline and recommend termination, but Dickerson was the final decision-maker for terminations.  (ECF 154-7, PageID.3145, 3150, Dickerson Deposition 185:15–21, 216:1–16; ECF 154-9, PageID.3175, Pyers Deposition 226:12–20.)

### III.   ARGUMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party need not "negat[e]" the non-moving party's case; but may prevail by "pointing out" the "absence of evidence to support [that] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); Fed. R. Civ. P. 56(c)(1)(B).  To defeat summary judgment, the non-moving party "must put forth sufficient evidence to demonstrate that there is a genuine issue of material fact; a mere scintilla of evidence is insufficient." *Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) (cleaned up).   "The key inquiry … is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Nethery*, 814 F. App'x at 102 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)); *accord Lett v. Dean Transp.*, 2021 WL 140936, at *6 (W.D. Mich. Jan. 15, 2021) (Jarbou, J.).

### A.   McDonald's Was Not Plaintiffs' Joint Employer.

Title VII and the ELCRA prohibit "employers" from engaging in unlawful acts.  *See* 42 U.S.C. § 2000e–2; MCL § 37.2202.  Plaintiffs seek to hold McDonald's liable as their joint employer under both statutes.  (ECF 142, PageID.2476.)  Entities are joint employers only where they "share or co-determine those matters governing essential terms and conditions of employment." *Nethery*, 814 F. App'x at 103.  To satisfy that stringent test, Plaintiffs must show that McDonald's had the "ability to hire, fire or discipline [Plaintiffs], affect their compensation and benefits, and direct and supervise their performance." *Id.* (calling these the "major factors" and affirming summary judgment for defendant); *Loewen v. Grand Rapids Med. Educ. Partners*, 2012 WL 1190145, at *6–7 (W.D. Mich. Apr. 9, 2012) (finding no joint employment where the

defendants did not hire, pay, supervise, or discipline plaintiff and had no control over terms or conditions of her residency).

"[C]ourts have been nearly uniform in holding that a franchisor"—by virtue of its business structure—"should not be deemed an 'employer' for purposes of Title VII when the plaintiff works for an independently owned franchise." *McFarland v. Breads of the World, LLC*, 2011 WL 801815, at *8, 12 (S.D. Ohio Feb. 1, 2011) (collecting cases).  As the Ninth Circuit explained, "McDonald's involvement in its franchises and with workers at the franchises is central to modern franchising and to the company's ability to maintain brand standards, but does not represent [the] control over wages, hours, or working conditions" necessary to establish a joint employment relationship. *Salazar v. McDonald's Corp.*, 944 F.3d 1024, 1030 (9th Cir. 2019) (affirming summary judgment for McDonald's on plaintiffs' joint employer theory) (interpreting California law).  Other cases are in accord. *See, e.g.*, *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1236 (N.D. Cal. 2015) (McDonald's was not a joint employer because "the authority to make hiring, firing, wage, and staffing decisions at the [franchisee's] restaurants lies in [the franchisee] and its managers—and them alone."); *Cropp v. Golden Arch Realty Corp.*, 2009 WL 10710585, at *8 (D.S.C. Mar. 31, 2009) (granting summary judgment for McDonald's because the franchisee "was solely responsible for exercising ordinary day to day control over the Restaurant"); *see also, e.g.*, *McClenton v. Office Evolutions, Inc.*, 2006 WL 522389, at *5 (W.D. Tenn. Mar. 2, 2006) (Title VII) (franchisor was not a joint employer where there was no evidence that it shared or co-determined matters relating to the "essential terms and conditions" of plaintiff's employment); *Wright v. Mountain View Lawn Care, LLC*, 2016 WL 1060341, at *6 (W.D. Va. Mar. 11, 2016) (Title VII) (similar); *In re Jimmy John's Overtime Litigation*, 2018 WL 323127, at *20 (N.D. Ill. June 14, 2008) (similar); *In re Domino's Pizza Inc.*, 2018 WL 4757944, at *4 (S.D.N.Y. Sept. 30,

2018) (finding "the type of standard setting and oversight exercised by a franchisor does not rise to the requisite level of control to constitute joint employer status").

Here, the undisputed record evidence, including sworn testimony from the Dickerson Organization, McDonald's USA, and each Plaintiff, confirms that McDonald's did not control hiring, firing, and/or the terms and conditions of Plaintiffs' employment and, thus, was not Plaintiffs' joint employer.

### 1. The Dickerson Organization Alone Selected, Interviewed, and Hired Plaintiffs.

The Franchise Agreement makes clear that sole responsibility for operating the restaurants and employing personnel to operate the restaurant resides with Dickerson. (ECF 154-3, PageID.3087–3088, Franchise Agreement ¶ 12(g); ECF 154-4, PageID.3104, Bonta Deposition 75:2–77:9.) As discussed, *supra*, the Dickerson Organization alone selected candidates, conducted interviews, and made hiring decisions. (*See, e.g.*, ECF 154-7, PageID.3153, Dickerson Deposition 266:11–16; ECF 154-8, PageID.3165, Bitner Deposition 226:22–227:11, 229:5–22; ECF 154-9, PageID.3173, Pyers Deposition 120:19–121:12.) Plaintiffs' testimony confirms that this was the case:

- Plaintiff Ries worked at the Mason Restaurant from Fall 2017 to March 2019. (ECF 142, PageID.2456.) Ries testified that Dickerson Organization Swing Manager Banks recruited her, interviewed her, and communicated her job offer. (ECF 154-13, PageID.3195, Ries Deposition 67:25–68:23.) Ries testified that only the General Manager ("GM") of the Mason Restaurant could make hiring decisions for the restaurant. (*Id*., PageID.3202, Ries Deposition 143:23–144:1.)

- Plaintiff Barber worked at the Mason Restaurant from Fall 2017 to Fall 2018. (ECF 142, PageID.2460.) Barber testified that GM Robertson encouraged her to apply to the Mason

13

Restaurant and offered to pay her more than she was making at Subway.  (ECF 154-14, PageID.3216, Barber Deposition 96:16–22.)

- Plaintiff Anibal worked as a crew member at the Mason Restaurant from May 2016 to June 2017.  (ECF 154-15, PageID.3232, Anibal Deposition 24:16–24.)  Swing Manager Banks interviewed and offered her a job.  (*Id*., PageID.3234, Anibal Deposition 30:4–31:2.)

- Plaintiff Bishop worked as a crew member at the Mason Restaurant for two months, from December 2018 to February 2019.  (ECF 142, PageID.2462; ECF 154-16, PageID.3249, 3258, Bishop Deposition 28:8–11; 87:8–12.)  Bishop was interviewed by Plaintiff Ries and hired by the GM.  (*Id*., PageID.3251, Bishop Deposition 47:20–49:17.)

