UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JENNA RIES, KATLYN BARBER,
EMILY ANIBAL AND JOANNE BISHOP,

      Plaintiffs,

v.

McDONALD'S USA, LLC, McDONALD'S
CORPORATION, MLMLM CORP., and
MAAKS. INC.

      Defendants.

Case No: 1:20-cv-0002-HYJ-RSK
District Judge Hala Y. Jarbou
Magistrate Judge Ray Kent

_____

**BRIEF SUPPORTING MOTION BY
DEFENDANTS MLMLM CORPORATION AND
MAAKS, INC. FOR PARTIAL SUMMARY JUDGMENT**


**<u>ORAL ARGUMENT REQUESTED</u>**


{00108488.DOCX}

# Table of Contents

Table of Contents .................................................................................................. i

Index of Authorities ............................................................................................ iii

Introduction ......................................................................................................... 1

Statement of Facts and Procedural History ........................................................ 1

    A. Defendants MLMLM and MAAKS enforced a no-tolerance policy for sexual harassment while all the named Plaintiffs worked for MLMLM .......... 1

    B. Plaintiff Ries quit working for MLMLM several months after she reported Mr. Banks, his employment was terminated and she was transferred to a new store ............................................................................................. 7

    C. Plaintiff Barber claims to have been constructively discharged, but told friends that she left the Mason restaurant because of what the general manager of the store had done .......................................................... 12

    D. Emily Anibal never reported any alleged sexual harassment while she worked for MLMLM at the Mason restaurant ..................................... 13

    E. Plaintiffs are seeking monetary and injunctive relief under Title VII of the Civil Rights Act of 1964 and Michigan's ELCRA .......................... 15

Argument ........................................................................................................... 17

    A. Summary Judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law .......................................................................................................... 18

    B. This Court should find that the admitted failure by Plaintiff Anibal to report the alleged harassment bars her ELCRA claim as a matter of law ......... 19

        1. There is a five part test for determining if an employer is liable for alleged harassment by an employee ............................................. 20

2.  MLMLM and MAAKS are not liable to Plaintiff Anibal as a matter of law on her claim that he pushed her ...........................................................21

3.  Plaintiff Anibal cannot show that MLMLM or MAAKS had actual or constructive notice of the alleged harassment by Mr. Banks......................23

4.  Mr. Banks was not the employer of Plaintiff Anibal ...................................27

C.  This Court should find that Plaintiffs Ries, Barber and Anibal were not constructively discharged as a matter of law......................................................29

1.  Plaintiff Ries was not constructively discharged as a result of any conduct by Mr. Banks, but instead quit because she did not like being suspended for walking out of work in the middle of a shift........................30

2.  Plaintiff Barber was not constructively discharged because she admittedly quit working for MLMLM because of numerous issues that she had with her supervisors ........................................................................32

3.  Even if Plaintiff Anibal can prove that she has a potential sexual harassment claim against MLMLM or MAAKS, she cannot prove that she was constructively discharged as a matter of law .................................34

D.  Plaintiffs cannot pursue their claims for injunctive relief against MLMLM and MAAKS as a matter of law.........................................................................35

1.  Plaintiffs do not have standing to seek injunctive relief against any of the Defendants in this case ............................................................................36

2.  The claims for injunctive relief against MLMLM and MAAKS are moot because they no longer operate the Mason restaurant or any other McDonald's franchise .................................................................................37

Conclusion and Relief Requested ........................................................................37

Statement of Compliance with Local Rule 7.2(b)(1)..........................................38

## Index of Authorities

**Case Law**

*Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242 (1986) ........................................................................................19, 22

*Brown v. Brown*,
478 Mich. 545, 739 N.W.2d 313 (2007) ....................................................22

*Cacevic v. City of Hazel Park*,
226 F.3d 483 (6th Cir. 2000) ................................................................18, 19

*Chambers v. Trettco, Inc.*,
463 Mich. 297, 614 N.W.2d 910 (2000).........................................21, 27, 28

*Chambers v. Trettco, Inc. (on remand),*
244 Mich. App. 614, 624 N.W.2d 543 (2001).........................................24, 25

*Elezovic v. Ford Motor Company*,
472 Mich. 408, 697 N.W.2d 951 (2005).................................................22-24

*Hamed v. Wayne County*,
490 Mich. 1, 803 N.W.2d 237 (2011)......................................................21, 22

*Jager v. Nationwide Truck Brokers, Inc.*,
252 Mich. App. 464, 652 N.W.2d 503 (2002),
ovveruled on other grounds by *Elezovic v. Ford Motor Company*,
472 Mich. 408, 697 N.W.2d 951 (2005).................................................30, 34

*Lewis v. Casey*,
518 U.S. 343, 357 (1996)............................................................................36

*Los Angeles v. Lyons*,
461 U.S. 95, 102, 111 (1983)......................................................................36

*McPherson v. Mich. High Sch. Ath. Ass'n*,
119 F.3d 453 (6th Cir. 1997) .....................................................................37

*Nathan v. Great Lakes Water Auth.*,
992 F.3d 557 (6th Cir. 2021) .....................................................................20

*Pennsylvania State Police v. Suders*,
542 U.S. 129 (2004).................................................................................29

*Radtke v. Everett*,
442 Mich. 368, 501 N.W.2d 155 (1993).......................................................*passim*

*Rosen v. Tenn. Comm'r of Fin. And Admin.*,
288 F.3d 918 (6th Cir. 2002) ....................................................................36

*Sheridan v. Forest Hills Public Schools*,
247 Mich. App. 611, 637 N.W.2d 536 (2001)...........................................24, 25

*Thornton v. Federal Express,*
530 F.3d 451 (6th Cir. 2008) ....................................................................26

*Vance v. Ball State University*,
570 U.S. 421, 424 (2013)......................................................................27, 28

*Wal-Mart v. Dukes,*
564 U.S. 338 (2011) ................................................................................36

*Walsh v. Nevada Dept. of Human Resources*,
471 F.3d 1033 (9th Cir. 2006) ..............................................................36, 37

**Federal Rules**

Fed. R. Civ. P. 56(a).................................................................................18

Fed. R. Civ. P. 56(c)(1).............................................................................19

## INTRODUCTION

Plaintiffs make a number of allegations in this case.  But, after discovery, Plaintiff Emily Anibal cannot prove that she has a viable legal claim against Defendants MLMLM Corporation or MAAKS, Inc.  Moreover, she and both Plaintiffs Jenna Ries and Katlyn Barber cannot prove that they were constructively discharged.  Finally, none of the Plaintiffs are entitled to any injunctive relief because they lack standing to request it and their claims are now moot.  Therefore, this Court should grant the Motion for Partial Summary Judgment filed by MLMLM and MAAKS.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   Defendants MLMLM and MAAKS enforced a no-tolerance policy for sexual harassment while all the named Plaintiffs worked for MLMLM.

Michael Dickerson is the owner and principal of Defendants MLMLM Corporation and MAAKS, Inc.  (ECF 142, Third Amended Complaint ("TAC"), ¶¶ 20-21, PageID.2453).[1]  Mr. Dickerson has a twelfth grade education and began working in a McDonald's corporate restaurant when he was 16 or 17 years old.  (ECF 161-2, Dickerson Deposition, pp. 26:10-16; 30:11-13, PageID.3412-PageID.3413).

---

[1] Because this is a Rule 56 Motion, MLMLM and MAAKS recognizes that this Court should assume the truth of unrebutted allegations in the Third Amended Complaint. Therefore, they are citing to this pleading, but are not amending their response to those allegations by doing so.

