UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JENNA RIES, KATLYN BARBER,                Case No: 1:20-cv-0002-HYJ-RSK
EMILY ANIBAL AND JOANNE BISHOP,           District Judge Hala Y. Jarbou
                                          Magistrate Judge Ray Kent
      Plaintiffs,

v.


McDONALD'S USA, LLC, McDONALD'S
CORPORATION, MLMLM CORP., and
MAAKS. INC.

      Defendants.

---

**RESPONSE BY DEFENDANTS MLMLM
CORPORATION AND MAAKS, INC. TO PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION (ECF 175)</u>**


**<u>ORAL ARGUMENT REQUESTED</u>**


{00114407.DOCX}

## INTRODUCTION

The claims by the named Plaintiffs all suffer from significant weaknesses. Plaintiff Jenna Ries claims that she was continually harassed by Shawn Banks while she worked for MLMLM.  The reality is that Plaintiff Ries called or texted Mr. Banks over 4,000 times while they both worked at MLMLM.  Most of her personal texts have been lost, but Plaintiff Ries agreed to engage in sexual relations with Mr. Banks in one of the three personal text strings that still exists.  Plaintiff Ries sent this text about a year after starting to work for MLMLM.  While it is not impossible for Plaintiff Ries to prove that Mr. Banks sexually harassed her, it will be extraordinarily difficult given how welcome their consensual relationship clearly was for most of her employment with MLMLM.

 While the other three named Plaintiffs did not have a long term relationship with Mr. Banks like Plaintiff Ries, none of their claims are very strong.  MLMLM Corporation and MAAKS, Inc. are seeking summary judgment on the claim by Plaintiff Emily Anibal because she admits that she never told anyone about the alleged harassment by Mr. Banks, and neither MLMLM nor MAAKS is vicariously liable for his conduct as a matter of law.

Plaintiff Joanne Bishop only worked for MLMLM for a period of eight weeks and worked with Mr. Banks for less than nine hours during those eight weeks. Therefore, her damages are minimal.  Finally, Plaintiff Katlyn Barber must convince

the jury that she was severely and pervasively harassed by Mr. Banks even though she got her best friend since kindergarten a job at the Mason restaurant where she claimed to be the victim of severe and pervasive sexual harassment.

Plaintiffs naturally want to avoid the problems that arise whenever anyone looks carefully at the merits of their individual cases.  Therefore, they have requested that this Court certify a class action and first have a trial on whether the conduct by Mr. Banks created an objectively hostile work environment before turning to any individualized issues.

But, Plaintiffs base their Motion primarily upon cases which the EEOC is seeking an injunction to force an employer to change a pattern or practice of intentional, company-wide, discrimination.  Plaintiffs do not, and cannot, seek such injunctive relief against MLMLM or MAAKS.  Moreover, the EEOC has special statutory authority to seek company-wide injunctive relief without proving that the Court should grant a motion for class certification.  Almost all the cases involving private plaintiffs are ones in which the plaintiffs are seeking class certification under Rule 23(b)(2), not Rule 23(b)(3), which is applicable to this case.

Finally, the procedure that Plaintiffs offer would not be an efficient method of resolving the issues that are before the Court.  Even if there were a finding that there was an objectively hostile work environment while Mr. Banks was physically present at the Mason restaurant, none of the named Plaintiffs would have proven that

MLMLM or MAAKS was liable to them.  Instead, it would still be necessary to do a detailed individualized review to prove liability.   In other words, Plaintiffs' proposed class action would add another layer of complexity to this case rather than streamline the proofs of any of the claims made by the named Plaintiffs or the potential class members.  Therefore, this Court should deny this Motion.

## ARGUMENT

Plaintiffs bear the burden of showing that all requirements for class certification are met.  *Wal-Mart v. Dukes*, 564 U.S. 338, 345 (2011).  To accomplish this, Plaintiffs must demonstrate that all four prerequisites to class certification required by Rule 23(a) are present.  *Wal-Mart Stores, Inc v Dukes*, 564 U.S. 338, 345 (2011).  Then, they must demonstrate that class certification is proper under at least one ground listed by Rule 23(b).  *Id.*

The four pre-requisites in Rule 23(a) are commonly called numerosity, commonality, typicality and adequacy of representation.  *See* Fed. R. Civ. P. 23(a). Plaintiffs are seeking class certification against MLMLM Corporation and MAAKS, Inc. under Rule 23(b)(3), which authorizes class certification if the plaintiff demonstrates that:

> questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy. . . .

Fed. R. Civ. P. 23(b)(3).

Plaintiffs are also seeking class certification on their claims for injunctive relief against the McDonald's Defendants under Rule 23(b)(2), which requires the plaintiff to prove that:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole

Fed. R. Civ. P. 23(b)(2). In a class certified under Rule 23(b)(2), the plaintiffs cannot recover individualized damages. 564 U.S. at 360-361. Instead, plaintiffs may only recover monetary damages if they are "incidental to the injunctive or declaratory relief." *Id.* at 360. *Accord Reeb v. Ohio Department of Rehabilitation & Correction*, 435 F.3d 639, 651 (6th Cir. 2006) (finding that class action cannot be certified under Rule 23(b)(2) in a Title VII case if the plaintiff seeking compensatory damages because of their individualized nature).

### A.   Plaintiffs are relying heaving upon case law that is not applicable, obsolete or effectively overruled.

Plaintiffs begin their argument by contending that this Court should follow several cases that they claim show that federal courts routinely certify classes in claims of sexual harassment. (ECF 190, Amended Brief Supporting Motion for Class Certification, pp. 20-22, PageID.4504-4506). Several of their key cases are enforcement actions brought by the EEOC, which may seek injunctive relief against

{00114407.DOCX}                    4

an employer proving that the district court should certify the case as a class action. Other cases requested class certification under Rule 23(b)(2), not Rule 23(b)(3), which is at issue in this Motion.  This case law generally seeks injunctive relief for an alleged "pattern or practice" of unlawful and intentional discrimination in hiring or promotion decisions, not monetary damages for an allegedly hostile work environment that existed only when one low level employee was present at one restaurant.

1.    *Teamsters* is an EEOC enforcement action that did not consider whether class certification was appropriate because the EEOC has the statutory authority to seek injunctive relief without proving that a class should be certified.

