UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNA RIES, et al.,

      Plaintiffs,

                                    Case No. 1:20-cv-2

v.

                                    Hon. Hala Y. Jarbou

MCDONALD'S USA, LLC, et al.,

      Defendants.

_____/

**OPINION**

Plaintiffs Jenna Ries, Katlyn Barber, Joanne Bishop, and Emily Anibal bring this action against Defendants for sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, et seq.  (*See* Third Am. Compl., ECF No. 142.)  Plaintiffs sue McDonald's, LLC and McDonald's Corporation (collectively, "McDonald's") as well as two entities operating a McDonald's franchise in Michigan:  MLMLM Corporation and M.A.A.K.S., Inc. (collectively, "Franchisee").  Plaintiffs are former employees of a McDonald's restaurant in Mason, Michigan, operated by Franchisee.  They allege that a manager at that location repeatedly harassed them, both physically and verbally.  Before the Court is a motion for summary judgment by McDonald's (ECF No. 154).  Because no reasonable juror could find that McDonald's acted as an employer or agent subject to liability under Title VII or the ELCRA, the Court will grant the motion.

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ.

P 56(c)) (internal quotations omitted). A fact is material if it "might affect the outcome of the

suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely

disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party." *Id.* at 249 (citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253,

288-89 (1961)). "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for

trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City

Serv.*, 391 U.S. at 289). When considering the facts, the Court must draw all inferences in the light

most favorable to the nonmoving party. *Id.* Summary judgment is not an opportunity for the Court

to resolve factual disputes. *Anderson*, 477 U.S. at 249.

## II. ANALYSIS

### A. Title VII

Title VII prohibits an "employer" from engaging in certain "unlawful employment

practices." 42 U.S.C. § 2000e-2(a). The term "employer" means "a person engaged in an industry

affecting commerce who has fifteen or more employees . . . and any agent of such a person[.]" 42

U.S.C. § 2000e(b).

McDonald's argues that it is not liable because it did not employ Plaintiffs or control

employment matters at the restaurant where Plaintiffs worked. McDonald's argues that it is simply

a franchisor; Franchisee controlled the conditions of Plaintiffs' employment, not McDonald's.

Plaintiffs respond that McDonald's is liable for two reasons:  (1) it retained sufficient control over

their employment conditions to qualify as a "joint employer"; and (2) McDonald's caused

Plaintiffs to believe that Franchisee was an agent of McDonald's.

### 1. Joint Employer

"Under the 'joint-employer' theory, 'an entity that is not the plaintiff's formal employer may be treated under these doctrines as if it were the employer for purposes of employment laws such as Title VII.'" *Nethery v. Quality Care Invs., L.P.*, 814 F. App'x 97, 102-03 (6th Cir. 2020) (quoting *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011)). "Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment.'" *Id.* (quoting *EEOC v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013)).

In determining whether an entity is the plaintiff's joint employer, "the major factors include the 'entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance.'" *Id.* (quoting *Skanska USA*, 550 F. App'x at 256). Put simply, McDonald's can be liable as a joint employer if it has "retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by [Franchisee]." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997).

Here, a franchise agreement between McDonald's and Michael Dickerson (the owner of MLMLM and M.A.A.K.S.) governed the relationship between McDonald's and Franchisee. (*See* Franchise Agreement, ECF No. 154-3.) The agreement, which had a 20-year term, expressly states that "Franchisee shall have no authority, express or implied to act as an agent of McDonald's" and that "Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way[.]" (*Id.*, PageID.3019.)

More importantly, the agreement did not give McDonald's the ability to hire, fire, discipline, or affect the compensation or benefits of Franchisee's employees. Dickerson testified that he and Nanette Bitner, his operations manager and the senior supervisor of the Mason

3

restaurant, had authority to hire and fire employees.  (Dickerson Dep. 216, ECF No. 154-7.)  No

one from McDonald's played a role in hiring, firing, promoting, disciplining, or setting wages for

employees at his restaurants.  (*Id.* at 266-68.)  Nor did they play a role in assigning individual

employees to their positions or in supervising their day-to-day activities.  (*Id.*)  Plaintiffs offer no

evidence to the contrary.