McDonald's had no role, or authority, in selecting, interviewing, or hiring Plaintiffs or any other Mason Restaurant employee (ECF 154-7, PageID.3153, Dickerson Deposition 266:11–16; ECF 154-4, PageID.3104, Bonta Deposition 75:2–13), a key factor demonstrating that McDonald's was not Plaintiffs' joint employer.  *Cropp*, 2009 WL 10710585, at *5 (McDonald's was not a joint employer because it "d[id] not have the right to direct The Ace Partnership to hire, terminate, or take any other employment action").

### 2. The Dickerson Organization Alone Had Authority to Discipline and Fire Plaintiffs.

As discussed, *supra*, only the Dickerson Organization could enforce its employment policies and practices, discipline Mason Restaurant employees, and terminate their employment. (*See, e.g.*, ECF 154-10, PageID.3180, Haller Deposition 114:10-116:16; ECF 154-9, PageID.3172, Pyers Deposition 107:1–15; ECF 154-12, PageID.3191, Robertson Deposition 26:18–27:16; ECF 154-7, PageID.3145, 3150, Dickerson Deposition 185:15–21, 216:1–16.)  Plaintiffs' testimony corroborates that McDonald's played no role in such actions:

- Ries testified that GM Robertson and Dickerson Organization Supervisor Heidi Pyers disciplined her during her employment and that no one above Dickerson Organization Operations Manager Nan Bitner was involved in any disciplinary actions taken against her. (ECF 154-13, PageID.3208, Ries Deposition 218:18–219:16; ECF 154-8, PageID.3156–3157, Bitner Deposition 41:10–42:1.)

- Barber understood GM Robertson could discipline Mason Restaurant employees and, as a Swing Manager, Barber herself had the authority to discipline crew members she supervised. (ECF 154-14, PageID.3221–3222, Barber Deposition 169:9–19, 170:7–19.)

- Anibal testified that restaurant-level managers had the authority to discipline Mason Restaurant employees (ECF 154-15, PageID.3240, Anibal Deposition 64:13–23) and that she was disciplined by restaurant-level managers. (*Id*., PageID.3243, Anibal Deposition 75:24–76:15.) Anibal admitted that no one outside of the Mason Restaurant management team was involved in her disciplinary actions. (*Id*.)

- Bishop understood that any Mason Restaurant manager could fire an employee. (ECF 154-16, PageID.3251–3252, Bishop Deposition 49:21–50:9.)

McDonald's lack of involvement in disciplining Plaintiffs (ECF 154-7, PageID.3153, Dickerson Deposition 266:17–22; ECF 154-9, PageID.3171, Pyers Deposition 102:13–17; ECF 154-10, PageID.3179, Haller Deposition 94:14–16) supports that McDonald's was not Plaintiffs' joint employer. *See Wright*, 2016 WL 1060341, at *5 (franchisor not a Title VII joint employer where "it was [the franchisee], not [the franchisor] that supervised and disciplined [Plaintiff]" and plaintiff's "personnel records reflect[ed] disciplinary action" only by franchise manager).

### 3.      The Dickerson Organization Alone Set and Paid Plaintiffs' Compensation and Benefits.

The undisputed evidence establishes that the Dickerson Organization, and not McDonald's, set wages for, and provided benefits to, Plaintiffs.  (ECF 154-7, PageID.3153, Dickerson Deposition 267:6–11.)  Mason Restaurant employees were paid by MLMLM, which controlled its own payroll system and bank accounts.  (*Id*., Dickerson Deposition 267:12–20; ECF 154-8, PageID.3161, Bitner Deposition 192:12–193:1.)  Plaintiffs cannot present any evidence to the contrary.  And, Plaintiffs' testimony again supports McDonald's position that it played no role in Plaintiffs' compensation or benefits.

Plaintiffs admitted that they were paid by MLMLM and testified that they directed questions about their paychecks or compensation to their GM.  (ECF 154-13, PageID.3207, Ries Deposition 214:6–215:5; ECF 154-17, PageID.3263, Ries W2; ECF 154-14, PageID.3226–3227, 3229, Barber Deposition 237:4–238:3, 246:4–8; ECF 154-20, PageID.3269, Barber W2; ECF 154-15, PageID.3237, 3242–3243, Anibal Deposition 47:3–11, 73:18–74:22; ECF 154-23, PageID.3275, Anibal W2; ECF 154-16, PageID.3256, 3260–3261, Bishop Deposition 74:11–15, 121:24–122:10; ECF 154-26, PageID.3281, Bishop W2.)  Because McDonald's had no role in setting or paying Plaintiffs' wages and benefits (ECF 154-7, PageID.3153, Dickerson Deposition 267:6–20), Plaintiffs' joint employer theory fails.  *Cropp*, 2009 WL 10710585, at *5 (McDonald's not a joint employer where franchisee "[wa]s responsible for setting wages and other conditions of employment").

### 4.      The Dickerson Organization Alone Trained and Promoted Plaintiffs.

The Dickerson Organization, not McDonald's, was responsible for training Plaintiffs. (ECF 154-7, PageID.3138, Dickerson Deposition 89:15–20; ECF 154-8, PageID.3167, Bitner Deposition 266:6–16, 266:24–267:5; ECF 154-13, PageID.3205, Ries Deposition 208:5–19.)

16

Dickerson had the autonomy to decide how and when he trained his employees (ECF 154-5, PageID.3123, Mullaney Deposition 141:8–9, 142:13–143:11) and confirmed that "McDonald's…[did]n't train the[m],"—the Dickerson Organization did.   (ECF 154-7, PageID.3138, Dickerson Deposition 89:15–20 ("I would train -- or my people would train the staff.").)  The Dickerson Organization was also solely responsible for promoting Plaintiffs and other Mason Restaurant employees.   (*Id*., PageID.3153, Dickerson Deposition 266:23–267:5.) Plaintiffs' testimony confirmed the same:

- Ries testified that, after working at the Mason Restaurant for a few months, GM Robertson offered her a spot in the Dickerson Organization's management program.  (ECF 154-13, PageID.3202, Ries Deposition 142:9–13.)  Ries was trained by Supervisors and GMs of the Dickerson Organization at one of Dickerson's restaurants and completed computer training in the Mason Restaurant.  (*Id*., PageID.3202, 3205–3206, Ries Deposition 142:14–143:17; 209:9–211:20.)  Once Ries completed her training, Supervisor Pyers observed Ries running a shift and certified her as a Swing Manager.  (*Id*., PageID.3206, Ries Deposition 211:21–212:5, 212:22–213:7.)