{00108488.DOCX}                           1

After rising to the level of area supervisor and field consultant, Mr. Dickerson purchased his first McDonald's franchise in 1993.    (ECF 161-2, Dickerson Deposition, pp. 30:23-7; 31:22-32:9; 72:9-17, PageID.3413, PageID.3415-3416). He eventually owned 11 McDonalds franchises, which were sold in August 2021. (ECF 154-7, Dickerson Deposition, pp. 71:2–75:9, PageID.3136–3137, 3415-3416; ECF 154-3, Franchise Agreement PageID.3082–3099) (ECF 142, TAC, ¶ 23 and n. 11, PageID.2453).

MAAKS was organized in 1993.  Mr. Dickerson assigned his rights in seven franchises to MAAKS, including the restaurant located at 730 North Cedar Street, Mason, Michigan.  (ECF 154-4, Bonta Deposition, pp. 99:7–100:9, PageID.3105). (ECF 142, TAC, ¶¶ 15-16, PageID.2452).  Nan Bitner was the Operations Manager and was next in command after Mr. Dickerson.  (Dickerson Deposition, pp. 34:17-18, PageID.3414) (Bitner Deposition, p. 87:6-12, PageID.3421).  Below her were three Supervisors, who each supervised a few restaurants.  (ECF 161-3, Bitner Deposition, p. 45:4-12, PageID.3419).  In January 1998, Heidi Pyers became the Supervisor responsible for the Mason Restaurant.  (ECF 161-3, Bitner Deposition, pp. 45:21-46:6, PageID.3419).  Martin Haller was temporarily the Supervisor of the Mason Restaurant while Ms. Pyers was on maternity leave in early 2019.  (ECF 161-4, Haller Deposition, p. 137:3-12, PageID.3428).

New MLMLM employees start as crew members.  The first substantive

promotion available is a position called swing or shift manager.  (ECF 161-4, Haller Deposition, p. 102:2-24, PageID.3426).   Plaintiff Jenna Ries and Katlyn Barber became swing managers a few months after starting at the Mason restaurant.  (ECF 142, TAC, ¶¶ 41, 67, PageID.2456, PageID.2460).  A general manager is in charge of each restaurant.  (ECF 161-3, Bitner Deposition, p. 92:10-13, PageID.3422).  In between the swing managers and the general manager are up to three assistant managers.  (ECF 161-4, Haller Deposition, pp. 102:25-103:10, Page.ID.3426). General managers have the authority to hire new employees for their restaurant, but do not have the authority to fire them.  (ECF 161-4, Haller Deposition, p. 104:16-19, 111:23-112:1PageID.3426-3427) (ECF 161-3, Bitner Deposition, p. 227:2-4, PageID.3424).

Mr. Dickerson was the ultimate decision maker on whether an employee should be terminated.  (Exhibit A: Bitner Deposition, p. 109:6-12) (also testifying that he would listen to her recommendations on discipline and that Supervisors could also recommend discipline).   General Managers were responsible for hiring decisions at the restaurant level, but did not have the authority to terminate an employee.  (Exhibit B: Dickerson Deposition, p. 216:1-6) (Exhibit C: Blakesley Deposition, p. 77:1-9).  Mr. Banks had a limited role helping her, but would have to check with her after interviewing a candidate before the person could be hired. (Exhibit C: Blakesley Deposition, pp. 80:5-11, 114:23-25, 125:12-24) (Exhibit D:

Niegoski Deposition, pp. 95:18-23, 97:25-98:5, 162:8-11).  A general manager could also temporarily suspend an employee for misconduct.  (Exhibit E: Response to Requests to Admit, Response to Request for Admission 21). Assistant Managers, not swing managers, prepared the weekly schedule for employees.  (Exhibit C: Blakesley Deposition, p. 180:1-13)(Exhibit D: Niezgoski Deposition, pp. 161:1-4, 163:3-5).

Swing managers had incredibly limited authority.  If more than one swing manager is working, then one will be designated to run the floor.  (ECF 161-5, Ries Deposition, p. 30:16-18, PageID.3436).   A swing manager could write-up an employee for minor discipline issues like a cash drawer violation.  (Exhibit E: Response to Requests to Admit, Response to Request for Admission 22 and 24).  Swing managers could also send a crew member home for appearance issues, like failing to shave or bath, significant insubordination or physical altercations with another employee.  (Exhibit E: Response to Request for Admission 22 and 24).

MLMLM employed all the individuals that worked at franchises owned by MAAKS.  (ECF 154-7, Dickerson Deposition, pp. 150:22-152:2, PageID.3142).  There is a formal orientation for all new MLMLM employees and those that leave and return to MLMLM.  During orientation, MLMLM employees review policy packets or the employee handbook, which expressly state that MLMLM had zero tolerance for sexual harassment and indicated how employees should report any

alleged harassment.  (*See, e.g.,* ECF 161-6, Anibal Personnel File, PageID.3442). All of the named Plaintiffs signed policy packets indicating that they knew and understood the sexual harassment policies.  (*See, e.g,* ECF 161-6, Anibal Personnel File, PageID.3442) (ECF 161-7, Anibal Deposition, pp. 139:3-12, PageID.3445) (Exhibit F: Ries Deposition, p. 112:15-18 (admitting her signature and printed named are on the Orientation Receipt confirming she received and reviewed a copy of the policy packet) (Exhibit G: Barber Deposition, pp 164:11-165:6, 243 (admitting her signature is on the "Orientation Receipt", but does not remember signing it) (Exhibit H: Bishop Deposition, p. 77:9-16) (admitting her initials and signature were on the Employee Acknowledgment Form regarding the MLMLM Handbook and that her acknowledgment was true when she signed it)

There was also a large poster in the employee breakroom, which stated "This organization prohibits discrimination and harassment."  (ECF 161-8, EEOC Poster, PageID.3450).  This poster also indicated how to report sexual harassment.  (ECF 161-8, EEOC Poster, PageID.3450).  Plaintiff Barber recalls the EEOC poster in the crew room at both the Fowlerville and Mason store, but does not recall reading it. (Exhibit G: Barber Deposition, pp. 36:5-14, 157:10-23). Plaintiff Anibal admitted there were large posters in the breakroom, but she does not recall either way if this EEOC was there.  (Exhibit I: Anibal Deposition, p. 125:7-23).  Plaintiff Bishop admitted there were posters in the crew room, and that one of them was "very large,"

but she never looked at these posters.  (Exhibit H: Bishop Deposition, p. 72:21-73:12).[2]

This case is based upon alleged conduct by Shawn Banks, a former swing manager at the Mason restaurant.  While Mr. Banks worked for MLMLM, it promptly investigated and took action on any claims of sexual harassment policy. For example, Tucker Smith, a crew member at the Mason store, was immediately suspended and then terminated after it was reported that he made a couple inappropriate remarks to female crew members, such as "you have a nice ass" and "damm girl you're sexy as fuck".  (ECF 161-9, Smith Investigation, MLMLM1516-1526, 1520A, Page ID.3452-3463).

Another employee, Marcus Smith, was immediately investigated when it was reported that he pinched another male employee's nipples.  (ECF 161-2, Dickerson Deposition, p. 166:6-11, PageID.3417) (ECF 161-10, Pyers Deposition, pp. 225:12-226:4, PageID.3468).  After Ms. Pyers investigated the allegations, Mr. Dickerson decided to terminate him.   (ECF 161-10, Pyers Deposition, p. 225:5-20, PageID.3468).  He was an outstanding employee.  (ECF 161-10, Pyers Deposition, p. 226:21-23, PageID.3468).  An employee at another restaurant was terminated after it was reported that he asked other crew members what they thought of his breasts while holding frozen chicken breasts in front of him.  (ECF 161-2, Dickerson

---

[2]  Plaintiff Ries was not asked about this poster during her deposition.