One of Plaintiffs' primary arguments is that this Court should certify a class and then use the procedures established by *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) to bifurcate trial into two phases.  (ECF 190, Amended Brief Supporting Motion for Class Certification, pp. 22-23, PageID.4505-4506).  But, *Teamsters* did not consider whether to grant class certification.  Instead, it was an enforcement action by the EEOC, which is authorized by 42 U.S.C. § 2000e(6)(a) to seek company-wide injunctive relief against an employer without first persuading a court to grant class certification.[1]  If the EEOC were required to seek

---

[1]  *Teamsters* was originally filed by the Attorney General of the United States, however, Congress transferred the statutory authority to seek injunctive relief to the EEOC, which was substituted for the United States.  431 U.S. at 328 n. 1.

{00114407.DOCX}                              5

class certification, it would have been doing so under Rule 23(b)(2), which authorizes the certification of a class seeking "injunctive relief . . . respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Therefore, *Teamsters* does not address any of the issues raised under Rule 23(a) or 23(b)(3), such as whether common issues predominate over individualized issues, which is critical to determining whether to grant Plaintiffs' Motion. Accordingly, *Teamsters* is not applicable to the issues presented by this Motion.

In addition, the EEOC was not pursuing a claim for harassment that allegedly was severe and pervasive enough to rise to the level of unlawful discrimination in *Teamsters*. Instead, the EEOC alleged that the defendant employer "had engaged in a pattern or practice of discriminating against minorities in hiring so called line drivers." 431 U.S. at 329. It also challenged a seniority system established by a collective bargaining agreement that perpetuated the effects of past discrimination. *Id.* at 330. The relief sought was an injunction to change these practices and also monetary relief to "make whole" the victims of the past discrimination. *Id.*

To prove that there was a "pattern or practice" of intentional discrimination, the EEOC submitted statistical evidence of the disparities between the number of line drivers that were white and that ethnic minorities. 431 U.S. at 337. It then offered evidence of specific instances of discrimination. *Id.* at 338. A significant part of *Teamsters* was rebutting the challenge that the employer had made to the use

of statistical evidence to prove intentional discrimination. *Id.* at 339-342. After reviewing this evidence and the challenge thereto, *Teamsters* affirmed the finding that the EEOC had proven that the employer engaged in intentional discrimination. *Id.* at 343. *Teamsters* then determined that the seniority system did not violate Title VII. 431 U.S. at 343-356.[2]

Therefore, *Teamsters* does not address whether any class should be certified, which is the issue now before this Court. Accordingly, it did not analyze, let alone reach a finding, that common issues predominated over individualized issues. Moreover, *Teamsters* involved alleged intentional, company-wide, discrimination in employment decisions, not alleged harassment by co-worker of Plaintiffs and the potential class members. Plaintiffs did not offer a statistical analysis or any other scientific studies, and this case has nothing to do with a seniority system, which were the primary issue resolved by *Teamsters*. Accordingly, this Court should find that *Teamsters* is neither controlling authority nor even marginally relevant to the issues before it.

> 2.    Neither *Cooper v. Federal Reserve* nor *Serrano v. Cintas* considers issues relevant to this Motion.

Plaintiff argues that the *Teamsters* has been followed in private Title VII class

---

[2]  *Teamsters* concludes with an discussion of the issues related to assessing damages given the finding that the company had engaged in intentional discrimination, but that the seniority system did not violate Title VII. *Id.* at 356-376. This issue is not relevant to this Motion or this case.

actions, relying upon *Cooper v. Federal Reserve Bank*, 467 U.S. 867 (1984) and *Serrano v. Cintas Corporation*, 699 F.3d 884 (6th. Cir. 2012).  (ECF 190, Amended Brief Supporting Motion for Class Certification, PageID.4505).  This is simply not accurate.

Like *Teamsters, Cooper* began as an EEOC enforcement action, but several individual plaintiffs were permitted to intervene.  467 U.S. at 869.  *Cooper* mentions *Teamsters* in a footnote, but only to quote from the Circuit Court decision essentially finding that the evidence presented in *Cooper* was much less persuasive than that presented in *Teamsters*.  *Id.* at 879 n. 11 (citing *EEOC v. Federal Reserve Bank*, 698 F.2d 633, 643-644 (4th Cir. 1993)). [3]  Neither the Supreme Court nor the Fourth Circuit considered whether class certification was appropriate.  Instead, the Supreme Court considered whether res judicata prevented an individual plaintiff from pursuing a claim for discrimination after a decision that there was not a pattern or practice of intentional discrimination affecting all members of a proposed class.  867 U.S. at 869.

*Serrano* began as a Title VII action by a private plaintiff, but the EEOC intervened in the case.  699 F.3d at 890.  The primary issue decided by *Serrano* was

---

[3] The Fourth Circuit extensively reviewed whether the statistical evidence presented was sufficient under *Teamsters* and other legal authorities to prove a pattern or practice of intention discrimination.   698 F.2d at 645-664.  It concluded that the evidence was insufficient to do so.  *Id.* at 664.

whether the EEOC could use the *Teamsters* "pattern or practice" discrimination procedure if the EEOC was proceeding under section 706 of Title VII instead of section 707 of Title VII. *Id.* at 891. The Sixth Circuit reversed the decision by the district court that the EEOC could not the "pattern or practice" discrimination procedure in a section 706 case. *Id.* at 896.

The district court denied the motion to certify a class action against Cintas, but *Serrano* did not review that decision. Instead, another plaintiff, Tanesha Davis appealed this decision.   699 F.3d at 890 n. 2.  In her appeal, *Davis v. Cintas Corporation*, 717 F.3d 476, 479 (6th Cir. 2013), the Sixth Circuit affirmed the district court decision to deny the motion for class certification.  In reaching this decision, the Sixth Circuit relied heavily upon *Wal-Mart v. Dukes*, but did not mention *Teamsters*.

In conclusion, neither *Cooper* nor *Serrano* found that private plaintiffs could use the *Teamsters* pattern or practice methodology.  More importantly, neither considered whether class certification was appropriate in a private party Title VII case, let alone whether class certification was appropriate for a sexual harassment case. Therefore, neither case helps Plaintiffs meet their burden of showing that class certification is appropriate in this case.

      3.      <u>This Court should not rely upon *Mitsubishi Motors*, another EEOC enforcement action seeking injunction relief, not a private party plaintiff seeking monetary damages.</u>

Plaintiffs also rely upon *EEOC v. Mitsubishi Motors*, 990 F. Supp. 1059 (C.D. Ill. 1998), claiming that it is a "seminal example of *Teamsters*' applicability in the harassment context.   (ECF 190, Amended Brief Supporting Motion for Class Certification, p. 30, PageID. 4506).   But, this is yet one more EEOC enforcement action, not a claim filed by a private plaintiff.   Therefore, this case once again does not consider whether class certification is appropriate or how to compensate private party plaintiffs for compensatory damages resulting from alleged harassment. Moreover, once again, the EEOC was seeking an employer wide injunction based upon an alleged "pattern or practice".   Therefore, *Mitsubishi* did not consider any of the principal issues before this Court, such as whether the Rule 23(a) prerequisites have been proven or whether common or individualized issues predominate under Rule 23(b)(3).   .