To be sure, the Franchise Agreement requires Franchisee to abide by a particular method

of operating and maintaining a restaurant, called the "McDonald's System."   (Franchise

Agreement, PageID.3088.)  This system details

> the retailing of a limited menu of uniform and quality food products, emphasizing
> prompt and courteous service in a clean, wholesome atmosphere which is intended
> to be attractive to children and families and includes proprietary rights in certain
> valuable trade names, service marks, and trademarks, including the trade names
> "McDonald's" and "McDonald's Hamburgers," designs and color schemes for
> restaurant buildings, signs, equipment layouts, formulas and specifications for
> certain food products, methods of inventory and operation control, bookkeeping
> and accounting, and manuals covering business practices and policies.

(*Id.*, PageID.3082.)  But that system does not set the terms of the relationships between Franchisee

and its employees.  It is instead a set of prescriptions for branding, operations, and quality control

that is common for franchise relationships.

Plaintiffs point to the requirement that Franchisee operate the restaurant in a "good, clean,

wholesome manner" (*id.*, PageID.3092), but Plaintiffs do not point to any evidence that any party

to the Franchise Agreement construed this requirement to mean an absence of sexual

discrimination and harassment among Franchisee's employees.  And even if that is what this

requirement means, there is no evidence that it gave McDonald's the ability to do anything other

than find Franchisee in breach of the Franchisee Agreement and terminate that agreement.

Although such a termination would have impeded Franchisee's ability to continue operating,

4

control over Franchisee's ability to continue business does not amount to control over Franchisee's relationship with its individual employees.[1]

Plaintiffs also rely on the fact that McDonald's periodically assessed Franchisee according to its "National Franchising Standards" ("NFS").  McDonald's used these assessments to "identify those [franchisees] with whom McDonald's desires to grow and/or enter into new franchise relationships."  (Bonta Dep. 28.)[2]  Before the term of a franchise agreement expires, McDonald's will review the assessments to determine whether to award a new term to the franchisee.  (*Id.* at 53.)   But these standards were not part of the Franchise Agreement; indeed, the standards themselves expressly state that they "do not create or modify any contract rights or obligations" and "do not necessarily address whether" the franchisee is complying with its franchise agreement. (NFS, ECF No. 176-5, PageID.4195.)  McDonald's plays a "consulting role" with respect to its franchisee's compliance with the standards; it cannot require the franchisee to comply with them. (Bonta Dep. 104.)

Plaintiffs argue that the NFS gave McDonald's substantial control because McDonald's frequently[3] assessed Franchisee's compliance with the NFS and then used those assessments to determine whether to renew a franchise at the end of its term.  But gathering data every few weeks or months from each restaurant for the purpose of deciding whether to continue a business relationship with Franchisee at the end of a multi-year term is a far cry from exercising day-to-day

---

[1] For similar reasons, the Court rejects Plaintiff's argument that the Franchise Agreement's requirement that Franchisee abide by "federal, state, and local laws" (Franchise Agreement, PageID.3089) gave McDonald's control over Franchisee's employees.  If the Court were to accept Plaintiffs' argument, then any contract between an employer and a third party containing a similar requirement (such as a loan or license agreement) could subject the third party to liability under Title VII if the contract was necessary for the employer to conduct its business.  It is unlikely that Congress intended Title VII to cast so wide a net.

[2] Alvaro Bonta testified as the corporate representative of McDonald's.  Excerpts of his deposition are located at ECF Nos. 154-4, 176-10, and 188-2.