- Barber testified that, as a crew member, she was trained by GM Robertson and other Mason Restaurant crew and managers.  (ECF 154-14, PageID.3228, Barber Deposition 244:9–245:8.)  GM Robertson suggested Barber become a manager.  (*Id*., PageID.3217, Barber Deposition 98:2–22.)   After Barber completed manager training from GM Robertson, Supervisor Pyers, and other managers from Dickerson's other restaurants, Pyers certified her as a Swing Manager.  (*Id*., PageID.3217, 3227–3228, Barber Deposition 98:17–99:22; 241:6–242:15.)   As a Swing Manager, Barber helped train other Mason Restaurant employees.  (*Id*., PageID.3228, Barber Deposition 245:11–13.)

17

- Anibal received training from a Mason Restaurant assistant manager, who walked her through a shift, showed her how to perform her job duties, and explained the Mason Restaurant policies. (ECF 154-15, PageID.3238–3240, Anibal Deposition 57:13–58:12; 61:20–62:6.) During her training, Anibal learned that, if she had any issues during her employment, she should speak with a Mason Restaurant manager. (*Id.*, PageID.3238, Anibal Deposition 55:16–56:6.)

- Bishop testified that she did "[n]ot really" receive training at the Mason Restaurant "[b]ecause [she] was already working fast food service, so they just told [her] to do something[,] told [her] what to push, and that's what [she] did." (ECF 154-16, PageID.3257, Bishop Deposition 82:19–83:5.)

This evidence further supports a finding that McDonald's was not Plaintiffs' joint employer. *Wright*, 2016 WL 1060341, at *6 (franchisor was not a joint employer where it did not train franchisee's employees).

### 5. The Dickerson Organization Alone Scheduled and Supervised Plaintiffs.

Finally, the Dickerson Organization—and not McDonald's—scheduled and supervised Plaintiffs' day-to-day work activities. (ECF 154-7, PageID.3153, Dickerson Deposition 268:7–10.) Dickerson himself set staffing goals for the Dickerson Organization. (*Id.*, PageID.3146, Dickerson Deposition 196:13–23; ECF 154-6, PageID.3131, Thelen Deposition 134:16–25; ECF 154-4, PageID.3104, Bonta Deposition 75:2–76:18.) The Dickerson Organization assigned employees to their work positions (ECF 154-7, PageID.3153, Dickerson Deposition 268:1–12), set employee schedules, and reviewed employees' performance. (ECF 154-9, PageID.3170, Pyers Deposition 84:20–85:15; ECF 154-13, PageID.3206–3207, Ries Deposition 213:19–214:2; ECF

18

154-14, PageID.3212, Barber Deposition 28:2–29:3.)   Plaintiffs' testimony shows that McDonald's had no part in day-to-day supervision of Plaintiffs' employment:

- Ries admitted that GM Robertson "did the scheduling" for the Mason Restaurant and that she spoke to Robertson when she needed a day off.  (ECF 154-13, PageID.3205–3207, Ries Deposition 207:21–25; 213:19–214:5.)  Ries brought staffing concerns to Supervisor Pyers, who coached Ries on how to be a better Swing Manager.  (*Id*., PageID.3199, Ries Deposition 94:17–24; ECF 154-9, PageID.3174, Pyers Deposition 221:2–17.)  When Ries wanted to transfer to another Dickerson Organization restaurant, she asked GM Robertson. (ECF 154-13, PageID.3203, Ries Deposition 175:19–24.)

- Barber testified that GM Robertson set the schedules for crew and managers and that whichever manager Robertson scheduled "to have the floor" was in charge of assigning crew and managers to work positions that day.  (ECF 154-14, PageID.3214–3215, Barber Deposition 45:10–46:16.)  If Barber had questions about her hours or needed to change her schedule, she talked to GM Robertson.  (ECF 154-14, PageID.3212, 3215, 3229, Barber Deposition 28:2–10, 46:21–47:13, 246:4–8.)   Supervisor Pyers provided Barber with feedback and reviewed her performance during one-on-one meetings.  (ECF 154-14, PageID.3219, Barber Deposition 144:1–145:16.)

- Anibal testified that if she had a question about her hours, needed to change her schedule, or called off sick, she would talk to Mason Restaurant managers.  (ECF 154-15, PageID.3236–3237, Anibal Deposition 44:12–17; 46:5–11; 47:12–48:7.)  When Anibal forgot to clock in or out and needed her timecard fixed, she spoke to a Mason Restaurant manager.  (*Id*., PageID.3241, Anibal Deposition 67:22–68:6.)

- Bishop admitted that GM Robertson was her direct supervisor and that she contacted Robertson when she wanted to discuss the goings-on at the Mason Restaurant and/or ask about her schedule.  (ECF 154-16, PageID.3255, Bishop Deposition 71:21–72:20.)

This evidence again demonstrates that McDonald's did not jointly employ Plaintiffs.  *See In re Jimmy John's*, 2018 WL 3231273, at *17 (franchisor not joint employer because "franchise managers themselves were in charge of creating, directing, and managing employee schedules at the store level").

The record evidence is clear and undisputed – McDonald's did not have the ability to, and did not, "hire, fire or discipline [Plaintiffs], affect their compensation and benefits, and direct and supervise their performance."  *Nethery*, 814 F. App'x at 103.  Accordingly, McDonald's is entitled to summary judgment on Plaintiffs' Title VII and ELCRA claims premised on the theory of joint employer liability.[3]

**B.     McDonald's Was Not Plaintiffs' Employer Under an Agency or Integrated Enterprise Theory.**

Anticipating that they cannot prove McDonald's was their joint employer, Plaintiffs allege that MLMLM and M.A.A.K.S. were "agent[s] of," "and/or operated as an integrated enterprise with," McDonald's.  (ECF 142, PageID.2480.)  These theories of liability fail.  *See, e.g., Gray v. McDonald's USA, LLC*, 874 F. Supp. 2d 743, 751–52 (W.D. Tenn. May 30, 2012) (holding McDonald's and franchisee were not an integrated enterprise, and franchisee was not McDonald's agent for employment purposes); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir. 1991) (similar).

---

[3] Additionally, no case in Michigan appears to have applied the "joint employer" test in the ELCRA context.