{00108488.DOCX}                              6

Deposition, pp. 165:14-166:5, PageID.3417).

> **B.      Plaintiff Ries quit working for MLMLM several months after she reported Mr. Banks, his employment was terminated and she was transferred to a new store.**

Plaintiff Ries, who filed the original Complaint, alleges that Mr. Banks harassed her the entire time she worked at the Mason restaurant.  (See, e.g., ECF 142, TAC, ¶ 44, PageID.2457).  Plaintiff Ries rekindled her high school romance with Mr. Banks after they reconnected in 2017 and started working together at the Mason store.  Plaintiff Ries texted or called Mr. Banks over 4,000 times during the time she worked for MLMLM.  (ECF 161-11, Banks Phone Record Summary PageID.3470).  In fact, they decided to live together, and even paid the deposit on an apartment lease, but ended up not living together.  (ECF 161-5, Ries Deposition, pp. 21-23, PageID.3435).  They continued having sexual relations after deciding not to live together.  (ECF 161-5, Ries Deposition, p. 24, PageID.3435).

Plaintiff Ries did not like working for MLMLM and had lots of complaints about her general manager and other MLMLM employees.  (ECF 161-12, Ries Facebook Messages, PageID.3486-3487) ("Stephanie has it out for me").  She especially disliked Kaylyn McGuire, another swing manager at MLMLM.  (ECF 161-5, Ries Deposition, p. 161:13-22, PageID.3439) (ECF 161-15, Ries Investigation, PageID.3502-3504) (ECF 161-12, Ries Facebook Messages PageID.3479-3480).  Ms. McGuire sent Plaintiff Ries home on March 22, 2019 after

a vulgar verbal tirade by Plaintiff Ries.   (ECF 161-15, Ries Investigation PageID.3502-3504).  Plaintiff Ries believed that she was going to be fired as a result of this incident.  (ECF 161-5, Ries Deposition, p. 165:15-16, PageID.3440).

The following morning, Plaintiff Ries told Jen Hablitzel, another MLMLM employee, that "McGuire was being a bitch as usual" and that Mr. Banks told Ms. McGuire that Plaintiff Ries was complaining about her.   (ECF 161-12, Ries Facebook Messages, PageID.3476).  After expressing a concern about being fired, Plaintiff Ries told Ms. Hablitzel that she was "going to throw everyone under the bus."  (ECF 161-12, Ries Facebook Messages, PageID.3476).  Plaintiff Ries then mentioned alleged harassment by Mr. Banks for the first time in writing.  (ECF 161-12, Ries Facebook Messages, PageID.3476).  She announced to Ms. Hablitzel that she was "going to unblock his gf and tell her everything including the fact that [Plaintiff Ries] banged her bf [Mr. Banks] on her bed while her kid was sleeping downstairs."   (ECF 161-12, Ries Facebook Messages PageID.3475).   Fifteen minutes later, Plaintiff Ries sent Mr. Banks' girlfriend a message to tell her about her and Shawn.  (ECF 161-12, Ries Facebook Messages PageID.3478).

Plaintiff Ries met with Mr. Haller and Ms. Bitner at 10:00 AM on March 26, 2019.  (ECF 161-12, Ries Facebook Messages, PageID.3474).  After this meeting, Plaintiff Ries was outraged that she had been suspended, but that Ms. McGuire was not.  (ECF 161-12, Ries Facebook Messages, PageID.3473).  Later that morning,

Plaintiff Ries texted Mr. Haller to tell him that:

- Mr. Banks had been harassing her;

- Mr. Banks had touched her inappropriately;

- Mr. Banks was "her ex";

- Ms. McGuire was his "new toy";

- Mr. Banks and Ms. McGuire were trying to get her fired; and

- **She had not mentioned this before because Mr. Banks was "her ex".**

(ECF 161-16, Banks Investigation, PageID.3509-3510).

As soon as Plaintiff Ries made this report, it was immediately investigated and acted upon.  On March 28, 2019, the next day that Plaintiff Ries and Mr. Banks worked at the Mason restaurant, Mr. Haller and Ms. Bitner interviewed them and took statements from other MLMLM employees.  (ECF 161-4, Haller Deposition, pp. 157:5-15, 163:6-11, 168:23-169:6, PageID.3429-3431).  Mr. Banks was suspended the same day and never worked for MLMLM again.  It was decided to terminate Mr. Banks.  (ECF 161-3, Bitner Deposition, p. 143:9-11; 143:21-24, PageID.3423), but he refused to come in for a meeting and told Ms. Pyers he was quitting.  (ECF 161-10, Pyers Deposition, p. 168:17-22, PageID.3465).  His personnel file states he cannot be rehired because of sexual harassment.  (ECF 149-18, PageID.2954).

Plaintiff Ries had been seeking a transfer to the Howell restaurant for some

{00108488.DOCX}                                          9

time.  There were regular Communications Days between swing managers and the mid-level managers.  At the January 2019 Communications Day, Ms. Bitner and Ms. Pyers both recall Ms. Ries asked for a transfer to the Howell restaurant because her boyfriend lived in Brighton at the January 2019 Communications Day.  (Exhibit A: Bitner Deposition, pp. 282:10-19) (Exhibit J: Pyers Deposition, p. 222:15-20). Neither remembers Plaintiff Ries telling her that Mr. Banks was harasser her or that she wanted a transfer because of Mr. Banks.  (Exhibit A: Bitner Deposition, pp. 283:18-284:5) (Exhibit J: Pyers Deposition, pp. 223:1-14).  Ms. Pyers noted that Plaintiff Ries did not have an issue raising concerns with Ms. Pyers.  (Exhibit J: Pyers Deposition, pp. 223:1-14).

Plaintiff Ries had been worried that her verbal altercation would prevent this transfer from happening.  (ECF 161-12, Ries Facebook Messages, PageID.3476) (ECF 161-5, Ries Deposition, p. 160:4-12, PageID.3439).  But, she was also transferred to the Howell restaurant on March 28, 2019.  Plaintiff Ries moved in with her new boyfriend, who lived near the Howell restaurant, a week after the transfer.  (ECF 161-5, Ries Deposition, p. 45:9-11, PageID.3437).  At first, she liked the new restaurant, telling Plaintiff Barber on April 27, 2019 that "My new store has its flaws but I'm not being harassed everyday and my new boss wants to help me be a better manager."  (ECF 161-12, Ries Facebook Messages, PageID.3485).  But, Plaintiff Ries quickly changed her mind.  (ECF 161-12, Ries Facebook Messages,

PageID.3485) (doesn't matter what McDonald's you work at.  They are a shit show and I'm done") and (ECF 161-12, Ries Facebook Messages, PageID.3493) ("same bs different store").

Plaintiff Ries had a long history of being disciplined for a variety of rules violations while she worked for MLMLM.  Plaintiff Ries was suspended from work on June 11, 2019 because she left a shift early.  (ECF 161-17, Ries Discipline Report, PageID.3512).  She told Ms. Habiltzel that she had been suspended for "going home . . . on [her] day off and people being dicks."  (ECF 161-12, Ries Facebook Messages PageID.3472).[3]  Plaintiff Ries immediately decided to quit working for MLMLM, telling Marcus Smith that "Got suspended for a day.  Went out and got a new job with kat [Plaintiff Barber] that very day."  (ECF 161-12, Ries Facebook Messages, PageID.3493).  She found it amusing that she applied to work at the Kroger's where Plaintiff Barber was working while still wearing her McDonald's uniform.  (ECF 161-12, Ries Facebook Messages, PageID.3472).  Plaintiff Ries bragged to Plaintiff Barber and Marcus Smith that she only worked two shifts after giving two weeks-notice.  (ECF 161-12, Ries Facebook Messages, PageID.3484, Page ID.3493).