      4.      <u>Plaintiffs rely upon case law applying Rule 23(b)(2) to cases requesting injunctive relief to remedy patterns or practices of intentional discrimination even though this is a sexual harassment case in which Plaintiffs seek class certification under Rule 23(b)(3).</u>

Plaintiffs selectively quote from three decisions in *Jenson v. Eveleth Taconite Company* to support their position that this Court should grant their motion for class certification. (ECF 190, Amended Brief Supporting Motion for Class Certification,

{00114407.DOCX}          10

p. 20, PageID.4504).  *Jensen* is readily distinguishable from this case because the plaintiffs were seeking different relief and their class action was certified under a different rule, when Title VII law was far different from today.

This lawsuit alleges that Mr. Banks sexually harassed the named Plaintiffs and the potential class members.  Although the *Jenson* plaintiffs alleged there was sexual harassment, the primary allegation in *Jenson* was that "Eveleth Mines engages in a pattern of discriminatory practices, including discrimination in hiring, job assignment, discipline, promotion and compensation."  *Jenson v. Eveleth Taconite Company,* 139 F.R.D. 657, 659 (D. Minn. 1993).  Indeed, the district court summarized their claims as follows:

> Plaintiffs do not purport to raise individual claims of sexual harassment.  Rather, plaintiffs advance the view that incidents of sexual harassment constitute but one facet of their discrimination claims.  They argue that systemic offenses were so pervasive as to create an "oppressive work environment."  Moreover, **plaintiffs do not seek damages based on individual incidents of harassment, but instead seek class-wide injunctive, declaratory and financial relief**.

139 F.R.D. at 662 (emphasis added).  Because the *Jenson* plaintiffs were not pursuing individual sexual harassment claims, but were instead seeking injunctive relief, they requested that their class be certified under Rule 23(b)(2).  *Id.* at 660.

Plaintiffs contend that this Court should follow the *Jensen* procedure and bifurcate trial into liability and damages phases.  (ECF 190, Amended Brief

Supporting Motion for Class Certification, p. 20, PageID.4504).  But, *Jensen* was filed before Congress authorized the recovery of either punitive or compensatory damages by private party litigants.  *Jensen v. Eveleth Taconite, Co.*, 130 F.3d 1287, 1290 n. 4 (8th Cir. 1997).  Therefore, the primary relief that the *Jensen* plaintiffs could seek under Title VII was injunctive relief.  After determining that the *Jensen* plaintiffs were entitled to injunctive relief, the district court then appointed a special master to determine the damages recoverable under the Minnesota Human Rights Act. *Id.* at 1290.  After permitting additional discovery, the special master conducted a seven week long trial, with almost 8,000 pages of testimony taken, before issuing a 416 page report and recommendations regarding the damages owed to the 16 plaintiffs.  *Id.*  While this was likely the only option open to the district court, it hardly seems to be an efficient method of proceeding.

Plaintiffs also cite *Neal v. Moore*, No. 92-2420 (D.D.C. Dec. 23, 1994) (Exhibit 1) an unpublished district court opinion, for the proposition that hostile work environment cases should be bifurcated into liability and damages phases.  The *Neal* plaintiffs alleged that supervisors across the transit system engaged in quid pro quo sexual harassment, favored women who acceded to sexual overtures with promotions other opportunities to the detriment of those that did not and that an offensive environment existed.  (*Id.*, p. 2).  As a result, *Neal* is a case involving intentional discrimination that deprived protected class members of promotions, not

a case in which the only claim is that a hostile work environment exists.  Finally, *Neal* granted class certification under Rule 23(b)(2), not Rule 23(b)(3).  (Exhibit 1, p. 17).[4]

In summary, then, *Jensen* and *Neal* are both cases in which the plaintiffs were seeking company-wide injunctive relief based upon claims that there was a "pattern or practice" of intentional discrimination in job opportunities and promotions.  In fact, the *Jensen* plaintiffs could not seek compensatory damages under Title VII.  As a result, the district courts in *Jensen* and *O'Neal* were considering whether to grant class certification under Rule 23(b)(2), not Rule 23(b)(3).  To obtain final injunctive relief, the plaintiffs would have to prove the merits of a "pattern or practice" case of intentional discrimination.  This was the most significant issue in their case.

In this case, Plaintiffs are not seeking injunctive relief against MLMLM or MAAKS.  (*See* ECF 190, Amended Brief Supporting Motion for Class Certification, p. 46, PageID.4522).  Instead, Plaintiffs are making individual sexual harassment claims and seeking individualized monetary relief, which is precisely the claim that the *Jensen* plaintiffs were not pursuing.  Therefore, Plaintiffs are also not seeking to certify a class under Rule 23(b)(2) against MLMLM or MAAKS, but instead seeking to certify a class and subclass class under Rule 23(b)(3).  (*See, e.g.,* ECF 190,

---

[4] Plaintiffs in this case allege the existence of a hostile work environment only when Mr. Banks was working with them or a potential class member.

Amended Brief Supporting Motion for Class Certification, p. 46, n. 97, PageID.4522).

The *Jensen* plaintiffs did succeed in establishing a sufficient violation of Title VII to obtain injunctive relief.  Despite that being established, the subsequent trial on damages took almost two months.  In this case, a trial that established that there was an objectively hostile work environment on a class basis would not prove liability because the Plaintiffs would still have to prove that they subjectively perceived the environment as hostile.  See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  In other words, determining that was an objectively hostile work environment existed would resolve nothing of significance and full blown trials would still be required.

     5.    <u>This Court should not rely upon precedent that did not apply a test similar to that established by *Wal-Mart v Dukes*.</u>

Plaintiffs also rely upon a district court case from the Northern District of Ohio: *BreMiller v. Cleveland Psychiatric Institute*, 195 F.R.D. 1 (N.D. Ohio 2000), which is a case in which a class was certified under Rule 23(b)(3).  (ECF 190, Amended Brief Supporting Motion for Class Certification, p. 21, PageID.4505).  *BreMiller* was decided eleven years before the Supreme Court significantly modified the test for determining if there were common questions in *Wal-Mart v. Dukes*.