[3] McDonald's conducted approximately one visit every three months at each of Franchisee's eleven restaurants. (Bonta Dep. 159.)

supervision and control over Franchisee's employees.  Plaintiffs do not point to any instance in which McDonald's used its assessments to dictate the discipline, promotion, or any other change in the terms or conditions of employment for any particular employee of Franchisee.  Although several Franchisee employees testified that scores on these assessments were considered *by Franchisee* during employee performance reviews (Blakesley Dep. 141-42, ECF No. 210-43), or were used *by Franchisee* as the basis for awarding employee perks or bonuses (Pyers Dep. 201, ECF No. 210-41; Bitner Dep. 205-08, ECF No. 210-40), there is no evidence that McDonald's required Franchisee to use the assessments in this manner.  The fact that Franchisee took these assessments into account when exercising *its own control* does not mean that McDonald's co-determined the essential conditions of Plaintiffs' employment.  *Cf. Nethery*, 814 F. App'x at 104 n.2 (finding no joint employer relationship where the employer took another entity's "wishes into account when exercising *its own* power").  Thus, Plaintiffs have not shown that the NFS standards gave McDonald's any significant control over Franchisee's employees.

McDonald's also provided an operations and training manual to its franchisees.  (Bonta Decl. ¶ 11, ECF No. 154-2.)  Amon other things, that manual contains a list of duties and procedures for opening the restaurant and starting a shift.  The Franchise Agreement provides that Franchisee must "promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals."  (Franchise Agreement, PageID.3084.)  However, the manual itself states that franchisees can "choose to apply or implement any portion" of it, and that franchisees are "exclusively responsible for complying with all statutes, laws, and regulations applicable to their restaurants."  (2015 Manual Excerpt, ECF No. 154-2, PageID.3079.)  A more recent version of the manual does not contain these disclaimers, but it repeatedly instructs employees to "contact your Owner/Operator for advice" about "practices at your restaurant."

6

(2017 Manual Excerpt, ECF No. 216-15, PageID.5193, 5195, 5198.)  Thus, the manual makes clear that practices will vary according to choices made by the franchisee.  Importantly, nothing in the manual excerpts provided by the parties gave McDonald's the ability to control the Franchisee's relationship with its employees.

Plaintiffs also point to a variety of templates and resources that McDonald's provided to Franchisee, including:  an "Employee Resources" poster describing employee rights and a sexual harassment policy; a personality test for screening candidates; a website for job postings; job interview guidelines and application templates; software to track employee time and generate disciplinary reports; guidelines for the number and type of employees necessary to run a restaurant; and training programs for certain employees.  However, there is no evidence that any of these resources or programs gave McDonald's control over the essential terms of employment for Franchisee's employees.  To the contrary, the evidence shows that Franchisee alone possessed and exercised that control.

Plaintiffs put stock in the fact that McDonald's purportedly required Franchisee to display the Employee Resources poster.  Plaintiffs apparently argue that McDonald's effectively required Franchisee to adopt the McDonald's policy described on the poster for reporting sexual harassment.  However, displaying a policy is one thing.  Implementing it is another.  There is no evidence that McDonald's played any role in implementing or enforcing such a policy.  Indeed, the poster states that any harassment is to be reported to employees of Franchisee (e.g., the "Restaurant/General Manager" or the "Owner Operator").  (ECF No. 210-46, PageID.4980.)  The poster also contains a blank space for contact information for the manager or owner of the restaurant.  The poster provides no information or guidance about reporting misconduct to

McDonald's.  Thus, the poster does not create a genuine issue of fact about whether McDonald's

retained sufficient control over Franchisee's employees to qualify as a joint employer.

Finally, Plaintiffs rely on an April 14, 2021, press release by McDonald's announcing that,

"[b]eginning in January 2022," it would be applying "new Global Brand Standards" to all of its

restaurants; these new standards will apparently "prioritize actions" in "harassment, discrimination

and retaliation prevention[.]"  (Press Release, ECF No. 175-26, PageID.3775.)  According to the

press release, McDonald's intends to assess its restaurants and "hold [them] accountable in

accordance with applicable McDonald's market's business evaluation processes."  (*Id.*)

McDonald's rightly notes that the press release has limited relevance to this case because

it is forward-looking.  It does not apply to the time period at issue in the complaint.  Plaintiffs

respond that the press release is evidence that McDonald's has always had the right to impose

personnel policies on its franchisees.  But neither the details of the new policy, nor its mechanism

of enforcement are laid out in the press release.  Nothing in the press release itself indicates that

McDonald's has had, or will have, control over the conduct of an individual employee of a

franchisee.  Indeed, the references to McDonald's "brand standards" and "business evaluation

processes" suggest that McDonald's will implement its new policies in the same manner that it

implements the NFS.[4]  As discussed above, periodic assessments and the power to terminate the

franchise relationship are not equivalent to day-to-day supervision and control over the working

conditions of a franchisee's employees.