### 1.       MLMLM and M.A.A.K.S Were Not McDonald's Agents.

An agent is "one who consents to act on behalf of another and subject to the other's control." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 (6th Cir. 1997) (citing Restatement of Agency § 1).  More specifically, "[a]n agent within the context of … employment discrimination statutes must be an agent with respect to *employment practices*." *Id.* (emphasis added).  Here, the Franchise Agreement made clear that, as a franchisee, Dickerson had "no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose." (ECF 154-3, PageID.3091, Franchise Agreement ¶ 16.)  Relevant to Plaintiffs' Title VII and ELCRA claims, McDonald's had no authority to control the terms and conditions of Plaintiffs' and other Mason Restaurant employees' employment, *see supra* Parts I(D), II(A).  (ECF 154-7, PageID.3153, Dickerson Deposition 266:11–268:12.)   Accordingly, McDonald's cannot be considered Plaintiffs' "employer" under Title VII or the ELCRA on the basis that MLMLM and/or M.A.A.K.S. was acting as its "agent."  *Swallows*, 128 F.3d at 996 (affirming summary judgment because the defendant university "did not delegate to Barnes & Noble the authority to make employment decisions on its behalf, nor did it exercise the requisite control over Barnes & Noble's employment decisions"); *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d 1138, 1145 (D. Nev. 1999) ("Because McDonald's did not control day-to-day operations at the Lemmon Valley McDonald's and did not have control over employment matters with respect to workers there, the argument that McDonald's may be held liable to Plaintiff for employment discrimination because Ledbetter acted as the corporation's agent must also fail.").

### 2.       McDonald's, MLMLM, and M.A.A.K.S. Were Not an Integrated Enterprise.

Plaintiffs fare no better under an "integrated enterprise" theory, which requires Plaintiffs prove that McDonald's and the Dickerson Organization had (1) interrelated operations; (2)

common management, directors, and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. *Swallows*, 128 F.3d at 993–94. The undisputed evidence demonstrates that none of these factors is met.

First, there is no interrelatedness of operations because McDonald's had no access to the Dickerson Organization's bank accounts or payroll (ECF 154-7, PageID.3153, Dickerson Deposition 267:12–20); Mason Restaurant employee records were kept either at the Mason Restaurant or the Dickerson Organization's corporate offices—which were not shared by McDonald's (*Id*., PageID.3135, Dickerson Deposition 64:9–65:18; ECF 154-8, PageID.3158, Bitner Deposition 59:21–60:4; ECF 154-9, PageID.3170 Pyers Deposition 83:17–23); and the Dickerson Organization owned the equipment in the Mason Restaurant.   (ECF 154-7, PageID.3143, Dickerson Deposition 161:14–22; ECF 154-3, PageID.3087–3088, Franchise Agreement ¶ 12(b)); *Swallows*, 128 F.3d at 994 (no interrelated operations where defendants "kept their own records, and maintained separate bank accounts and offices"); *Alberter*, 70 F. Supp. 2d at 1143 ("The two companies did not share office space, equipment, or telephone lines…[they] maintained separate bank accounts, books, accounting records, lines of credit, payroll accounts, and personnel records.").

Second, there was no "common management," as Dickerson was the sole director and officer of MLMLM and M.A.A.K.S. (ECF 154-7, PageID.3134, Dickerson Deposition 44:14–45:8); managers and supervisors of the Dickerson Organization were employed only by Dickerson's companies (*Id*., PageID.3142, Dickerson Deposition 150:22–152:3; ECF 154-8, PageID.3162, Bitner Deposition 194:22–195:13); and no one from McDonald's had any role in managing the day-to-day operations of the Mason Restaurant.   (ECF 154-7, PageID.3153, Dickerson Deposition 268:1–12; ECF 154-3, PageID.3089, Franchise Agreement ¶ 13); *Alberter*,

70 F. Supp. 2d at 1143 ("None of McDonald's managers worked at he [sic] Lemmon Valley restaurant; none had any control over management of the Lemmon Valley restaurant.").

Third, as discussed in detail above, there was no centralized control of labor relations because McDonald's had no control over the terms and conditions of Plaintiffs' employment, *see supra* Parts I(D), II(A).   (ECF 154-7, PageID.3153, Dickerson Deposition 266:11–268:12); *Swallows*, 128 F.3d at 995 (no centralized control of labor relations where university defendant had no authority to hire or fire Barnes & Noble employees, and was not responsible for paying plaintiffs); *Gray*, 874 F. Supp. 2d at 750 ("no evidence indicates that McDonald's retains the ability to hire, fire, or discipline an employee.").

Finally, there was no common ownership or financial control between McDonald's on the one hand, and MLMLM/M.A.A.K.S. on the other, as Plaintiffs cannot prove either entity was a sham.  *Gray*, 874 F. Supp. 2d at 750 ("[T]he fourth Swallows prong is not met because it is undisputed that neither McDonald's nor Century is a sham entity."); *see Swallows*, 128 F.3d at 995.  Even so, McDonald's did not have an ownership interest in MLMLM or M.A.A.K.S. (ECF 154-7, PageID.3134, Dickerson Deposition 44:17–45:23) or otherwise have control over their finances, and vice versa.  (*Id*., PageID.3153, Dickerson Deposition 267:12–20); *Evans*, 936 F.2d at 1090 ("McDonald's did not have financial control over [franchisee's] franchises.").

### C.   Plaintiffs' "Apparent Agency" Theory Does Not Apply Under Title VII or the ELCRA.

Unable to establish that McDonald's directly or jointly employed them, Plaintiffs pivot to allege that "McDonald's USA and McDonald's Corporation are liable for the acts of MLMLM and M.A.A.K.S. because MLMLM and M.A.A.K.S. were the apparent agents of McDonald's USA and McDonald's Corporation."  (ECF 142, PageID.2456.)  In other words, they claim McDonald's was their "apparent" employer.  But that theory fails.  The statutory definition of "employee" under

Title VII is "an individual *employed by* an employer[.]"  42 U.S.C. § 2000e(f) (emphasis added).

And the hallmark of an employment relationship under Title VII is control: the employer's control

over hiring, firing, wages, and other terms and conditions of the employee's work.  *See Wright*,

2016 WL 1060341, at *4 (noting that "the common-law element of control remains the principal

guidepost").  The definition of an employee under Title VII cannot be stretched to include plaintiffs

who mistakenly believe they are employed by an entity that in fact lacks *actual* authority and

control over the terms and conditions of their employment.  Nor does the Restatement contemplate

a franchisor's tort liability for a franchisee's employee's misconduct—against a fellow

employee—because of "logos," "branding," "trademarks," and the like, as Plaintiffs suggest.

*Compare* (ECF 142, PageID.2481), *with* Restatement (Third) of Agency § 7.08.

### 1.    Title VII and the ELCRA Do Not Create Liability for an "Apparent" Employer or "Apparent" Employment Relationship.