---

[3] The disciplinary report indicates that Plaintiff Ries had "picked up a shift from 9:00 AM to 3:30 PM, [but] clocked out and left at 2:00 PM because [she] was frustrated." (ECF 161-17, PageID.3512).

C.    **Plaintiff Barber claims to have been constructively discharged, but told friends that she left the Mason restaurant because of what the General Manager of the Store had done.**

Plaintiff Barber also contends that she was constructively discharged. (ECF 142, TAC, ¶ 83, PageID.2462). Plaintiff Barber frequently complained about other aspects of working for MLMLM, including Ms. Robertson, the general manager. (*See* ECF 161-12, Ries Facebook Messages, PageID.3486 ("Stephanie is a seriously a piece of shit") and PL563-565 (agreeing with Plaintiff Ries that Mr. Robertson's treating her employees badly is why they are "jumping ship"). In September 2018, Plaintiff Barber told Plaintiff Ries "this is why I left" when Plaintiff Ries complained about labor. (ECF 161-12, Ries Facebook Messages, PageID.3488) (ECF 161-18, Barber Deposition, pp. 189:22-190:20, PageID.3524).

In a January 28, 2020 Instagram message, Plaintiff Barber told Keegan Monroe, who had worked at the Mason restaurant, that "if someone [is] going to be as bitchy as Stephanie [Robertson] they don't deserve a job". (ECF 161-19, Barber Instagram, PageID.3528). She also said that:

- she "could not handle Stephanie [Robertson],

- "Stephanie used to change my hours on my paychecks," and

- "I told Heidi [Pyers] and nothing happened so I left."

(ECF 161-18, Barber Deposition, p. 133:8-17, PageID.3519) (ECF 161-19, Barber Instagram, PageID.3528). At her deposition, Plaintiff Barber conceded Ms. Pyers'

{00108488.DOCX}                                12

not doing anything about her hours being changed was "one of" the reasons why she left MLMLM.   (ECF 161-18, Barber Deposition, pp. 133:8-17, 137:22-138:3, PageID.3519-3520).   Plaintiff Barber admitted her Instagram messages did not mention being sexually harassed, but states her leaving because of sexual harassment was implied.   (ECF 161-18, Barber Deposition, pp. 133:8-17, 137:22-138:3, PageID.3519-3520).

At her deposition, Plaintiff Barber tried to explain away these statements by claiming she did not quit because of Mr. Robertson, but that she impacted the environment, which was not healthy.  (ECF 161-18, Barber Deposition, p. 131:16-22, PageID.3518). She did testify, however, that Ms. Robertson was not doing her job duties and was not always very kind.  (ECF 161-18, Barber Deposition, p. 131:11-15, PageID.3518).

### D. Emily Anibal never reported any alleged sexual harassment while she worked for MLMLM at the Mason restaurant.

Plaintiff Emily Anibal worked for MLMLM at the Mason restaurant from the spring of 2016 to May 2017.  (ECF 142, TAC, ¶ 98, PageID.2464).  She alleges that Mr. Banks made a number of inappropriate remarks and that he pushed her into a table once.  (ECF 142, ¶¶ 102-104, PageID.2465).   Shortly after this lawsuit was filed, Ms. Anibal told her friend Chloe Anderson that she felt "guilty about never saying anything . . . ."  (ECF 161-21, Anibal Texts, PageID.3539).

{00108488.DOCX}                    13

During her deposition, Ms. Anibal confirmed that:

- she certified that she had read the policies in the MLMLM policies handbook;

- the handbook described types of sexual harassment was prohibited;

- the conduct by Mr. Banks fit within the description of sexual harassment;

- the handbook stated that "any employee who feels subjected to . . . harassment should immediately report it to their boss or their boss's supervisor or Mike Dickerson; "

- she did not make a formal report to any of the supervisors; and

- the only person she informally told was Blake Roodvoets,[4] who was a trainer, not a supervisor.

(ECF 161-7, Anibal Deposition, pp. 139-145, PageID.3445-3446).

Plaintiff Anibal claims to have be constructively discharged because she quit in May 2017 and took a lower paying job as a nanny.  (ECF 142, TAC, ¶ 108, PageID.2466).  She testified that her friend, Chloe Anderson, had quit a few weeks before her, and it was hard to work there without her support.  She started working as a nanny three weeks later.  (ECF 161-7, Anibal Deposition, p. 102:13-19, PageID.3444).  During those three weeks, she graduated from high school and attended a number of graduation parties.  (ECF 161-7, Anibal Deposition, pp. 149-

---

[4]  Ms. Anibal introduced her close friend, Chloe Anderson to Blake Roodvoets. (Exhibit K: Chloe Roodvoets Deposition, p. 15).  They were married in 2018. (Exhibit K: Chloe Roodvoets Deposition, p. 15).

150, PageID.3447-3448).

Ms. Anibal made around $9.50 per hour working for MLMLM.  (ECF 161-7, Anibal Deposition, p. 104, PageID.3444).  She worked less than 58 hours during the entire summer of 2016 for MLMLM.  (Exhibit L: Anibal Hours Worked).  She was paid $8.00 to work as a nanny, but did not pay taxes on this income because her father, a CPA, told her that she did not have to report this income, but could instead consider it a gift because she made less than $5,000.  (ECF 161-7, Anibal Deposition, p. 151, PageID.3448).  She worked about 35 hours a week as a nanny.  (ECF 161-7, Anibal Deposition, p. 150, PageID.3448).  Plaintiff Anibal stopped being a nanny when she began her freshman year at Michigan State in the fall of 2017.  (Exhibit M: Anibal Answer to Interrogatory 1).  She worked for a period of time at her father's accounting firm in Okemus at $15.00/hour, but then found a position on campus that was more convenient.  (Exhibit M: Anibal Answer to Interrogatory 1).

**E.    Plaintiffs are seeking monetary and injunctive relief under Title VII of the Civil Rights Act of 1964 and Michigan's ELCRA.**

Plaintiffs' pleadings have two claims: Count I, which seeks relief under the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §37.2101, et seq. ("ELCRA"), and Count II, which seeks relief Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.  (ECF 142, TAC, PageID.2480-2485). All of the Plaintiffs are alleging claims under the ELCRA; only Plaintiff Ries and

Bishop are seeking relief under Title VII.  (ECF 142, TAC, ¶ 38, PageID.2456).

In both the ELCRA and Title VII claims, Plaintiffs seek monetary compensation for both "[e]conomic damages based on lost wages and fringe benefits, both past and future" and "on-economic damages for injuries such as emotional distress[.]"  (ECF 142, TAC, ¶¶ 194, 202, PageID.2483-2485).  They are also asking this Court to issue:

> An injunction requiring Defendants to remedy the civil rights violations described herein, and to prevent future sexual harassment and subjection of their employees to a sexually hostile work environment, by, among other things:

> i. Forming a committee of McDonald's workers that, together with McDonald's and independent experts, will devise worker-centered and worker-led practices to prevent and stop sex harassment.

> ii. Developing and implementing mandatory training focused on recognizing, preventing, and addressing sexual harassment at McDonald's. The training should be informed by worker feedback, specifically by the feedback and input of survivors of sexual harassment at McDonald's, should be designed to specifically address the scenarios faced by McDonald's workers, and should take into account the working conditions and demographic background of McDonald's workforce.