In *Wal-Mart v. Dukes*, plaintiffs claimed that there was a pattern of

employment decisions that discriminated on the basis of sex in violation of Title VII at Wal-Mart stores across the country.  The Supreme Court recognized that any competently crafted class action complaint contains common questions.  *Wal-Mart*, 564 U.S. at 349.  The issue is not whether there are common questions, but whether there are common answers that apply to class members and can be obtained by a single, classwide, inquiry.  *Wal-Mart, supra*, 564 U.S. at 350.  To meet their burden of proceeding, the plaintiffs must show that the proposed class members have a "common contention . . . that . . . is capable of classwide resolution.  564 U.S. at 350.

Five years later, the Supreme Court confirmed that an individual question is one in which the members of the proposed class must present evidence that varies from member to member.  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  On the other hand, if there is a common question, the same evidence will suffice for each class member to make a prima facie showing or a material issue susceptible to generalized class-wide proof.  *Id.* Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Dukes,* 564 U.S. at 349 (citation omitted); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) ("What we are looking for is a common issue the resolution of which will advance the litigation.")

In *BreMiller*, the district court found that plaintiffs had established the commonality element of Rule 23(a)(2) because the facts alleged were "bound by a

common legal theory." 195 F.R.D. at 21.  But, *BreMiller* did not consider whether the "common evidence" would generate "common *answers*" to this "common legal theory" for the approximately 200 women who allegedly experienced sexual harassment ranging in circumstance, severity, and harasser.  195 F.R.D. at 6-18. This analysis was acceptable more than 20 years ago, but it not appropriate after the Supreme Court decided *Wal-Mart v. Dukes*, 564 U.S. at 350.  Therefore, this Court should not rely upon *BreMiller* when resolving this Motion.

6.   <u>The only recent case law relied upon has been effectively overruled</u>.

Plaintiffs rely upon *Brown v. Cook County*, 332 F.R.D. 229 (N.D. Ill. 2019), a putative class action filed by 260 female attorneys that alleged that there was a hostile work environment at the Cook County jail.  (ECF 190, PageID.4410).  On the same day that Judge Kennelly granted the motion for class certification in *Brown*, he also granted the motion for class certification in *Howard v. Cook County*, 2019 U.S. Dist. Lexis 134941 (N.D. Ill. August 12, 2019), a putative class action filed by corrections officers, rehabilitation workers, medical professionals and deputy sheriffs that worked at the Cook County jail.  332 F.R.D. at 233; 2019 U.S. Dist. Lexis *3.  Both cases were handled together by Judge Kennelly.  *See, e.g., Brown v. Cook County*, 2018 U.S. Dist. Lexis 106746 (N.D. Ill. June 26, 2018) (combined opinion and order denying motions to dismiss filed in *Brown* and *Howard*).

*Brown* settled after the class was certified.  *Brown v. Cook County*, 2020 U.S.

Dist. Lexis 207609 (N.D. Ill. September 18, 2020). But, *Howard* was appealed to the Seventh Circuit, which reversed the decision to grant class certification. *Howard v. Cook County*, 989 F.3d 587 (7th Cir. 2021). In reaching this decision, the Seventh Circuit resolved a number of issues raised by this Motion against the position taken by Plaintiffs.

First, the *Howard* plaintiffs had offered upon the expert witness testimony of Dr. Louise Fitzgerald, the same expert retained by Plaintiffs in this case. The district court had relied upon her opinions in assessing the commonality pre-requisite of Rule 23(a)(2). 989 F.3d at 600-601. The Seventh Circuit found that the district court's reliance on Dr. Fitzgerald's opinions was improper. *Id.* at 601.

Second, *Howard* recognized that "[h]ostile work environment claims are fact intensive [because they depend] on the frequency, severity, character and effect of the harassment." 989 F.3d at 604. Even if many potential class members had comparable experiences, the plaintiffs had not established this for the class they sought to represent. *Id.* In this case, even the experiences among the named Plaintiffs are different from each other. In addition, as in this potential class, some members allegedly experienced direct harassment while others experienced indirect or ambient harassment. *Id.* at 606. Finally, the reasonableness of the response is a fact based inquiry. *Id.* at 608.

Therefore, in all likelihood, *Brown* was erroneously decided in light of

*Howard*.   Accordingly, this Court should not rely upon *Brown* when evaluating Plaintiffs' Motion.

       7.    <u>Plaintiffs's legal analysis is flawed because it relies upon case law seeking class-wide injunctive relief or certification under Rule 23(b)(2), which requires a different analysis from that required under Rule 23(b)(3)</u>

Almost all of Plaintiffs' case law seeks injunctive relief, which can be a ground for class certification under Rule 23(b)(2).  In *Dukes v. Wal-Mart*, Justice Scalia explains a key difference between classes under Rule 23(b)(2) and Rule 23(b)(3) as follows:

> When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so--which is precisely why (b)(3) requires the judge to make findings about predominance and superiority before allowing the class.

564 U.S. at 362-63.

Plaintiffs are not seeking class wide injunctive relief against MLMLM or MAAKS and are not seeking class certification under Rule 23(b)(2).  Therefore, most of their case law never considers the predominance or superiority issues that are present in a Rule 23(b)(3) evaluation.  In other words, Plaintiffs' case law simply does not apply to the request that this Court certify a class under Rule 23(b)(3)

against MLMLM and MAAKS.

**B.** **Plaintiffs have failed to meet their burden of showing that this case is appropriate for class certification under Rule 23(a).**

There are four prerequisites for class certification under Rule 23(a): numerosity, commonality, typicality and adequacy of representation.  MLMLM and MAAKS rely upon the objections that the McDonald's Defendants are raising to the numerosity requirements.  They will address the other requirements.

1.   <u>Plaintiffs cannot demonstrate that there are common questions that will be resolved by class-wide proof.</u>

The second Rule 23(a) prerequisite is commonality.  The issue is not whether there are common questions, but whether there are common answers that apply to class members and can be obtained by a single, classwide, inquiry.  *Wal-Mart v. Dukes*, 564 U.S. at 350.  To meet their burden of proceeding, the plaintiffs must show that the proposed class members have a "common contention . . . that . . . is capable of classwide resolution.  564 U.S. at 350.  An individual question is one in which the members of the proposed class must present evidence that varies from member to member.  *Tyson Foods,* 136 S. Ct. at  1045; and *Sprague*, 133 F.3d at 397 ("What we are looking for is a common issue the resolution of which will advance the litigation.")

Plaintiffs offer a list of nine questions that they claim are common to this case. (ECF 190, Brief Supporting Motion for Class Certification, p. 24, PageID4508).  The

last three relate solely to Plaintiffs' potential claims against the McDonald's Defendants.  (*Id.*, PageID.4508).  Even if these are common issues under Rule 23(a), the existence of these questions does not affect whether this Court should certify a class against MLMLM or MAAKS.