In short, construing the evidence in a light most favorable to Plaintiffs, there is no genuine

dispute that McDonald's did not meaningfully participate in employment decisions or possess

---

[4] "Brand Standards Visit" is a term that McDonald's uses in the NFS to describe some of its in-person restaurant assessments.  (NFS, PageID.4196.)

sufficient control over the terms of Plaintiffs' employment to qualify as a joint employer. The

control that McDonald's did have in its relationship with Franchisee was "control over conformity

to standard operational details inherent in many franchise settings" and "the power to terminate

[the] franchises." *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir. 1991). As other

courts have concluded, that level of involvement in a franchisee's business does not suffice to give

rise to employer liability under Title VII. *See id.*; *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d

1138, 1143-45 (D. Nev. 1999) (finding that personnel policies contained in business manuals

provided by McDonald's to its franchisee did not establish control by McDonald's over

employment matters at the franchisee's restaurant); *McFarland v. Breads of the World, LLC*, No.

1:09-cv-929, 2011 WL 801815, at *8-12 (S.D. Ohio Feb. 1, 2011), *report and recommendation*

*adopted*, No. C-1-09-929, 2011 WL 801793 (S.D. Ohio Mar. 2, 2011) (noting that "courts have

been nearly uniform in holding that a franchisor should not be deemed to be an 'employer' for

purposes of Title VII when the plaintiff works for an independently owned franchise"); *accord*

*Baetzel v. Home Instead Senior Care*, 370 F. Supp. 2d 631, 640-41 (N.D. Ohio 2005) (citing cases).

Plaintiffs rely on cases in which courts denied a franchisor's attempt to dismiss similar

claims against it because the franchisor was involved in creating personnel policies or provided

training to the franchisee's employees. *See, e.g.*, *Johnson v. McDonald's*, No. 4:20-CV-1867-

RWS, 2021 WL 2255000 (E.D. Mo. June 3, 2021); *A.H. ex rel. Hunt v. Wendy's Co.*, No. 3:18-

cv-0485, 2018 WL 4002856 (M.D. Pa. Aug. 22, 2018); *Parrott v. Marriott Int'l, Inc.*, No. 17-

10359, 2017 WL 3891805 (E.D. Mich. Sept. 6, 2017); *Harris v. Midas*, No. 17-95, 2017 WL

5177668 (W.D. Pa. Nov. 8, 2017); *Myers. v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d

598 (E.D. Pa. 2010). Those cases are distinguishable. There, courts concluded that the plaintiffs

had alleged sufficient facts in their complaints to state a plausible claim against the franchisor and

proceed to discovery. The question facing this Court is a different one. The Court is not assessing the allegations in Plaintiffs' complaint. At this stage, Plaintiffs must support their allegations with evidence sufficient to demonstrate that they can proceed to trial against McDonald's. They have not done so. They have not shown that there is a genuine dispute of fact about whether McDonald's was a joint employer with Franchisee.

### B. Apparent Authority

As an alternative to the "joint employer" theory, Plaintiffs contend that McDonald's can be liable under an "apparent authority" theory. As indicated above, Title VII prohibits action by an "employer," a term that is defined to mean "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any *agent* of such a person." 42 U.S.C. § 2000e(b) (emphasis added). Thus, employers can be liable under Title VII for the actions of their agents. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755-65 (1998).

Plaintiffs invoke the principle "apparent authority," which is found in the Restatement (Second) of Agency. According to the Restatement,

> (1) A master or other principal is subject to liability for torts which result from reliance upon, or belief in, statements or other conduct within an agent's apparent authority.

> (2) Unless there has been reliance, the principal is not liable in tort for conduct of a servant or other agent merely because it is within his apparent authority or apparent scope of employment.

Restatement (Second) of Agency § 265. Plaintiffs argue that they thought Franchisee was controlled by McDonald's and, thus, McDonald's is liable under Title VII because Franchisee and its employees were apparent agents of McDonald's.