"A prerequisite to maintaining an action under Title VII or Elliott Larsen is that a plaintiff

be an *'employee' of the defendant.*"  *Savas v. William Beaumont Hosp.*, 216 F. Supp. 2d 660, 664

(E.D. Mich. 2002) (emphasis added).  That means, "[t]o establish Title VII liability on the part of

a *particular* defendant, the plaintiff must prove both that the defendant meets Title VII's definition

of 'employer,' … and that an employment relationship existed between h[er] and that defendant,"

*Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, __F. Supp. 3d__, 2020 WL 1248263, at *7

(W.D. Tex. 2020), such that the particular defendant exercised actual "control over the employee,"

*Nethery*, 814 F. App'x at 104 (citing *Satterfield v. Tennessee*, 295 F.3d 611, 618 (6th Cir. 2002));

*see also Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 795 (6th Cir. 2000) ("Congress chose

to limit Title VII liability to employers only"); *Seabrook v. Mich. Nat'l Corp.*, 520 N.W.2d 650

(Mich. Ct. App. 1994) (ELCRA) (granting summary judgment to a holding company because it

did not employ the plaintiff).

24

An "apparent agency relationship" between McDonald's and MLMLM/M.A.A.K.S., as alleged, cannot establish an actual "employment relationship" between McDonald's and Plaintiffs under Title VII or the ELCRA.  As an initial matter, the statutory definition of "employer" does not, as so alleged, include an "*apparent* employer," or, conversely, an "*apparent* agent" of an employer.  *Compare* 42 U.S.C. § 2000e(f) ("employer" includes "agent of such person."); MCL § 37.2201 (same).  In the same vein, the statutory requirement of an employment relationship is not satisfied where none actually exists.  *See Nethery*, 814 F. App'x at 104.

The apparent agency theory, by its very nature, disregards the actual control necessary to establish a statutory employment relationship under Title VII and the ELCRA.  "Apparent agents" encompass only "actors who *appear* to be agents *but are not*." Restatement (Third) § 2.03(a) (emphasis added); *see also* Restatement (Second) § 8(a) ("apparent authority" is "entirely distinct from authority, either expressed or implied"); *Apparent*, Oxford English Dictionary (3d ed. 2020) ("Contrasted with *real*").  *Compare* 42 U.S.C § 2000e (defining "employer" to include "agents"); MCL § 37.2201 (same).  The statutory text and logic should control here, not common-law concepts that conflict with them.  *See Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) ("absent provision[s] cannot be supplied by the courts"); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986)) (noting the Restatement and common-law principles are not "transferable in all their particulars to Title VII"); *cf. Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 108 (6th Cir. 1996) (holding debt collector cannot create vicarious liability for its principal if the principal *itself* is not a "debt collector" under the statutory definition).  To allow apparent agency as a basis for Title VII and ELCRA liability would render meaningless the statute's focus on "the employer-employee relationship." *Satterfield*, 295 F.3d at 618; *accord Nethery*, 814 F. App'x at 104.

On this score, other courts have rejected an "apparent employer" application under Title VII.  *See, e.g.*, *Gray v. McDonald's USA, LLC*, 874 F. Supp. 2d 743, 751–52 (W.D. Tenn. 2012) (rejecting application because (i) McDonald's did not "meet[] the statutory definition of 'employer' under the THRA [or Title VII]," and (ii) other cases "involve third-party plaintiffs who have no previous relationship with the defendant"); *Wright*, 2016 WL 1060341, at *9–10 (W.D. Va. Mar. 11, 2016) (rejecting application in the sexual harassment context).  Other courts, too, have held the doctrine does not apply under Title VII.  *See, e.g.*, *Dotson v. McDonald's Corp.*, 1998 WL 164871, at *3–4 (N.D. Ill. Apr. 2, 1998) (rejecting application because there are "no cases that attach liability in a sexual harassment case such as this under the apparent agency theory proposed by Plaintiffs").

Moreover, reading the statute to extend this far would produce absurd results, allowing franchisee employees to take an easy stroll to a jury trial at the non-employer franchisor's expense by claiming they were "unaware of how [a] system of franchising worked" and "believed that they worked for the global [franchisor]"—even if they also knew, for example, that franchisee owner's title was "owner" and the franchisee's "unexplained initials" were "on their paystubs."  (ECF 142, PageID.2477); *see also United States. v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018) ("[A]bsurd results are to be avoided.").  As explained above, Plaintiffs cannot meet the joint-employer, actual-agency, or integrated-enterprise tests to establish an employment relationship with McDonald's, and so they should not be able to circumvent those tests based on their mistaken alleged belief that MLMLM and M.A.A.K.S. were McDonald's agents.  Those other tests, *see supra*, comport with the statutory definitions and requirements because those tests assess whether the defendant in fact had the ability to control the plaintiffs' terms and conditions of work.  But the *apparent* agency doctrine does not.

For this independent reason, Plaintiffs' apparent agency theory fails.

> **2.      The Restatement's Definition of "Apparent Authority" Does Not Apply Where There Is No Link Between the Alleged Apparent Authority and the Tortious Conduct.**

Even if Title VII and the ELCRA contemplated an "apparent employer" (or "apparent agent or subagent")—they do not—this theory still would fail under the Restatement.  Courts have at times consulted common law agency and tort principles to help interpret employment discrimination statutes.  *See, e.g.*, *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013) (citing Restatement (Third) of Agency in Title VII context); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (citing Restatement (Third) of Torts in Title VII context); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (analyzing employment discrimination statute and stating that "when Congress creates a federal tort it adopts the background of general tort law").  *But cf. Burlington Indus.*, 524 U.S. at 755 (citing *Meritor*, 477 U.S. at 72) (noting the Restatement and common-law principles are not "transferable in all their particulars to Title VII").  But even by their own terms, the principles demonstrate that apparent agency cannot expand Title VII and ELCRA liability to non-employers.

The Restatement's Chapter 7 ("Torts—Liability of Agent and Principal") and Section 7.08 ("Agent Acts with Apparent Authority") are instructive.  Chapter 7 teaches that "[t]he torts to which this section applies are those in which an agent appears to deal or communicate on behalf of a principal and the agent's appearance of authority *enables* the agent to commit a tort or conceal its commission."  *Id.* § 7.08 (emphasis added).  "Such torts include fraudulent and negligent representation[], defamation, tortious institution of legal proceedings, and conversion of property obtained by agent purportedly at the principal's direction."  *Id.* cmt. a.  By contrast, "[a]pparent authority rarely serves as a basis for liability when an employee or agent commits an intentional physical tort," *id.* cmt. b, as "the rule … is inapplicable when a third party does not reasonably

27

believe that an *agent's action has been authorized by the principal*," *id.* cmt. a (emphasis added); *cf. Staub*, 562 U.S. at 411 (calling an employment discrimination claim an "intentional tort"). After all, "[w]hen an agent's conduct constitutes a tort such as assault … only in unusual circumstances would a third party harmed by the tort believe that the agent acted with actual authority in committing it." Restatement of Agency § 7.08; *see id.* § 3.11(2) (noting "apparent authority ceases when it becomes unreasonable for the third party to believe that the agent continues to act with actual authority"); *see also* Restatement (Third) of Employment Law § 4.03 ("Apparent authority is of limited relevance to employer liability for harm to their employees. Only rarely will an employee or third party suffer aggravated harm as a result of a reasonable belief, caused by an employer or its authorized agent or employee, that an employee has authority to commit wrongful acts outside the scope of employment or agency.").