> iii. Revising anti-harassment policies to ensure that the policies are based on worker and survivor feedback and input, make managers and supervisory employees accountable for the work environment in their restaurant locations, and are written in terms that a non-lawyer McDonald's worker would understand.

> iv. Implementing a safe reporting mechanism

including multiple channels for reporting sexual harassment, and adequately communicating that reporting mechanism to all workers.

v. Creating a protocol for investigation of employee complaints by an entity or individuals skilled in conducting and documenting workplace investigations, including trauma-informed ways of asking questions of individuals reporting harassment.

vi. Establishing a remedial scheme that assures accountability for parties found to have engaged in harassment and managers who have failed to prevent harassment, and that assures a safe, harassment-free environment for those who report harassment.

vii. Adopting and implementing practices to ensure that employees who report harassment are not the subject of retaliation.

viii. Monitoring the number and type of complaints lodged at each restaurant and the resolution thereof.

ix. Establishing metrics by which franchises will be evaluated for success in preventing and remedying sexual harassment and monitored for compliance, and establishing penalties for noncompliance, up to and including termination of the franchise agreement.

(ECF 142, TAC, Prayer for Relief, ¶ C, PageID.2486-2487).  It is undisputed that

MLMLM has sold all of the McDonald's franchises that it owned and that MLMLM

no longer staffs any McDonald's restaurants.

## ARGUMENT

After the tremendous amount of discovery that has taken place, there are

several claims Plaintiffs cannot support as a matter of law on the undisputed facts.

First, Plaintiff Anibal does not have any evidence that either MLMLM or MAAKS knew or should have known about the harassment that she alleges occurred. Therefore, this Court should grant summary judgment to MLMLM and MAAKS on her sole claim. Second, Plaintiffs Ries, Barber and Anibal (if this Court finds that her claim survives summary judgment, cannot prove that they were constructively discharged as a matter of law. Third, this Court should find that Plaintiffs lack the Article III standing required to pursue their claims for injunctive relief and that those claims are moot. Therefore, this Court should grant this Motion.

### A.    Summary Judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

This Court should grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Sixth Circuit has recently summarized the general principles for review of Rule 56 motions as follows:

> Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. The judge is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. A genuine issue for trial exists when there is sufficient evidence on which the jury could reasonably find for the

plaintiff.

*Cacevic v. City of Hazel Park*, 226 F.3d 483, 491 (6th Cir. 2000) (cleaned up).[5]

The moving party has the initial burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). It ca meet this burden either by showing that a material fact cannot be disputed based upon the evidence in the record or showing that there is an absence of evidence that could create a dispute over a material fact. Fed. R. Civ. P. 56(c)(1). If the moving party meets this burden, then the party opposing the motion must present come forward with substantively admissible evidence showing that there is a genuine issue for trial. *See Anderson,* 477 U.S. at 256; Fed. R. Civ. P. 56(c)(1).

> **B.** **This Court should find that the admitted failure by Plaintiff Anibal to report the alleged harassment bars her ELCRA claim as a matter of law.**

Plaintiff Anibal is pursuing a claim under the ELCRA, but not under Title VII. (*See, e.g.,* ECF 142, TAC, ¶¶11, 38, 166, PageID.2451, 2456, 2477) (indicating that Plaintiff Anibal bring suit on behalf of the Class, not the Title VII Subclass). She did not report Mr. Banks to "her boss, her boss's supervisor or Mike Dickerson." Neither did her friend, Ms. Anderson. Not did other MLMLM employee that worked

---

[5] "Cleaned up" means internal quotation marks, brackets, ellipses, footnotes, and citations omitted.

at the Mason restaurant at the same time as Plaintiff Anibal did.  Therefore, this Court should find that MLMLM and MAAKS are not vicariously liable as a matter of law for his alleged harassment of Plaintiff Anibal.

> 1. <u>There is a five part test for determining if an employer is liable for alleged harassment by an employee.</u>

The ELCRA expressly defines sexual harassment as discrimination on the basis of sex.  *See, e.g.,* Mich. Comp. Laws §37.2103(i).  This statutory definition is similar to how federal case law has defined the extreme circumstances under which sexual harassment may constitute discrimination on the basis of sex.  *Id.*  The Sixth Circuit has found that sexual harassment claims under Title VII and the ELCRA require the same proofs, holding that:

> To prove sexual harassment under Title VII and the ELCRA, Plaintiffs must show "(1) they belonged to a protected group; (2) [they were] subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the Defendants knew or should have known about the harassment and failed to act.

*Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 (6th Cir. 2021) (cleaned up).

The Michigan Supreme Court, however, describes the elements slightly differently, holding that:

> [T]here are five necessary elements to establish a prima facie case of a hostile work environment:
>
>> (1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior.

*Radtke v. Everett*, 442 Mich. 368, 382-83, 501 N.W.2d 155, 162 (1993). The plaintiff has the burden of proving all of these elements by a preponderance of the evidence. *Chambers v. Trettco, Inc.*, 463 Mich. 297, 311-313, 316, 614 N.W.2d 910 (2000) (citing *Radtke*).

After reviewing the records of this case, this Court should find that MLMLM and MAAKS are entitled to summary judgment on Plaintiff Anibal's ELCRA claim because she cannot prove the respondeat superior element of that claim.

> 2.   MLMLM and MAAKS are not liable to Plaintiff Anibal as a matter of law on her claim that he pushed her

Plaintiff Anibal claims that Mr. Banks "violently grabbed Plaintiff Anibal by the shirt and pushed her up against the counter when she was trying to walk past him." (ECF 142, TAC, ¶ 104, PageID2465). There are no other reports of Mr. Banks' allegedly committing a physical assault on any other employees. Under the ELCRA, employers are only liable for intentional torts and criminal acts of their employees as permitted under the respondeat superior doctrine. *Hamed v. Wayne*

{00108488.DOCX}                    21

*County*, 490 Mich. 1, 5-6, 12-14; 803 N.W.2d 237 (2011).  Under this doctrine, "an employer can be held liable for its employee's conduct if the employer knew or should have known of the employee's propensities and criminal record before that employee committed an intentional tort.  490 Mich. at 12 (cleaned up).  *Hamed* held that the employer could not be held liable under for ELCRA for the rape of an employee and reinstated the trial court decision granting summary disposition to the employer.  490 Mich. at 36.  *See also Brown v. Brown*, 478 Mich. 545, 554-555; 739 N.W.2d 313 (2007) (finding that employer not liable the unforeseen rape of an employee even though the rapist had repeatedly made sexually offensive remarks to his victim).

There are no other reports of Mr. Banks physically assaulting another employee before Mr. Banks allegedly physically assaulted Plaintiff Anibal.  There is no evidence that he had a criminal record.  Even if he did have a criminal record, there is no evidence that MLMLM or MAAKS was aware of this record.  Therefore, this Court should find as a matter of law that MLMLM and MAAKS are not liable for this alleged physical assault under the ELCRA (or any other theory).

      3.    <u>Plaintiff Anibal cannot show that MLMLM or MAAKS had actual or constructive notice of the alleged harassment by Mr. Banks.</u>

The Michigan Supreme Court has held that "an employer can be vicariously liable for a hostile work environment only if it 'failed to take prompt and adequate

remedial action upon reasonable notice of the creation of a hostile [work] *environment*." *Elezovic v. Ford Motor Company*, 472 Mich. 408, 430; 697 N.W.2d 951 (2005) (alterations in original). *Radtke,* 442 Mich. at 396-97 (finding that "employer, of course, must have notice of alleged harassment before being held liable for not implementing action."