### Question 1: Was there an objectively hostile work environment in the Mason McDonald's during shifts when Banks was working?

The allegedly hostile work environment existed only when Mr. Banks was present for shift.  Mr. Banks worked different shifts, at different times, with different people between October 16, 2016 and March 28, 2019, the date he was suspended. There were three different general managers over this time period.[5]  There is evidence that his behavior differed depending upon whether a general manager was also working at the restaurant.  (See, e.g., Exhibit 4: Anderson Deposition, p. 127 (testifying that Shawn's behavior was "more tame" and that he tried to do his job better when more when the General Managers (Ms. Blakesley and Mr. Niezgoski) were present, but that he was a lot more lax in his manager duties and behavior when they were not; and Exhibit 5: Mackley Deposition, p. 91 (admitting that Mr. Banks did not make inappropriate comments when Mr. Niezgoski was around) and p. 100 (not remembering if any general managers were present when he behaved inappropriately or within earshot when he said inappropriate things).

---

[5] Dawn Blakesley, Todd Niezgoski and Stephanie Robertson.

Plaintiffs offer evidence from other witnesses claiming that the behavior of Mr. Banks was not different when the general managers.  Rather than showing that all MLMLM employees experienced the same hostile work environment, however, this conflicting testimony about the behavior of Mr. Banks actually confirms that determining whether there was a hostile work environment when he worked is an individualized inquiry.

Finally, whether there was a hostile work environment is an individualized inquiry depends upon the reaction of individuals to whatever Mr. Banks is proven to have done or said.  The videotape of the interaction between Mr. Banks and Ms. McQuire in the office provides a good example of why this is such an individualized inquiry here.  Plaintiffs have filed this videotape as Exhibit 6 to their Motion for Class Certification.  (ECF 175-1, List of Exhibits, PageID.3661).[6]  They label this exhibit as "Video of Banks Harassing in Office".  (*Id.*).  But, was he actually harassing anyone on the office?  His alleged victim was Ms. McGuire, the arch-nemesis of Plaintiff Ries.  One week later, Ms. McGuire signed a statement in which she denied that she had ever seen Mr. Banks do anything inappropriate.  (Banks Investigation, PageID.4596).

Therefore, whatever anyone objectively thinks of their interaction in the

---

[6] Plaintiffs indicated that they have filed this videotape by delivering a USB drive to the Court.  (ECF 175-5, PageID.3680).

office, Ms. McGuire did not believe subjectively she was being sexually harassed, which is one element of a sexual harassment claim.  *Harris*, 510 U.S. at 21.  As explained in more detail below, the same is true of the interactions between Mr. Banks and Plaintiff Ries.

### Question 2: Did Defendants have actual or constructive knowledge of the hostile environment?

In *Dukes v. Wal-Mart*, the Supreme Court found that the plaintiffs failed to prove the commonality required by Rule 23(a)(2) because there were numerous individualized decisions made by different individuals are different times. Resolving this issue is dependent upon an individualized inquiry because so few of the named Plaintiffs and Declarants even claim to have reported the conduct of Mr. Banks to anyone.

For example, Plaintiff Anibal admits that she did not do so.  (ECF 161-7, PageID.3446, Anibal Deposition 143:3–17.).  She worked at the Mason restaurant at the same time as Ms. Anderson, Ms. Rice and Ms. Bacon.  None of them reported Mr. Banks for sexual harassment while Plaintiff Anibal worked there.  (Anderson Declaration, ¶ 43, PageId.1778) (ECF 161-24, Rice Deposition, pp. 77:8-17; 78:6-8; 78:15-23; 79:14-17; 87:3-5, PageID.3547-3548)[7] (Bacon Deposition, p. 143:3-17,

---

[7]  During her second period of employment, Ms. Rice admits she did not report Mr. Banks to anyone until she was asked to write a statement during the investigation of Mr. Banks.  (ECF 161-24, Rice Deposition, p. 123:15-18, PageID.3555).

{00114407.DOCX}                                    22

PageID.3446). They claim, however, that their superiors were present when Mr. Banks either said or did things that they now claim were offensive and objectionable.

Evaluating each of these contentions that someone must have seen something at sometime, then, is an individualized inquiry.

### Question 3: Did Defendants fail to take systemic steps to address the problem?

MLMLM and MAAKS acted quickly and decisively to address sexual harassment that was reported in multiple cases.  They acted quickly when Plaintiff Ries reported Mr. Banks on March 26, 2019.  There is no credible evidence that she did so before.

Whether MLMLM or MAAKS failed to act promptly in the case of Mr. Banks depends upon what they knew and when they knew it.  As explained above, this is an individualized inquiry into what people are allegedly to have seen or heard because so few individuals even claim to have reported the alleged harassment.

### Question 4: Is Banks a "supervisor" for whose actions Defendants are strictly liable under Title VII, and, if so, is there a valid *Faragher-Ellerth* defense?

Whether Mr. Banks was a supervisor and whether the *Faragher-Ellerth* doctrine only applies to the potential Title VII subclass because the Michigan Supreme Court has rejected this standard for ELCRA claims.  *Chambers v. Trettco, Inc.*, 463 Mich. 297, 313-316, 614 N.W.2d 910 (2000).  Plaintiffs claim there are 22 individuals in the Title VII subclass.  (ECF 190, PageID.4507).  One of them was

{00114407.DOCX}                                23

Plaintiff Ries, who cannot prove that Mr. Banks was her supervisor at any time

during the period of January 12, 2019 to March 28, 2019 because they were both

swing manager this entire time period.  Therefore, this issue affects no more than 21

individuals.  Accordingly, even if it could be resolved by common proof, it would

not provide a class wide answer that would drive the litigation forward to conclusion.

> **Question 5: Are General Managers and Assistant Managers "higher management" whose knowledge of harassment can be imputed to Defendants under ELCRA?**

The Michigan Court of Appeals has "define[d] this term [higher management]

to mean someone in the employer's chain of command who possesses the ability to

exercise significant influence in the decision-making process of hiring, firing, and

disciplining the offensive employee." *Sheridan v. Forest Hills Public Schools*, 247

Mich. App. 611, 622, 637 N.W.2d 536 (2001).  General managers had the authority

to hire new employees for their restaurant, but did not have the authority to fire them.