The main problem with Plaintiffs' argument is that it stretches Title VII beyond its textual limits. The statute expressly applies to employers and agents of employers. An "employer" is defined as a "person with fifteen or more employees," i.e., the plaintiff's actual or potential

employer, and "any agent of *such a person*."  42 U.S.C. § 2000e(b) (emphasis added).  In other

words, the agent must be an agent *of the employer*.  *See Meritor Sav. Bank, FSB v. Vinson*, 477

U.S. 57, 72 (1986) (noting that, in 42 U.S.C. § 2000e(b), Congress chose "to define 'employer' to

include any 'agent' *of an employer*" (emphasis added)); *see also Ellerth*, 524 U.S. at 758-62

(discussing circumstances where "agency principles impose liability *on employers*" (emphasis

added)).  Title VII does not expressly apply to agents of *apparent employers* or to an *apparent*

*principal* of the actual employer.  For reasons stated in the previous section, McDonald's was not

Plaintiffs' employer, either by itself or jointly with Franchisee, because it did not possess sufficient

control over the terms of Plaintiffs' employment.  In addition, McDonald's was not an agent of

Plaintiffs' employer.  Thus, for purposes of Plaintiffs' claim, McDonald's does not fit within the

definition of "employer" in Title VII.

Furthermore, Sixth Circuit precedent suggests that, without some control over employment

decisions, an entity is not liable under Title VII, either as an ostensible employer or as an agent.

That court

> has not comprehensively explained the legal theories by which to identify
> "employers" under the Civil Rights Acts.  Instead, we appear to have three lines of
> cases setting out three theories . . . .  First, we have stated in several cases that for
> the purposes of the ADA and other Civil Rights Acts, an employer/employee
> relationship is identified by considering:  the entire relationship, with the most
> important factor being *the employer's ability to control job performance and*
> *employment opportunities* of the aggrieved individual.  Second, we have recognized
> that *an agent of an employer* may be identified as an employer for the purposes of
> the Civil Rights Acts *if the employer delegated employment decisions to the agent*.
> Finally, . . . we have stated that Title VII does not require a formal employment
> relationship between the plaintiff and the defendant.  Rather, a plaintiff is protected
> if the defendant is *one who significantly affects access of any individual to*
> *employment opportunities*.
>
> These three lines of cases do not seem to recognize one another; although, arguably,
> the later cases in this court stating the first theory consolidate all three theories
> under the "control" concept.

*Satterfield v. Tennessee*, 295 F.3d 611, 617 (6th Cir. 2002) (emphasis added; quotation marks and citations omitted).  "The first and second theories, the employer control theory and the agency theory, seem to be essentially the same in this circuit."  *Id.* at 617 n.6.

Applying the three legal theories mentioned in *Satterfield* to this case, Plaintiffs cannot proceed to trial with their Title VII claim against McDonald's.  There is no evidence that McDonald's had the ability to control Plaintiffs' job performance or employment opportunities, that it delegated employment decisions to Franchisee, or that it significantly affected the access of any individual to employment opportunities with Franchisee.

The upshot is that McDonald's does not face liability under Title VII merely because Plaintiffs wrongly believed that McDonald's was their employer or that it could control the conditions of their employment.  Indeed, holding McDonald's liable under these circumstances would deprive it of a defense to liability because, unlike an actual employer (or an agent acting on the employer's behalf), McDonald's had no means "to prevent and correct promptly any sexually harassing behavior[.]"  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (discussing an employer defense to liability for harassment).  For instance, McDonald's could not supervise Franchisee's employees and then discipline them to correct harassing behavior.  The undisputed evidence shows that Franchisee alone possessed and exercised that authority.

Plaintiffs purport to rely on "agency principles" to support their claim, ignoring the foregoing precedent and the text of Title VII, which in its most natural reading (and as construed in *Ellerth* and *Vinson*) indicates that the agent must be an agent *of the plaintiffs' employer*, not an agent of a third party who had no meaningful ability to control the terms and conditions of the plaintiffs' employment.  Plaintiffs cite only a handful of cases supporting an "apparent agency" theory of liability against a principal who has no employer relationship with the plaintiff.  None of

12

those cases addresses the tension between that theory and the text of Title VII. Considering the lack of textual and legal support for Plaintiffs' theory, the Court is not persuaded that it can serve as a viable basis for a claim against McDonald's.