That all means that Plaintiffs' "apparent agency" theory has no home in Title VII, even under the Restatement. *See, e.g.*, *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 562 (7th Cir. 1997) (en banc) (Manion, J., concurring in part and dissenting in part) (explaining how under Title VII "[a]pparent authority is the square peg that doesn't fit into this round-hole discussion"). And, even if it did, there is no evidence in the record to support that McDonald's *knew* Swing Manager Banks or any of the Plaintiffs, let alone that Plaintiffs reasonably believed that sex harassment was occurring under McDonald's "actual authority." *See id.* Instead, Plaintiffs merely allege, for example, that "the McDonald's Corporate Defendants permitted the use of their logos, branding, and trademarks at the restaurant"—and that permission "made Defendants MLMLM and M.A.A.K.S. the ostensible and apparent agents of the McDonald's Corporate Defendants." (ECF 142, PageID.2481.)

28

Nor is there a connection between typical franchise branding and advertising arrangements, on the one hand, and fostering a *hostile work environment* in violation of Title VII and the ELCRA, on the other.  *See* Restatement of Agency § 7.08 (requiring a "close link between an agent's tortious conduct and the agent's apparent authority").  As the Restatement's illustrations teach, McDonald's is quite clearly "not subject to liability" because Plaintiffs cannot establish that MLMLM and M.A.A.K.S. acted with *apparent* authority in allegedly enabling a hostile work environment.  *See id.* cmts.  Plaintiffs' apparent agency theory fails, even under the Restatement.

### D.    McDonald's Is Not Liable Under an Apparent Agency Theory.

Even if an apparent agency theory could apply here, Plaintiffs fail as a matter of law to satisfy the requisite elements.  To establish liability under an apparent agency theory, Plaintiffs must prove that (1) McDonald's made a manifestation to Plaintiffs that MLMLM and M.A.A.K.S. were its agents, and (2) Plaintiffs reasonably believed, based on such manifestation, that MLMLM and M.A.A.K.S. had authority to act on McDonald's behalf as to Plaintiffs' employment.  *See* Restatement of Agency § 2.03 (plaintiff must reasonably believe the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations); *see Burlington Indus.*, 524 U.S. at 755 (noting the Restatement "is a useful beginning point" and that "state-court decisions, applying state employment discrimination law," are "instructive.").  The ELCRA further requires that Plaintiffs relied on manifestations by McDonald's to their *detriment.  Little v. Howard Johnson Co.*, 183 Mich. App. 675, 683 (1990) ("[T]he alleged principal must have made a representation that leads the plaintiff to reasonably believe that an agency existed and to suffer harm on account of a justifiable reliance thereon."); *accord Whitfield v. McDonald's*, 2010 WL 6593297 (Mich. Cir. Ct. July 28, 2010) (holding franchisee not apparent agent of McDonald's). Plaintiffs cannot cite evidence sufficient to pass these stringent tests.

### 1.   Plaintiffs Cannot Show McDonald's Made a Manifestation Regarding MLMLM's or M.A.A.K.S.' Authority as an Employer.

To establish that McDonald's made a manifestation, Plaintiffs must show that McDonald's represented—or directed MLMLM and M.A.A.K.S. to represent—that they were authorized to act on McDonald's behalf and hold out that McDonald's was the employer responsible for the work environment.  *See* Restatement of Agency § 2.03 ("Manifestations … include explicit statements that an [apparent] principal makes directly to a third party [and] statements made by others concerning an actor's authority that reach the third party and are traceable to the principal"—e.g., "by directing an agent to make statements to third parties…"); *Doelle v. Nemeth*, 2018 WL 4927147, at *8 (Mich. App. Ct. Oct. 9, 2018) (granting summary disposition for defendant, noting that "the [apparent] principal must have done something that would create in the third party's mind the reasonable belief that the [apparent] agent was acting on behalf of the [apparent] principal").

There is no record evidence to establish that, at any time during Plaintiffs' employment at the Mason Restaurant, McDonald's held itself out or made representations directly or indirectly to Plaintiffs that McDonald's—and not MLMLM (or M.A.A.K.S.)—employed them.  The limited evidence that can be traced back to McDonald's proves the opposite.  Each Plaintiff completed and signed a Licensee Crew Member Records Folder—an optional resource made available by McDonald's USA (ECF 154-5, PageID.3121, Mullaney Deposition 51:13–24)—which states:

> "I acknowledge that I am applying for employment with an independently owned and operated McDonald's franchise, a separate company and employer from McDonald's Corporation and any of its subsidiaries."

(ECF 154-13, PageID.3196, Ries Deposition 71:10–23; ECF 155-1, PageID.3291, Ries Records Folder; ECF 154-14, PageID.3218, Barber Deposition 104:21–105:24; ECF 155–2, PageID.3293, Barber Records Folder; ECF 154-15, PageID.3235, Anibal Deposition 40:4–24; ECF 155-3, PageID.3295, Anibal Records Folder; ECF 154-16, PageID.3252, Bishop Deposition 51:19–

30

52:19; ECF 155-4, PageID.3297, Bishop Records Folder.)   Additionally, McDonald's USA provided Dickerson with plaques to hang in his restaurants that identified the owner of the store and, during graded visits, checked to see if the plaques were posted.  (ECF 154-6, PageID.3130 Thelen Deposition 118:8–22; ECF 154-7, PageID.3151–3152, Dickerson Deposition 222:13–22, 260:9–261:13.)

Plaintiffs all testified that they never spoke to anyone from McDonald's about their employment.   (ECF 154-13, PageID.3209, Ries Deposition 222:7–223:5; ECF 154-14, PageID.3227, Barber Deposition 238:22–239:23; ECF 154-15, PageID.3245, Anibal Deposition 108:8–109:9; ECF 154-16, PageID.3259, Bishop Deposition 115:23–116:2, 117:15–23.)   The absence of evidence showing that McDonald's made any representation holding itself out as Plaintiffs' employer—or as MLMLM or M.A.A.K.S.'s principal with respect to any alleged sexual harassment or hostile work environment—dooms Plaintiffs' claims.  *See, e.g.,* Restatement of Agency § 2.03 (requiring a "manifestation of a principal"); *see also Doelle*, 2018 WL 4927147, at *8 ("the [apparent] principal must have done something that would create in the third party's mind the reasonable belief that the [apparent] agent was acting on behalf of the principal").