The Michigan Supreme Court has held that "notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers*, 463 Mich. at 319). In reaching this conclusion, the Michigan Supreme Court cited *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997) for the principle that "the law against sexual harassment is not self-enforcing; although an employee has not duty under the law to report discriminating harassment, an employer cannot be expected to correct such harassment unless the employer has reason to know that it is occurring." *Id.* This principle derives from the fact that different individuals find different behavior and words to be inappropriate. If an employee does not tell anyone that they believe their environment is hostile because of the conversations between employees, then the employer would not be on notice of the alleged harassment.

Michigan courts have frequently held that plaintiffs have failed to establish that their employer had actual or constructive notice of alleged sexual harassment as

a matter of law.  For example, *Elezovic* held that there was insufficient evidence to submit plaintiff's claims of sexual harassment against Ford Motor Company to a jury because "plaintiff's telling two supervisors in confidence- about one instance of Bennett's improper conduct does not constitute notice[.]"  472 Mich. at 428, 430. Therefore, it affirmed the lower court decisions to enter a directed verdict in favor of Ford Motor Company.  472 Mich. at 411, 431.   In *Sheridan v. Forest Hills Public Schools*, 247 Mich. App. 611, 617, 627; 637 N.W.2d 536 (2001), the Michigan Court of Appeals held that there was no constructive notice when plaintiff was harassed on four occasions over a three-year period, when plaintiff made only generalized complaints, and when plaintiff told an inquiring manager that it was "none of their business."

In *Chambers v. Trettco, Inc. (on remand),* 244 Mich. App. 614, 616; 624 N.W.2d 543 (2001), the plaintiff was allegedly harassed over a four day period by a temporary supervisor.  She "did not initiate the proceeding for sexual harassment complaints set forth in defendant's employee's handbook."  *Id.* The plaintiff did have a discussion with her supervisor who "sensed that something was wrong, but plaintiff chose not to explain the problem, apparently because the offender was nearby."  *Id.*  The Michigan Court of Appeals held that these facts "cannot render defendant . . . vicariously liable for its temporary supervisor's conduct in establishing a hostile work environment."  *Id.* at 618.  Based upon this evidence,

there was no basis for finding that the employer "could reasonably be charged with actual or constructive notice that sexual harassment was taking place." *Id.* at 618-619.  To hold otherwise "would have the effect of making an employer an insurer of an employee's personal anguish of which the employer had little or no understanding." *Id.* at 619.

At her orientation, Plaintiff Anibal certified in writing that she had read the MLMLM policies handbook.  (ECF 161-7, Anibal Deposition, p. 139:3-19, PageID.3445).  This handbook includes a no tolerance policy for sexual harassment and describes how to report any alleged harassment.  (ECF 161-6, Anibal Personnal File, PageID.3442).  She admitted at her deposition that the handbook described prohibited types of sexual harassment, the alleged conduct by Mr. Banks fit within this description of sexual harassment, and that "the handbook stated that "any employee who feels subjected to . . . harassment should immediately report it to their boss or their boss's supervisor or Mike Dickerson[.]  (ECF 161-7, Anibal Deposition, p. 141:1-22, PageID.3445).  Plaintiff Anibal understood that she was supposed to report complaints to the general manager of the store.  (Exhibit I: Anibal Deposition, p. 55:16-24).  But, just like the plaintiff in *Chambers*, Plaintiff Anibal never made a formal report of sexual harassment to anyone.  Therefore, Plaintiff Anibal cannot meet her burden of showing that MLMLM or MAAKS had actual notice of the alleged harassment by Mr. Banks.

{00108488.DOCX}                    25

The only person that Plaintiff Anibal informally spoke with out of work about the alleged harassment was a crew trainer named Blake Roodvoets. (ECF 161-7, Anibal Deposition, p. 143, PageID.3446). Ms. Anibal was friends with Mr. Roodvoets, and she introduced him to her close friend, Chloe Anderson. (Exhibit K: Chloe Roodvoets Deposition, p. 15). They were married in 2018. (Exhibit K: Chloe Roodvoets Deposition, p. 15). There is no evidence that Mr. Roodvoets passed along Plaintiff's Anibal's informal comments to anyone higher up in the organization.

Plaintiff Anibal worked at the Mason restaurant at the same time as Ms. Anderson, Ms. Rice and Ms. Bacon. None of them reported Mr. Banks for sexual harassment while Plaintiff Anibal worked there. (Anderson Declaration, ¶ 43, PageId.1778) (ECF 161-24, Rice Deposition, pp. 77:8-17; 78:6-8; 78:15-23; 79:14-17; 87:3-5, PageID.3547-3548)[6] (Bacon Deposition, p. 143:3-17, PageID.3446). Ms. Anderson did not report Mr. Banks because she "knew that [she] would be ostracized and treated poorly[.]" (Anderson Declaration, ¶43, PageID.1778). This does not excuse her failure to report as a matter of law. *Thornton v. Federal Express*, 530 F.3d 451, 457 (6th Cir. 2008).

Finally, there were two general managers at the Mason restaurant while

---

[6] During her second period of employment, Ms. Rice admits she did not report Mr. Banks to anyone until she was asked to write a statement during the investigation of Mr. Banks. (ECF 161-24, Rice Deposition, p. 123:15-18, PageID.3555).

{00108488.DOCX}                          26

Plaintiff Anibal worked there: Ms. Blakesley and Mr. Niezgoski.  Both testified that they were not aware of any alleged sexual harassment by Mr. Banks.  (Exhibit C: Blakesley Deposition, p. 149:10-14) (Exhibit D: Niezgoski Deposition, pp. 197-21-198:4).  There is no evidence Mr. Dickerson or Ms. Bitner knew that Plaintiff Anibal believed that she was being sexually harassed by Mr. Banks.

Therefore, Plaintiff Anibal does not have substantively admissible evidence to meet her burden of showing that MLMLM or MAAKS had actual or constructive knowledge about Mr. Banks allegedly creating a hostile work environment for her.

### 4.    Mr. Banks was not the employer of Plaintiff Anibal.

The respondeat superior element of a hostile work environment claim is established if the alleged harasser is the employer of the plaintiff.  *Radtke*, 442 Mich. at 396.  In *Radtke*, the alleged harasser was a 50% owner of the employer.  442 Mich. at 374-375.  Therefore the Michigan Supreme Court found that the plaintiff had established the respondent superior element of her hostile work environment claim.  442 Mich. at 396.  Mr. Banks did not own MLMLM or MAAKS; Mr. Dickerson did.  (ECF 142, TAC, ¶¶ 20-21, PageID.2453).

In Title VII cases, there is a difference standard if a supervisor is the alleged harasser.[7]  But, the Michigan Supreme Court has rejected this standard.  *Chambers*,

---

[7]  Under Title VII, a supervisor is a person that has the authority to make tangible employment decisions, such as "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

463 Mich. at 313-316.  Instead, an employer's liability for an allegedly hostile work environment will depend upon whether the employer "adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment."  *Id.* at 312.  This is the case whether the alleged harasser was a co-worker or a supervisor.  *Id.*

But, even if this were not the case, the role of Mr. Banks at the Mason restaurant was extremely limited.  He could not terminate employees.  Only Mr. Dickerson could.  (Exhibit A: Bitner Deposition, p. 109).  Although he interviewed some potential new employees, including Plaintiff Anibal, he did not have the authority to hire new employees.   Instead, the general manager of the Mason restaurant did.  (Exhibit C: Blakesley Deposition, pp. 80:5-11, 114;23-25, 125:12-24) (Exhibit D: Niezgoski Deposition, pp. 95:18-23, 98:1-5, 162:8-11). Assistant Managers, not swing managers, prepared the weekly schedule for employees. (Exhibit C: Blakesley Deposition, p. 180:1-13)(Exhibit D: Niezgoski Deposition, pp. 161:1-4, 163:3-5).