(ECF 161-4, Haller Deposition, p. 104:16-19, 111:23-112:1, PageID.3426-3427)

(ECF 161-3, Bitner Deposition, p. 227:2-4, PageID.3424).  A general manager could

also temporarily suspend an employee for misconduct.  (Response to Requests to

Admit, Response to Request for Admission 21, PageID.4347). Assistant Managers

prepared the weekly schedule for employees.  (Blakesley Deposition, p. 180:1-13,

PageID.4336)( Niezgoski Deposition, pp. 161:1-4, 163:3-5, PageID.4340-4341).

Perhaps, under these facts, this issue could be resolved against Plaintiffs under

these common facts.  If it cannot be resolved against Plaintiffs, the principal question here is not the authority possessed by general managers or assistant managers.  The questions are: (1) did Plaintiffs actually report sexual harassment to a general manager and (2) should MLMLM or MAAKS have known about the alleged misconduct by Mr. Banks despite the acknowledged failure of many witnesses to report him.

### Question 6: Are MLMLM and MAAKS an integrated enterprise or joint enterprise?

This issue applies to Plaintiffs' claims under Title VII, which would only affect the claims of about 22 employees.  Under the ELCRA, the question would be whether MAAKS is vicariously liable for the conduct of Mr. Banks under the doctrine of respondeat superior.  *See, e.g., Radtke v. Everett*, 442 Mich. 368, 382-83, 501 N.W.2d 155, 162 (1993) (listing five elements of hostile work environment claims arising under the ELCRA).  Therefore, this issue would only partially affect a liability determination as to less than 25% of the proposed class.[8]

2.   <u>Plaintiffs cannot demonstrate that their claims are typical of the potential class.</u>

Plaintiffs summarily argue that their claims are typical because they all

---

[8] Plaintiffs cite *West Ottawa Education Assoc. v. West Ottawa Public Schools*, 126 Mich.App. 306, 319-320; 337 N.W.2d 533 (1983) for the proposition that this test applies to the ELCRA.  *West Ottawa* was not a ELCRA case, and there do not appear to be any ELCRA cases applying this methodology to determine if one company is liable for alleged harassment by the employee of another company.

experienced harassment.  But, the claims by the named Plaintiffs are not typical of each other, let alone of the potential class, most of whose members have not spoken.

"The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980).  "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (cleaned up).  "[T]he typicality requirement is not satisfied when a plaintiff can prove his own claim but not 'necessarily have proved anybody's else's claim.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir., 2007)).  "[U]nder the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many distinct factual or legal questions as to make class certification inappropriate." *Marquis v. Tecumseh Prods. Co.*, 206 F.R.D. 132, 159 (E.D. MI. 2002) (typicality not met where substantial differences exist in the hostile work environment claims).

One element of determining whether there is a hostile work environment is subjective and depends upon whether each plaintiff found that the conduct by the alleged harasser was unwelcome, severe and pervasive.  The claim by Plaintiff Ries is not typical because of her consensual sexual relationship with Mr. Banks, her calling or texting him over 4,000 times and the fact that they even planned on living

together.  (Banks Phone Record Summary, PageID.3470) (Ries Deposition, pp. 20:20-21:6,  21:24-22:17,  23:17-23,  PageID.3434-3435).  Similarly,  Plaintiff Barber's helping Ms. Adams get a job at the Mason restaurant, instead of another restaurant staffed by MLMLM, is evidence of her subjective belief that she was not really being severely harassed by Mr. Banks.  (Adams Deposition, pp. 21:12-13, 21:23-22:2; 22:3-18, 91:23-92:6, PageID.3530, 3536).  Whether either Plaintiff Ries or Barber subjectively felt they were harassed does not determine whether any potential class member believed they were subjectively harassed.

The same is true of determining whether the words or conduct of Mr. Banks was unwelcome.  Resolving the claims by Plaintiff Ries depend upon an individualized review of her untraditional and rather chaotic relationship with Mr. Banks.  But, figuring out what conduct by Mr. Banks was welcomed by Plaintiff Ries, and what conduct was not, will not determine whether his conduct was welcomed by any other member of the potential class.  And whether Plaintiff Ries welcomes sexual relations with Mr. Banks does not answer the question of whether other women welcomed his sexual advances.  These are all separate, individualized, inquiries.

Plaintiff Bishop, alone among the named Plaintiffs and Declarants, has testified that she was actually terminated because she complained about Mr. Banks to Ms. Robertson.  There is no other Plaintiff, or Declarant, that makes a similar

{00114407.DOCX}                     27

claim.  Therefore, resolving the most important issue in the claim by Plaintiff Bishop will not affect the resolution of any issue in the potential claim by any other potential class member.

Therefore, this Court should find that Plaintiffs have failed to establish the typicality requirement for class certification.

        3.    <u>Plaintiffs cannot establish adequacy because they cannot establish typicality or commonality</u>.

Adequacy requires that Plaintiffs establish that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To satisfy this inquiry, Plaintiffs must "have interests in common with, and not antagonistic to, the interests of the unnamed members of the class[.]"  *Marquis,* 206 F.R.D. at 161. Because Plaintiffs cannot establish commonality or typicality, they are not adequate representatives.  *Brown v. Asset Acceptance, LLC*, 2020 WL 6940764, at \*7 (W.D. Mich. Sept. 28, 2020) (Neff, J.) (noting that adequacy and typicality "tend to merge" and holding that because "neither commonality nor typicality are present in this case, the Court similarly concludes that Plaintiff cannot adequately represent the interests of the proposed class.")

**C.**    **Plaintiffs have failed to meet their burden of showing that this case is appropriate for class certification under Rule 23(b)(3).**

Rule 23(b)(3) requires that a plaintiff show that common issues predominate over individualized issues.  A review of the evidence regarding just a few issues

related to Plaintiff Ries demonstrates why individualized issues predominate over common issues in this case.

        1.     <u>Determining if Plaintiff Ries was sexually harassed before July 26, 2018 or if she was trying to report Mr. Banks for sexual harassment July 26, 2018 is an individualized inquiry.</u>

Plaintiffs claim that Plaintiff Ries frequently reported Mr. Banks to Ms. Robertson.  (ECF 190, Amended Brief Supporting Motion for Class Certification, p. 10, PageID.4494).  In a Declaration prepared to support this Motion, Plaintiff Ries claims that she asked Ms. Robertson for a transfer in July of 2018 "to get away from Banks."  (ECF Doc. 175-36, Ries Declaration, ¶ 18, PageID.3887).  Plaintiff Ries did send Ms Robertson a text on July 26, 2018, in which she stated that "There's no fixing anything anymore.  I think I need to be transferred."  (Ries Text Message, PageID.4129).  But, did Plaintiff Ries want to be transferred to get away from Mr. Banks and, if so, why did Plaintiff Ries want to get away from Mr. Banks?