Another problem with Plaintiffs' theory stems from agency law. The concept of apparent authority is ill-suited to a harassment or discrimination claim against a third party like McDonald's. "As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have . . . . In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence." *Ellerth*, 524 U.S. at 759.

Furthermore, where an employee concludes that an individual had apparent authority, that conclusion "must be a reasonable one." *Id.* If the employee "knows or has reason to know that an agent lacks authority to take a particular action, the agent does not act with apparent authority." Restatement (Third) of Agency § 7.08 cmt. b. And "[w]hen an agent's conduct constitutes a tort such as assault . . . , only in unusual circumstances would a third party harmed by the tort believe that the agent acted with actual authority in committing it." *Id.* Here, there is scant evidence that Plaintiffs reasonably believed that their manager's harassing actions were within the authority given to him by McDonald's.

Plaintiffs cite *Miller v. D.F. Zee's, Inc.*, 31 F. Supp. 2d 792 (D. Or. 1998), in which a district court determined there was a triable issue of fact in a Title VII case as to whether a franchisor could be vicariously liable under an apparent agency theory for the actions of the employees of its franchisee. *Id.* at 805. That opinion is not binding on this Court and it is not persuasive because it relies upon Oregon agency law. *Id.* at 806.

In addition, *Miller* is distinguishable. There, the court concluded that "there was no indication in the restaurant that the restaurant was owned by a franchisee." *Id.* at 808. In contrast,

Franchisee told each of the Plaintiffs at or before the start of their employment that McDonald's was not their employer.  All but one of the Plaintiffs initialed a document provided by Franchisee which states that

> The McDonald's restaurant you work at is owned and operated by an independent McDonald's Franchisee (your "owner/operator").  This is your employer. McDonald's Corporation is not involved in any way in the employment matters of the independently owned McDonald's restaurants.

(ECF Nos. 154-19 (Ries), 154-22 (Barber),  154-28 (Bishop).)[5]  And they all signed a document stating,

> I acknowledge that I am applying for employment with an independently owned and operated McDonald's franchisee, a separate company and employer from McDonald's Corporation and any of its subsidiaries.

(ECF Nos. 155-1 (Ries), 155-2 (Barber), 155-3 (Anibal), 155-4 (Bishop).)

Plaintiffs contend that they did not read these documents or understand them. Nevertheless, they had reason to know that their manager was not acting on behalf of McDonald's. *See Wright v. Mountain View Law Care, LLC*, No. 7:15-cv-00224, 2016 WL 1060341, at *11 (W.D. Va. Mar. 11, 2016) (distinguishing *Miller* for similar reasons); *accord D.L.S. v. Maybin*, 121 P.3d 1210, 1214 (Wash. Ct. App. 2005) (distinguishing *Miller* and rejecting a theory of apparent agency liability against McDonald's).

Accordingly, for all the foregoing reasons, McDonald's is entitled to summary judgment in its favor for Plaintiffs' Title VII claim.

### C. ELCRA

Plaintiffs' ELCRA claim against McDonald's fails for similar reasons.  The ELCRA prohibits an "employer" from discriminating against individuals "with respect to employment,

---

[5] Anibal did not initial this document, but it was in her personnel file.  In any case, she testified that she understood that she did not work for McDonald's, and that McDonald's was not involved in employee discipline.  (Anibal Dep. 76, 103, ECF No. 154-15.)

compensation, or a term, condition, or privilege of employment, because of . . . sex[.]"  Mich.

Comp. Laws § 37.2202(1)(a).  "Discrimination because of sex includes sexual harassment."  Mich.

Comp. Laws § 37.2103(i).  And as in Title VII, the definition of employer includes an "agent" of

the employer.  *See* Mich. Comp. Laws § 37.2201(a).