Plaintiffs will likely argue that McDonald's made a manifestation by allowing the Dickerson Organization to display McDonald's logos and branding (ECF 142, PageID.2477), but, in the employment context, branding and logos are insufficient manifestations of an agency relationship or of apparent control over the terms and conditions of employment because they relate merely to quality.  *See, e.g.*, *Cropp*, 2009 WL 10710585, at *6 (granting McDonald's motion for summary judgment, opining that "the placement of the McDonald's name on uniforms, pay reports, and signs do not amount to a representation of an agency relationship"); *Walton v. May*, 2020 WL 5578422, at *3 (M.D. Ga. July 8, 2020) (finding signage alone insufficient and granting

31

summary judgment for franchisor); *D.L.S. v. Maybin*, 130 Wash. App. 94, 103 (Wash. Ct. App. 2005) (dismissing complaint against McDonald's because "[u]sing young people in advertisements … [was] not enough to create an employment relationship between McDonald's Corporation and its franchisees' employees").

### 2.    Plaintiffs Did Not Reasonably Believe or Rely on Any Alleged McDonald's Manifestation.

Even if McDonald's branding could be a sufficient manifestation of an agency relationship with the franchisee, Plaintiffs must also show that they *reasonably* believed the manifestations, such that the manifestations factored into their decision to accept employment with the franchisee. *See, e.g., Cropp*, 2009 WL 10710585, at *6 (no reliance where plaintiff failed to show that the identity of the franchisor played any role in plaintiff's decision to accept employment at the restaurant); *cf. Wright*, 2016 WL 1060341, at *10 (W.D. Va. Mar. 11, 2016) (granting franchisor's motion to dismiss where plaintiff could not show that she relied on the franchisor's mark in accepting employment); *O'Banner v. McDonald's Corp.*, 173 Ill.2d 208, 213 (1996) ("Even if one concedes that McDonald's advertising and other conduct could entice a person to enter a McDonald's restaurant in the belief it was dealing with an agent of the corporation itself, that is not sufficient.").  The Michigan ELCRA requires that plaintiffs prove justifiable reliance upon a principal's representations *and* resulting harm—i.e., *detrimental* reliance.  *Little*, 455 N.W.2d at 394 (granting summary judgment for franchisor where plaintiff could not demonstrate harm resulting from her belief that franchisee was an agent).[4]

---

[4] Courts are critical of employee-plaintiffs' reliance on branding, as opposed to customer plaintiffs, because employees are presumed to be familiar with their employer. *See, e.g., Gray*, 874 F. Supp. 2d at 752 (finding that customer cases "focus[ed] on appearances as an indicator of agency…because they had no other knowledge of the actual relationship between the franchisee and the franchisor"); *see also Mann v. Prudential Real Estate Affiliates, Inc.*, 1990 WL 205286, at

Here, there is no evidence showing a bona fide belief (or corresponding reliance)—let alone a *reasonable* belief—in any purported manifestation by McDonald's that McDonald's employed Plaintiffs or that MLMLM or M.A.A.K.S. were McDonald's agents for the purposes of Plaintiffs' employment.  Critically, the evidence shows that the Dickerson Organization informed Plaintiffs that they were employed by an independent owner-operator, both during orientation and throughout their employment.  (ECF 154-7, PageID.3151, Dickerson Deposition 222:13–223:1.) Dickerson testified that Mason Restaurant employees "were told at the time of hire" that they were employed by the Dickerson Organization, and that "[w]e were very clear" as to who was their employer.  (*Id*.)  For example, "[i]n every store, we had posters up that says, 'this franchise is operated by Mike Dickerson.'"  (*Id*.)  As another example, Ries, Barber, and Bishop[5] initialed an Employment Policy in the MLMLM Corporation Employee Handbook that states in relevant part:

> Who is Your Employer? The McDonald's restaurant you work at is owned and operated by an independent McDonald's Franchisee (your 'owner/operator'). This is your employer. McDonald's Corporation is not involved in any way in the employment matters of the independently owned McDonald's restaurants.
>
> Individuals employed by independent owners of McDonald's restaurants are not employees of McDonald's Corporation or of its subsidiaries.
>
> …. Your employment is "at will." This means that both you and MLMLM Corporation are free to terminate employment at any time, with or without notice, for any reason or no reason at all.

---

*5, n.2 (N.D. Ill. Dec. 10, 1990) (dismissing claims against franchisor, finding significant that the plaintiffs were employees and not customers who may more reasonably rely on branding).

[5] Anibal did not initial this policy, but it was maintained in her personnel file with other documents she signed.  (ECF 154-15, PageID.3235–3236, Anibal Deposition 40:1–24, 41:22–42:15; ECF 154-25, PageID.3279, Anibal Employer Policy.)  In any event, she testified that she did not believe she worked for McDonald's Corporation or McDonald's USA. (ECF 154-15, PageID.3244, Anibal Deposition 102:22–103:20.)

(ECF 154-13, PageID.3200, Ries Deposition 112:1–14, ECF 154-19, PageID.3267, Ries Employer Policy; ECF 154-14, PageID.3220, Barber Deposition 164:3–6; ECF 154-22, PageID.3273, Barber Employer Policy; ECF 154-16, PageID.3259, Bishop Deposition 116:16–117:7; ECF 154-28, PageID.3285, Bishop Employer Policy.)  Bishop also initialed a welcome letter signed by "Mike Dickerson, Owner/Operator," that states:

> Welcome to MLMLM Corporation d/b/a McDonald's (the "Company")…If you should have any questions about anything in this Handbook or about the Company in general, please contact Nan Bitner, Jen Sheldon, Heidi [Pyers] or myself.

(ECF 154-16, PageID.3254, Bishop Deposition  62:11–22; ECF 154-29, PageID.3287, Bishop Welcome Letter.)

Furthermore, the undisputed evidence demonstrates that Plaintiffs understood that Dickerson owned the Mason Restaurant and that they were told that MLMLM was their employer:

- Plaintiffs knew Mike Dickerson owned the Mason Restaurant.  (ECF 154-13, PageID.3198, Ries Deposition 80:15–24; ECF 154-14, PageID.3213, 3228, Barber Deposition 41:2–13, 243:12–244:1; ECF 154-15, PageID.3236, Anibal Deposition 44:18–45:13; ECF 154-16, PageID.3253, Bishop Deposition 55:1–10.)

- Bishop knew Dickerson was the owner before working at the Mason Restaurant, having been previously employed by the Dickerson Organization at another location.  (ECF 154-16, PageID.3248, 3253, Bishop Deposition 19:2–20:8; 55:1–10.)