The only disciplinary authority that a swing manager had was handling either minor infractions, like cash drawer violation or failing to shave or bath.  (Exhibit E: Response to Requests to Admit, Response to Request for Admission 22 and 24).

---

significant change in benefits."  *Vance v. Ball State University*, 570 U.S. 421, 424, 431  (2013).

They could also send an employee home for significant insubordination or physical altercations with another employee. (Exhibit E: Response to Request for Admission 22 and 24). But, they were not permitted to suspend an employee for such misconduct. (Exhibit E: Response to Request for Admission 22 and 24).

In conclusion, Plaintiff Anibal cannot meet her burden of showing that Mr. Banks was her employer because he was not. Michigan's application of the respondeat superior doctrine would be the same regardless of whether Mr. Banks was the supervisor of Plaintiff Anibal or not. Plaintiff Anibal has not shown that MLMLM or MAAKS had either actual or constructive knowledge of the alleged hostile work environment. Even if Michigan were to shift course dramatically, Mr. Banks was not the supervisor of Plaintiff Anibal. Therefore, this Court should grant summary judgment to MLMLM and MAAKS on the ELCRA claim by Plaintiff Anibal because she cannot prove all of the elements of her claim against MLMLM or MAAKS.

### C.    This Court should find that Plaintiffs Ries, Barber and Anibal were not constructively discharged as a matter of law.

Plaintiffs Ries, Barber and Anibal claim that they were constructively discharged. To prove that they were constructively discharged requires proving that there was an abusive environment that was so intolerable that resignation from work amounted to a tangible employment action. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 142-143 (2004). This is a difficult burden to meet.

{00108488.DOCX}                                              29

Constructive discharge has been recognized by Michigan courts.[8]  But, concluding that efforts to alert someone of alleged harassment has been futile and feeling humiliated when an investigation found a harassment claim unsubstantiated does not amount to constructive discharge.  *Jager v. Nationwide Truck Brokers*, 252 Mich. App. 464, 474, 652 N.W.2d 503 (2002), overruled on other grounds by *Elezovic v. Ford Motor Company*, 472 Mich. 408, 697 N.W.2d 951 (2005).

      1.    <u>Plaintiff Ries was not constructively discharged as a result of any conduct by Mr. Banks, but instead quit because she did not like being suspended for walking out of work in the middle of a shift.</u>

Plaintiff Ries alleges that Mr. Banks sexually harassed her.  After she reported this harassment to Mr. Haller, her report was immediately investigated.  Two days later, Mr. Banks was suspended.  In addition, she was immediately transferred to the Howell restaurant, which was also staffed by MLMLM.  Plaintiff Ries moved in with her new boyfriend, who lived near the Howell restaurant, a week after the transfer. (ECF 161-5, PageID.3437, Ries Deposition, p. 45:9-11).  At first, she liked the new restaurant, telling Plaintiff Barber that her "new boss wants to help me a better manager".  (ECF 161-12, Ries Facebook Messages, PageID.3485).  But, Plaintiff Ries quickly changed her mind.  (ECF 161-12, Ries Facebook Messages PageID.3485) (doesn't matter what McDonald's you work at.  They are a shit show

---

[8]  It is arguable that this case law has been overruled, but MLMLM and MAAKS will assume that it is still good law for purposes of this brief.

and I'm done") (ECF 161-12, Ries Facebook Messages, PageID.3493) ("same bs different store").

Plaintiff Ries was frequently disciplined for a variety of rules violations while she worked for MLMLM.  (Exhibit N: Ries Disciplinary Information).[9]  This continued at the Howell restaurant.  Plaintiff Ries was suspended from work on June 11, 2019 because she left a shift early.  (ECF 161-17, Ries Discipline Report, PageID.3512).  She told Ms. Habiltzel that she had been suspended for "going home . . . on [her] day off and people being dicks."  (ECF 161-12, Ries Facebook Messages, PageID.3472).  Plaintiff Ries decided to quit working for MLMLM.  She found it amusing that she applied to work at the Kroger's where Plaintiff Barber was working while still wearing her McDonald's uniform.  (ECF 161-12, Ries Facebook Messages, PageID.3472).  Plaintiff Ries also bragged about only working two shifts after giving two weeks-notice.  (ECF 161-12, Page ID.3493, Ries Facebook Messages, PageID.3484).

The evidence is undisputed that Mr. Banks did not sexually harass Plaintiff Ries after March 22, 2019 because (1) they did not work together between the day of her vulgar tirade and March 28, 2019, (2) Mr. Banks was suspended on March 28, 2019 and never worked for MLMLM again and (3) Plaintiff Ries was transferred

---

[9]   There are typically 4 entries on this spreadsheet for each discipline event (Disciplinary Action Code Added, Disciplinary Action Added, Disciplinary Action Approved, and Disciplinary Action Posted).

to the Howell restaurant on the same day.  Plaintiff Ries has never alleged that she was sexually harassed at the Howell restaurant.  Her Facebook messages indicate that she was not sexually harassed there.  (ECF 161-12, Ries Facebook Messages, PageID.3485).  What Plaintiff Ries apparently found to be intolerable was that she had to finish a work shift.  (ECF 161-17, Ries Discipline Report, PageID.3512).

This requirement was not objectively intolerable.  Even if it were objectively intolerable, it was not related to anything that Mr. Banks did or that either MLMLM or MAAKS failed to do about him.  Therefore, this Court should find that Plaintiff Ries was not constructively discharged as a matter of law.  Accordingly, it should also found that Plaintiff Ries cannot recover any economic damages as a matter of law because her alleged economic damages are "lost wages and fringe benefits, both past and future."  (ECF 142, TAC, ¶¶ 194, 202, PageID.2483-2484).

> ### 2.   Plaintiff Barber was not constructively discharged because she admittedly quit working for MLMLM because of numerous issues that she had with her supervisors.

Plaintiff Barber also contends that she was constructively discharged.  (ECF 142, TAC, ¶ 83, PageID.2462).  Plaintiff Barber frequently complained about other aspects of working for MLMLM, including Ms. Robertson, the general manager. (*See* Ries Facebook Messages, PL555-556 ("Stephanie is a seriously a piece of shit") and PL563-565 (agreeing with Plaintiff Ries that Mr. Robertson's treating her employees badly is why they are "jumping ship").   In September 2018, Plaintiff

Barber told Plaintiff Ries "this is why I left" when Plaintiff Ries complained about labor.  (ECF 161-12, Ries Facebook Messages, PageID.3488) (ECF 161-18, Barber Deposition, pp. 189:22-190:20, PageID.3524).

In a January 28, 2020 Instagram message, Plaintiff Barber told Keegan Monroe, who had worked at the Mason restaurant, that "if someone [is] going to be as bitchy as Stephanie [Robertson] they don't deserve a job".  (ECF 161-19, Barber Instagram, PageID.3528).  She also said that:

- she "could not handle Stephanie [Robertson],

- "Stephanie used to change my hours on my paychecks," and

- "I told Heidi [Pyers] and nothing happened so I left."