The answer to this question depends primarily upon looking into the details of the relationship between Plaintiff Ries and Mr. Banks in late July 2018.  Two days before asking for a transfer, Plaintiff Ries and Justine Kassab exchanged a series of Facebook messages in which they discuss that the terrible things that Mr. Banks and her live-in girlfriend[9] were supposedly saying to her.  (Exhibit 2: Ries Facebook

_____

[9] Unsurprisingly, the mother of the second child of Mr. Banks was not a fan of Plaintiff Ries.

Messages, PL000430).   Mr. Banks had apparently made some sort of threat to end

his life.   (Exhibit 2: Ries Facebook Messages, PL000430).   Plaintiff Ries then tells

Ms. Kassab that:

> She [Mr. Banks' girlfiend] says I followed him to his job
> and that I should go find another one.  He [Mr. Banks] says
> he only used me because he wanted another place to live.
> **He never loved me.**

(Exhibit 2: Ries Facebook Messages, PL000430) (emphasis added).   Plaintiff Ries

then explained that "Im just over it.  I'm always to blame and now I'm heartbroken

again.  I don't want him to kill himself.  I don't know why I care …."  (Exhibit 2:

Ries Facebook Messages, PL000429).   During her deposition, Plaintiff Ries testified

that she was heartbroken on July 24, 2018 because she was no longer in a sexual

relationship with Mr. Banks and nothing else.  (Exhibit 3: Ries Deposition, pp. 37-

38).

Two days later, on July 26, 2018, Plaintiff Ries tells Ms. Kassab that she had

asked for a transfer and that Ms. Robertson "said she was sorry and we would talk

about it the next time I [Plaintiff Ries] work."  (Exhibit 2: Ries Facebook Messages,

PL000427).   Plaintiff Ries then said that "I need to get away from him.  He's toxic."

(Exhibit 2: Ries Facebook Messages, PL000426).   A few weeks later, Ms. Kassab

told Plaintiff Ries that

> You honestly need to forget Shawn. . . . I'm sorry and I
> don't mean to hurt you but he lying to you.  Kirk told me
> today that Shawn was talking to people about how he's

gonna try to marry his gf by next fall… Just please believe
me on this …. He's not good for you…

(Exhibit 2: Ries Facebook Messages, PL405).

This evidence strongly suggests that Mr. Banks had not been sexually
harassing Plaintiff Ries before July 26, 2018.  Moreover, it is reasonably likely that
Plaintiff Ries was not even Ms. Robertson because of her relationship issues with
Mr. Banks.  Instead, Plaintiff Ries was having a great deal of difficulty at work
during the first half of July 2018, as she discussed with Plaintiff Barber.  (Exhibit 2:
Ries Facebook Messages, PL568-570).  Her problems included the difficulties with
Mr. Robertson.  (*Id.*).

Accordingly, determining why Plaintiff Ries was texting Ms. Robertson to
request a transfer is an individualized inquiry that requires an inquiry into both her
relationship with Mr. Banks and her other problems at work.  Therefore, rather than
demonstrate that common issues predominate over individualized ones, the July 28,
2018 text simply confirms the individualized nature of the claims that exist in this
case.

2.   Determining if the sext that Mr. Banks sent Plaintiff Ries
on October 6, 2018 is evidence of a hostile work
environment is an individualized inquiry.

In her Declaration, Plaintiff Ries also claims that Mr. Banks "continued to try
to get me to engage in sex with him, sending me a text picture of his penis and
demands to meet up with him." (Ries Declaration, ¶ 8, PageID.3885).  Plaintiff Ries

called or texted Mr. Banks over 4,000 times; he called or texted her almost 2,900 times.  (ECF 161-11, PageID.3470).  Only a few of these text messages exist; most were produced by MLMLM and MAAKS.

Plaintiff Ries did produce three strings of personal text messages between her and Mr. Banks.  One began late in the evening of October 6, 2018, and Mr. Banks did ask Plaintiff Ries if she wanted to have sex with him.  (Exhibit 6: Banks-Ries Text Exchange, PL00016).  But, the only objection that Plaintiff Ries had to his request was that she could not do so because she was at work.  (Exhibit 6: Banks-Ries Text Exchange).  Mr. Banks tells Plaintiff Ries that they could have sex after she was done with work and that she should text him because he would "be waiting". (Exhibit 6: Banks-Ries Text Exchange).  Plaintiff Ries then asked "How do I know it's you?"  (Exhibit 6: Banks-Ries Text Exchange).  Mr. Banks responds by "sexting" her a photograph of an erect penis.  (Exhibit 6: Banks-Ries Text Exchange).[10]  Plaintiff Ries responded 40 minutes later by texting the word "done" to Mr. Banks.  (Exhibit 6: Banks-Ries Text Exchange).  She did so at 12:01 AM on October 7, 2018, which was six minutes after she was done with work.  (Exhibit 7: Ries Time Punch) (showing Plaintiff Ries punching out at 11:55 PM on October 6, 2018.

Therefore, whether the October 6, 2018 sext message from Mr. Banks

---

[10] This exhibit is redacted.

constituted either sexual harassment or evidence of a hostile work environment is not dependent upon what Mr. Banks said to or around other MLMLM employees. It is not dependent upon what Mr. Banks did to or with other MLMLM employees. It is also not dependent upon what anyone else said or saw.  It is solely dependent upon the relationship that Plaintiff Ries and Mr. Banks had and whether his sexual advances were welcomed or not.  That is an individualized inquiry.

Plaintiffs argue that the consensual relationship that Mr. Banks and Plaintiff Ries had does not mean that he could have never committed actionable sexual harassment against Ms. Ries.  MLMLM and MAAKS certainly agree that it is possible for a former lover to engage in conduct that could rise to the level of severe and pervasive sexual harassment.  There is little to no contemporaneous evidence that Plaintiff Ries ever stopped loving Mr. Banks before March 23, 2019 or that she ever rejected his advances.

All of this evidence, of course, is highly individualized and only resolves the issue of whether Plaintiff Ries welcomed the advances of Mr. Banks, not whether anyone else was sexually harassed.

3.    <u>Determining if Plaintiff Ries had been sexually harassed by Mr. Banks or whether she was trying to report him for sexual harassment on October 19, 2018 is an individualized inquiry.</u>

In her declaration, Plaintiff Ries claims that she texted Ms. Robertson in October 2018 and "complained to her about how Banks treated me and others and

that he always got away with it." (ECF 175-36, Ries Declaration, ¶ 19, PageID.3887). The implication is that Plaintiff Ries is complaining about sexual harassment by Mr. Banks although Plaintiff Ries does not actually say this.