### 1. Employer

As discussed above, there is no genuine dispute that McDonald's was not Plaintiffs' actual

employer.  For ELCRA claims, Michigan courts employ a control test similar to the joint employer

test described above.  That is, McDonald's may be liable if Plaintiffs "can establish that [it]

affected or controlled a term, condition, or privilege of [Plaintiffs'] employment."  *McClements v.*

*Ford Motor Co.*, 702 N.W.2d 166, 174-75 (Mich. 2005).

Plaintiffs have not made that showing.  McDonald's played no role in determining the

terms or conditions of their employment and had no meaningful authority to do so.  *Cf. Whitfield*

*v. McDonald's*, No. 08-118582, 2010 WL 6593297 (Wayne Cnty. Cir. Ct. July 28, 2010) (finding

insufficient evidence that McDonald's affected or controlled the terms of employment for its

franchisee's employees).

In addition, under Michigan franchise law,

> [t]o the extent allocation of employer responsibilities between the franchisor and
> franchisee is permitted by law, the franchisee shall be considered the sole employer
> of workers for whom it provides a benefit plan or pays wages except as otherwise
> specifically provided in the franchise agreement.

Mich. Comp. Laws § 445.1504b.  Under that statute, Franchisee was the sole employer for the

workers at Franchisee's restaurants because Franchisee was responsible for paying their wages and

benefits.  Thus, if § 445.1504b applies to the ELCRA, then McDonald's was not an employer

subject to suit under the ELCRA.

### 2. Apparent Authority

To the extent Plaintiffs' claim relies on a theory of "apparent authority," their claim fails under the ELCRA just as it did under Title VII. The Michigan Supreme Court has said that the definition of employer in the ELCRA, which includes "an agent of that person," "mean[s] that the Legislature intended to make the agent tantamount to the employer so that the agent unmistakably is also subject to suit along with the employer." *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 857-58 (Mich. 2005) ("*Elezovic I*"). In other words, both the employer and an *agent of the employer* can be liable under the ELCRA. Consequently, an employee-plaintiff can sue her employer as well as the supervisor who sexually harassed the plaintiff. *Id.* at 861; *see Elezovic v. Bennett*, 731 N.W.2d 452, 461 (Mich. Ct. App. 2007) ("*Elezovic II*") ("Agents [under the ELCRA] are persons to whom *the employing agency* delegates supervisory power and authority over subordinates" on things such as "promotions, bonuses, overtime options, raises, shift and job assignments, and terminations[.]" (emphasis added)).

But McDonald's was neither Plaintiffs' "employing agency" nor an agent of such an entity. Plaintiffs fail to cite a case in which a Michigan court permitted a claim under the ELCRA against an "apparent" employer, i.e., an entity whom the employee mistakenly believed was the one who controlled the terms and conditions of her employment. Indeed, the parties cite only one Michigan state court case that addresses an "apparent agency" theory of liability under the ELCRA, and the court in that case rejected it as applied to McDonald's. According to that court, "an 'agent' is one to whom supervisory power and authority over subordinates is delegated." *Whitfield*, 2010 WL 6593297 (citing *Elezovic II*, 731 N.W.2d at 458). Because the plaintiff in *Whitfield* failed to show that there was such an agency relationship between McDonald's and its franchisee, the plaintiff could not maintain its claim against McDonald's. *Id.*

Similarly, Plaintiffs do not contend, let alone show, that there is an agency relationship between McDonald's and Franchisee such that Franchisee was "an agent of the employing entity." There is no genuine dispute that Franchisee was Plaintiffs' employer, not McDonald's. Accordingly, McDonald's is not liable under the ELCRA for the actions of Franchisee and its employees. Therefore, McDonald's is entitled to summary judgment in its favor for the ELCRA claim as well.

### III. CONCLUSION

For the reasons stated, McDonald's is entitled to summary judgment for the Title VII and ELCRA claims, so the Court will grant its motion. There are no other claims against McDonald's, so the Court will dismiss it as a defendant.

The Court will enter an order consistent with this Opinion.

Dated: December 6, 2021                                     /s/ Hala Y. Jarbou
                                                            HALA Y. JARBOU
                                                            UNITED STATES DISTRICT JUDGE

17