- MLMLM was listed as the employer on Plaintiffs' paychecks and W2s.  (ECF 154-13, PageID.3197–3198, Ries Deposition 77:1–78:7; ECF 154-14, PageID.3226–3227, Barber Deposition 237:1–238:3; ECF 154-15, PageID.3242–3243, Anibal Deposition 73:18–74:5; ECF 154-16, PageID.3256, Bishop Deposition 74:11–15.)

- Barber and Ries understood MLMLM was their employer.  (ECF 154-13, PageID.3197–3198, Ries Deposition 77:1–78:7; ECF 154-14, PageID.3225, 3228, Barber Deposition 233:1–5, 243:12–16.)

- Bishop was told at orientation that MLMLM was her employer.  (ECF 154-16, PageID.3261, Bishop Deposition 123:4–10.)

- Anibal did not believe she worked for McDonald's Corporation or McDonald's USA, which is fatal to her claim.  (ECF 154-15, PageID.3244, Anibal Deposition 102:22–103:20.)

Finally, no evidence shows Plaintiffs relied on a manifestation by McDonald's regarding an employment relationship when deciding to work at the Mason Restaurant. *Doelle*, 2018 WL 4927147, at *8 (affirming summary judgment for defendant where plaintiff failed to prove "that she relied on any purported agency relationship to her detriment.")

- Ries decided to work at the Mason Restaurant because she needed a job and it was close to where she lived.  (ECF 154-13, PageID.3204, Ries Deposition 199:15–200:7.)

- Barber decided to work at the Mason Restaurant because GM Robertson invited her to apply and "because it paid more than Subway."  (ECF 154-14, PageID.3224, Barber Deposition 227:17–228:5.)

- Anibal decided to work at the Mason Restaurant, instead of the Culver's, A&W, or Wendy's to which she also applied, because she knew people who worked there and she "heard back from that [restaurant] the soonest." (ECF 154-15, PageID.3233–3234, Anibal Deposition 29:14–30:3.)

- Bishop did not know why she applied to the Mason Restaurant, but admitted she chose to work there instead of the Wendy's or Subway to which she also applied because she did

not hear back from Wendy's and was offered the job at the Mason Restaurant first.  (ECF 154-16, PageID.3250–3251, Bishop Deposition 45:15–46:25.)

Ries, Barber, and Bishop now self-servingly claim that they did not know what "MLMLM" meant or thought it was another name for McDonald's or that Dickerson worked for McDonald's. (ECF 154-13, PageID.3207, Ries Deposition 215:3–15; ECF 154-14, PageID.3227, Barber Deposition 238:18–21; ECF 154-16, PageID.3259, Bishop Deposition 114:18–23.)  But such assertions are not reasonable as a matter of law in light of the other record evidence, including Plaintiffs' own admissions.  Further, Plaintiffs' alleged reliance on branding and logos does not suffice in the employment discrimination context to create a genuine issue of material fact as to the reasonable belief necessary to establish apparent agency.  *See, e.g., Cropp*, 2009 WL 10710585, at *7 (holding that because "McDonald's Corporation did not operate the Restaurant … it is not liable to the plaintiff under a theory of apparent agency"); *cf. Viches v. MLT, Inc*., 127 F. Supp. 2d 828, 832 (E.D. Mich. 2000) ("A franchisor's insuring the uniformity and standardization of services, however, does not give rise to an agency relationship.") (collecting cases); *Mann*, 1990 WL 205286, at *5, n.2 (dismissing claims against franchisor, finding significant that the plaintiffs were employees and not customers who may more reasonably rely on branding).  If such evidence were enough to survive summary judgment in the face of all other evidence presented here, franchisors would face a jury trial any time a franchisee employee alleged an apparent-agency theory and testified that she thought the franchisor and franchisee were the same company.  That is not the law.  Courts routinely find that beliefs in this context are not reasonable as a matter of law and this Court should do so again in this instance.  *See, e.g.*, *Mann*, 1990 WL 205286, at *5.

E.      **Plaintiffs Lack Standing to Seek Injunctive Relief.**

Finally, McDonald's is entitled to summary judgment on Plaintiffs' claims for injunctive relief because, as former employees, they lack Article III standing to pursue it.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011) (observing that "plaintiffs no longer employed by Wal-Mart lack standing to seek injunctive or declaratory relief against its employment practices") (Title VII).  Plaintiffs who seek damages "must demonstrate standing separately for each form of relief sought"—including "injunctive relief."  *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018).  Named plaintiffs who represent a putative class must prove that they each independently satisfy standing requirements, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Rosen v. Tenn. Comm'r of Fin. And Admin.*, 288 F.3d 918, 928 (6th Cir. 2002) (similar).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects" and a "likelihood of substantial and immediate irreparable injury."  *Los Angeles v. Lyons*, 461 U.S. 95, 102, 111 (1983) (cleaned up).

Here, as of the date of the Original Complaint, not a single named Plaintiff was (or is) employed at the Mason Restaurant (or any other McDonald's brand restaurant for that matter). (ECF 154-13, PageID.3201, Ries Deposition 137:13–16; ECF 154-14, PageID.3223, Barber Deposition 188:5–24; ECF 154-15, PageID.3232, Anibal Deposition 24:16–24; ECF 154-16, PageID.3258, Bishop Deposition 87:8–12.)   And, as of the date of the Original Complaint, Banks—the alleged harasser—was no longer employed at the Mason Restaurant.  (ECF 154-7, PageID.3144, Dickerson Deposition 176:14–17.)  Accordingly, Plaintiffs clearly lack standing to seek injunctive relief under Title VII.  *See, e.g.*, *Walsh v. Nevada Dept. of Human Resources*, 471

F.3d 1033, 1037 (9th Cir. 2006) (finding former employee "would not stand to benefit from an injunction requiring the anti-discriminatory policies she requests at her former place of work").

**CONCLUSION**

For the reasons explained above, there is no genuine issue of material fact as to the claims against McDonald's Corporation and McDonald's USA, such that they are entitled to summary judgment on all claims.

Dated:      June 11, 2021                              Respectfully submitted,

                                                       /s/  *Jennifer W. Plagman*
                                                       Elizabeth B. McRee
                                                       Jennifer W. Plagman
                                                       JONES DAY
                                                       77 West Wacker
                                                       Chicago, IL  60601.1692
                                                       Telephone:    +1.312.782.3939
                                                       Facsimile:     +1.312.782.8585
                                                       emcree@jonesday.com
                                                       jplagman@jonesday.com

                                                       Andrew J. Clopton
                                                       JONES DAY
                                                       150 W. Jefferson, Suite 2100
                                                       Detroit, MI 48226.4438
                                                       Telephone:    +1.313.733.3939
                                                       Facsimile:     +1.313.230.7997
                                                       aclopton@jonesday.com

                                                       *Attorneys for Defendants McDonald's*
                                                       *Corporation and McDonald's USA, LLC*