(ECF 161-18, Barber Deposition, p. 133:8-17, PageID.3519) (ECF 161-19, Barber Instagram, PageID.3528).  At her deposition, Plaintiff Barber conceded Ms. Pyers' not doing anything about her hours being changed was "one of" the reasons why she left MLMLM.  (ECF 161-18, Barber Deposition, pp. 133:8-17, 137:22-138:3, PageID.3519-3520).  Plaintiff Barber admitted her Instagram messages did not mention being sexually harassed, but states her leaving because of sexual harassment was implied.  (ECF 161-18, Barber Deposition, pp. 133:8-17, 137:22-138:3, PageID.3519-3520).

At her deposition, Plaintiff Barber tried to explain away these statements by claiming she did not quit because of Mr. Robertson, but that she impacted the

environment, which was not healthy.  (ECF 161-18, Barber Deposition, p. 131:16-22, PageID.3518).  She did testify, however, that Ms. Robertson was not doing her job duties and was not always very kind.  (ECF 161-18, Barber Deposition, p. 131:11-15, PageID.3518).

Viewed in the totality of the circumstances, there were numerous reasons why Plaintiff Barber quit working for MLMLM.  Even if Plaintiff Barber felt helpless because no one was taking her complaints about Mr. Banks seriously, it would not amount to constructive discharge under Michigan law.  *See Jager*, 252 Mich App at 474.  Therefore, this Court should find that Plaintiff Barber was not constructively discharged as a matter of law.  Accordingly, it should also found that Plaintiff Barber cannot recover any economic damages as a matter of law because her alleged economic damages are "lost wages and fringe benefits, both past and future."  (ECF 142, TAC, ¶ 194 PageID.2483).

        3.     <u>Even if Plaintiff Anibal can prove that she has a potential sexual harassment claim against MLMLM or MAAKS, she cannot prove that she was constructively discharged as a matter of law.</u>

Plaintiff Anibal claims to have be constructively discharged because she quit in May 2017 and took a lower paying job as a nanny.  (ECF 142, TAC, ¶ 108, PageID.2466).  She testified that her friend, Chloe Anderson, had quit a few weeks before her, and it was hard to work there without her support.  She started working as a nanny three weeks later.  (ECF 161-7, Anibal Deposition, p. 102:13-19,

{00108488.DOCX}                                      34

PageID.3444).   During those three weeks, she graduated from high school and attended a number of graduation parties.  (ECF 161-7, Anibal Deposition, pp. 149-150, PageID.3447-3448).

While Plaintiff Anibal had a slightly higher hour rate at MLMLM than she did as a nanny, she only worked 58 hours for MLMLM the entire summer of 2016, but worked about 35 hours per week as a nanny.  (ECF 161-7, Anibal Deposition, p. 104, 150, PageID.3444, 3448) (Exhibit L: Anibal Hours Worked).

Even if Plaintiff Anibal found it difficult to work at the Mason restaurant after Ms. Anderson left, her claim of constructive discharge is not as well supported as the claim by the plaintiff in *Jager* because Plaintiff Anibal did not even report the alleged harassment.  Moreover, when viewed in the totality of the circumstances, Plaintiff Anibal was not harmed economically by quitting MLMLM just before her high school graduation.  Therefore, this Court should find that Plaintiff Anibal was not constructively discharged as a matter of law.  Accordingly, it should also found that Plaintiff Ries cannot recover any economic damages as a matter of law because her alleged economic damages are "lost wages and fringe benefits, both past and future."  (ECF 142, TAC, ¶ 194 PageID.2483).

**D.     Plaintiffs cannot pursue their claims for injunctive relief against MLMLM and MAAKS as a matter of law.**

MLMLM and MAAKS have requested that Plaintiffs stipulate to an order dismissing their claims for injunctive relief.  Plaintiffs' counsel has indicated that

they are no longer seeking injunctive relief "at this time", but will not stipulate to the entry of an order confirming this.  While this issue no longer appears to be contested, Plaintiffs' pleadings still request this relief.

1.    <u>Plaintiffs do not have standing to seek injunctive relief against any of the Defendants in this case</u>.

None of the Plaintiffs work for MLMLM any longer.  (ECF 154-13, Ries Deposition, p. 137:13–16, PageID.3201)(ECF 154-14, Barber Deposition, p. 188:5–24, PageID.3223) (ECF 154-15, Anibal Deposition, p. 24:16–24, PageID.3232) (ECF 154-16, Bishop Deposition, p. 87:8–12, PageID.3258)   Therefore, none have Article III standing to pursue a claim for injunctive relief.  *See Wal-Mart v. Dukes,* 564 U.S. 338, 364 (2011) ("plaintiffs no longer employed by Wal-Mart lack standing to seek injunctive or declaratory relief against its employment practices").  Named plaintiffs who represent a putative class must prove that they each independently satisfy standing requirements.  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Rosen v. Tenn. Comm'r of Fin. And Admin*., 288 F.3d 918, 928 (6th Cir. 2002) (similar).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects" and a "likelihood of substantial and immediate irreparable injury." *Los Angeles v. Lyons*, 461 U.S. 95, 102, 111 (1983) (cleaned up).

Accordingly, Plaintiffs clearly lack standing to seek injunctive relief under Title VII. *See, e.g., Walsh v. Nevada Dept. of Human Resources*, 471 F.3d 1033,

{00108488.DOCX}                                    36

1037 (9th Cir. 2006) (finding former employee "would not stand to benefit from an injunction requiring the anti-discriminatory policies she requests at her former place of work").

2. <u>The claims for injunctive relief against MLMLM and MAAKS are moot because they no longer operate the Mason restaurant or any other McDonald's franchise.</u>

Plaintiffs have requested that this Court issue extraordinarily detailed injunctive relief. (*See* TAC, Prayer for Relief, PageID.2486-2487). None of the named Plaintiffs currently works for MLMLM. Both MLMLM and MAAKS have ceased their involvement with the Mason McDonald's franchise (and all other franchises). Therefore, Plaintiffs' claims for injunctive relief are moot. *See, e.g., McPherson v. Mich. High Sch. Ath. Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) ("The test for mootness 'is whether the relief sought would, if granted, make a difference to the legal interests of the parties'").

## CONCLUSION AND RELIEF REQUESTED

This Court should grant this Motion.

Respectfully Submitted,

Lipson Neilson P.C.


By:    /s/ C. Thomas Ludden
       C. Thomas Ludden (P45481)
       Attorneys for Defendant MLMLM
       and M.A.A.K.S., Inc.
       3910 Telegraph Road, Suite 200
       Bloomfield Hills, Michigan 48302
       (248) 593-5000
       tludden@lipsonneilson.com

Dated:  June 25, 2021

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(b)(1)

This supporting brief complies with Local Rule 7.2(b)(1) because it contains 8758 words, excluding the case caption, cover sheets, tables of contents and authorites, signature block, attachments and exhibits.  This brief was prepared in Microsoft Office 2016, whose word count feature was used to determine compliance with rule.

Respectfully Submitted,

Lipson Neilson P.C.

By:    /s/ C. Thomas Ludden
       C. Thomas Ludden (P45481)
       Attorneys for Defendants
       MLMLM and MAAKS
       3910 Telegraph Road, Suite 200
       Bloomfield Hills, Michigan 48302
       (248) 593-5000
       tludden@lipsonneilson.com

Dated:  June 25, 2021

{00108488.DOCX}                           38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2021, I electronically filed a BRIEF SUPPORTING MOTION BY DEFENDANTS MLMLM CORPORATION AND MAAKS, INC. FOR PARTIAL SUMMARY JUDGMENT and this Certificate of Service with the Clerk of the Court using the ECF System which will send notification of such filing to all attorneys of record.

*/s/ Amy Zielinski*