Determining if Plaintiff Ries had actually been harassed on or before October 19, 2018 and whether she was reporting Mr. Banks for sexual harassment on that date is an individualized inquiry. October 19, 2018 is only 11 days after Plaintiff Ries agreed to have sexual relations with Mr. Banks in a text message. By itself this suggests that Plaintiff Ries is not complaining about being sexually harassed to Ms. Robertson in her October 19, 2018 text message.

In her October 18, 2019 text, Plaintiff Ries tells Ms. Robertson that Mr. Banks "talked down to her", called her a "fat", "lazy" and a "shitty worker", and complains that "he never gets in trouble but I get bitched at for every little thing." This text message was merely the latest in a string of text messages between Plaintiff Ries and Ms. Robertson that goes back over a month until September 13, 2018. On that day, Plaintiff Ries complaints that she's "seriously had enough of no one doing their job." (Exhibit 8: Ries-Robertson Text Messages). Her complaints about how other people are not doing their jobs and other problems continue for the next month. (Exhibit 8: Ries-Robertson Text Message).

This series of text messages culminates with Mr. Bank's reporting Plaintiff Ries for calling Ms. Robertson a "bitch" to crew members in a snapchat message.

{00114407.DOCX}                34

(Exhibit 8: Ries-Robertson Text Messages, MLMLM_texts_116-117). As a result, Ms. Robertson requesting a meeting with Plaintiff Ries earlier in the day on October 18, 2018.   (Exhibit 8: Ries-Robertson Text Messages, MLMLM_texts_118). Several hours later, Plaintiff Ries sent the October 18, 2018 text that Plaintiffs attached to their Motion later that same day.

Accordingly, even evaluating the October 18, 2018 text message depends primarily upon asking and answering individualized questions.  It appears that this text message does not have anything to do with sexual harassment by Mr. Banks, but other problems that Plaintiff Ries is having at work, including insubordination. How this issue is ultimately resolved does not resolve any other issue in the case. Once again, this confirms that individualized issues predominate over common ones.

4.     Determining if the videotape shows Mr. Banks sexually harassing Plaintiff Ries is an individualized inquiry.

In her Declaration, Plaintiff Ries claims that she sent a text to Mr. Haller and told him that "Banks was touching me and other women.  I asked him to review restaurant security camera footage of Banks placing his penis in my hand while I was trying to work and hitting another employee's rear end with a muffin paddle." (ECF 175-36, Ries Declaration, ¶ 20, PageID.3887).

The grill videotape is 115 seconds long.[11]  During the first 35 seconds, Mr.

_____

[11]   Plaintiffs filed the grill videotape as Exhibit 5 by submitted a USB drive to the Court.  (ECF 175-4, PageID.3679).

Banks is present only briefly although Plaintiff Ries happily smiles at him when he does appear. Beginning about 45 seconds into the video, for a period of 7 to 8 seconds, Mr. Banks dances around Plaintiff Ries, rubs her shoulders and then grinds himself into her.[12] Whenever her face is visible, Plaintiff Ries is smiling. Plaintiff Ries responds to his actions by either grabbing or slapping his buttocks playfully. Mr. Banks then gives a "hip check" to the crew member in the grill area.[13] For the last 20 seconds of the video, Mr. Banks and Plaintiff Ries are standing closely together, side by side, and making sandwiches. At the very end, Plaintiff Ries's face briefly appears; she is beaming contently at Mr. Banks.

From a purely objective standpoint, the conduct by Mr. Banks is not appropriate and would appear to be evidence of his sexually harassing Plaintiff Ries. But, determining whether he is actually sexually harassing Plaintiff Ries is entirely dependent upon an individualized inquiry into the relationship between Plaintiff Ries and Mr. Banks. Plaintiff Ries claims that she had told Mr. Banks she was not interested anymore before this videotape was taken. But, there is significant evidence unique to Plaintiff Ries showing otherwise.

In summary, wow the trier of fact resolves the questions of what the July 26,

---

[12] Plaintiff Ries and Plaintiff Barber have told people that they have a videotape of Mr. Banks putting his penis in her hand. Her counsel references his doing so several times in the recent briefs. This videotape does not show Mr. Banks doing so.
[13] The crew member does not like being hip checked, and who could blame her. But, this safety violation is not evidence of severe and pervasive sexual harassment.

{00114407.DOCX}                    36

2018 and October 19, 2018 text messages mean and whether Mr. Banks is sexually

harassing Plaintiff Ries in the videotape will not depend upon who reported what

about Mr. Banks before July 2018.  Resolving these questions will not depend on

what other people saw, heard or felt.  Resolving these questions depend solely upon

individualized inquiries that will not resolve any common issues for other potential

class members.

All of this evidence exists about Plaintiff Ries because she is the lead Plaintiff

and is the centerpiece of Plaintiffs' case.  But, similar individualized inquires will

exist for all of the named Plaintiff and all of the Declarants.  Therefore, this Court

should find that Plaintiffs cannot meet their burden of showing that class certification

is appropriate under Rule 23(b)(3) and deny this Motion.

### CONCLUSION AND RELIEF REQUESTED

This Court should deny this Motion.

Respectfully Submitted,

Lipson Neilson P.C.

By:   /s/ C. Thomas Ludden
C. Thomas Ludden (P45481)
Jessica Lynn Wynn (P 75442)
Attorneys for Defendant MLMLM
and M.A.A.K.S., Inc.
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan 48302
(248) 593-5000
tludden@lipsonneilson.com

Dated:  July 23, 2021

{00114407.DOCX}                                                        37

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(b)(1)

This supporting brief complies with Local Rule 7.2(b)(1) because it contains 8787 words, not including case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits..  This brief was prepared in Microsoft Office 2016, whose word count feature was used to determine compliance with rule.

Respectfully Submitted,

Lipson Neilson P.C.

By:   /s/ C. Thomas Ludden
       C. Thomas Ludden (P45481)
       Jessica Lynn Wynn (P75442)
       Attorneys for Defendants
       MLMLM and MAAKS
       3910 Telegraph Road, Suite 200
       Bloomfield Hills, Michigan 48302
       (248) 593-5000
       tludden@lipsonneilson.com

Dated:  July 23, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, I electronically filed the RESPONSE BY DEFENDANTS MLMLM CORPORATION AND MAAKS, INC. TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF 175) and this Certificate of Service with the Clerk of the Court using the ECF System which will send notification of such filing to all attorneys of record.

*/s/ Yolunder Amos*