UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNA RIES, et al.,

      Plaintiffs,

                                   Case No. 1:20-cv-2

v.

                                   Hon. Hala Y. Jarbou

MCDONALD'S USA, LLC, et al.,

      Defendants.

_____/

## OPINION

        Plaintiffs Jenna Ries, Katlyn Barber, Joanne Bishop, and Emily Anibal bring this action against Defendants for sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, et seq.  (*See* 3d Am. Compl., ECF No. 142.)  Plaintiffs sue McDonald's, LLC and McDonald's Corporation (collectively, "McDonald's") as well as two entities that operated a McDonald's franchise in Michigan:  MLMLM Corporation and M.A.A.K.S., Inc. (collectively, "Franchise Defendants").  Plaintiffs are former female employees of a McDonald's restaurant in Mason, Michigan, operated by Franchisee.  They allege that a shift manager at that location repeatedly sexually harassed them and other co-workers, both physically and verbally.  The Court has dismissed McDonald's from the case.  Before the Court is a motion for partial summary judgment by Franchise Defendants (ECF No. 180).  For the reasons herein, the Court will deny the motion in all respects but one:  Plaintiffs' request for injunctive relief is moot.  Otherwise, Plaintiffs' claims against Franchise Defendants can proceed.

## I. BACKGROUND

        Franchise Defendants were owned by Michael Dickerson.  They operated multiple McDonald's restaurants in Michigan, including one located in Holt, one in Mason, and one in

Howell.  Shawn Banks worked for Franchise Defendants as a swing manager, first at the Holt restaurant and then at the Mason restaurant from 2014 to March 2019.

Plaintiffs were hired as crew members at the Mason restaurant, so Banks had some supervisory authority over them.[1]  He interviewed most of them before they were hired and could write them up for minor disciplinary issues or send them home for more major issues.  (*See* Defs.' Answers to Reqs. for Admiss., ECF No. 183-6, PageID.4348-4349.)

Plaintiffs contend that Banks regularly and repeatedly harassed them, and that Defendants did nothing about it until March 2019.  Franchise Defendants deny any knowledge of this harassment until receiving a complaint from Ries that month.  Within a few days of that complaint, they suspended him and then he quit.  Plaintiffs worked at the Mason restaurant at different time periods but allege similar facts about Banks's behavior toward them and their co-workers.

## II. CLAIMS

All four Plaintiffs assert claims under the ECLRA.  Ries and Bishop also assert claims under Title VII.  Franchise Defendants ask the Court to grant summary judgment in their favor on some aspects of these claims.  Specifically, Franchise Defendants argue that Anibal cannot proceed with her ELCRA claim because she did not report the alleged harassment against her.  In addition, Franchise Defendants argue that Plaintiffs Ries, Barber, and Anibal cannot prove that Franchise Defendants constructively discharged them.  Finally, Franchise Defendants argue that Plaintiffs are not entitled to injunctive relief.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] Ries and Barber were eventually promoted to the swing manager position.

Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289).  When considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Anderson*, 477 U.S. at 249.

## IV. ANALYSIS

### A. Anibal's Harassment Claim

The ELCRA prohibits employers from discriminating against individuals "with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex[.]"  Mich. Comp. Laws § 37.2202(1)(a).  "Discrimination because of sex includes sexual harassment."  Mich. Comp. Laws § 37.2103(i).  Relevant to this case, sexual harassment means "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature," where that conduct or communication "has the purpose or effect of substantially interfering with an individual's employment[.]"  Mich. Comp. Laws § 37.2103(i)*(iii)*.

A plaintiff-employee asserting a claim of sexual harassment must establish five elements:

3

(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior.

*Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993) (footnote omitted).

Franchise Defendants contend that Anibal cannot establish the last element, respondeat superior, because Defendants did not have notice of Banks's actions.  "[E]mployer responsibility for sexual harassment can be established only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action."  *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005).  "'[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring.'"  *Id.* (quoting *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 919 (Mich. 2000)).  "[A]ctual notice to the employer is not required; rather, the test is whether the employer *knew or should have known* of the harassment."  *Id.* (emphasis added).

"The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge."  *Sheridan v. Forest Hills Pub. Schs.*, 637 N.W.2d 536, 542 (Mich. Ct. App. 2001) (quoting *McCarthy v. State Farm Ins. Co.*, 428 N.W.2d 692, 695 (Mich. Ct. App. 1988)).  Higher management is "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the

4

offensive employee."  *Id.* at 543.  In other words, it is someone who has "actual authority to

effectuate change in the workplace."  *Id.*

Anibal worked at the Mason restaurant from the spring of 2016 to May 2017.  (3d Am.

Compl. ¶ 98.)  Plaintiffs allege that, among other things, Banks "violently grabbed" Anibal "by

the shirt and pushed her up against the counter when she was trying to walk past him." (*Id.* ¶ 104.)

She explained this incident in her deposition, stating:

> Chloe and I were walking to the back.  He wanted to talk to me about another
> coworker.  He wanted me to date him and I didn't want to talk to him about that.
> And he grabbed my shirt, pulled me back to him, pushed me up against a wall that
> had a cart on it, like, sauce and stuff, hurting my back and then he told me . . .
> whatever thing he wanted to say.  And then he let me go, pushed me, and I went
> into the back with Chloe.[2]

(Anibal Dep. 82.)[3]

Anibal also described many other incidents, summarizing Banks's conduct as follows:

> Almost every shift throughout the shift he would make sexual comments, jokes,
> talk about having sex with other people, would grab people, push people – he
> pushed me – grabbed people's hands tightly, touched people in inappropriate
> places, [and] frequently date[d] much younger workers who he had superiority
> over.

(*Id.*)

For instance, Banks would "nudge" Anibal or give her "small pushes" about once per shift,

using his shoulders up "really close" or using his hands from behind her.  (*Id.* at 83, 131.)  He

would also grab her hand tightly and not let go when asked.   (*Id.* at 83.)  A few times he pinched

her.  (*Id.* at 131.)  He would also make sexual comments and jokes "about 50 times a shift" when

she was working with him.  (*Id.* at 85.)  He would state who he would or would not like to have

sex with and would tell stories about his sexual activity, often involving their coworkers.  And he

---

[2] Chloe Roodvoets (formerly Chloe Anderson) was another employee at the restaurant.

[3] Excerpts of Anibal's deposition are available at ECF Nos. 161-7, 175-38, 183-10, and 226-12.

would comment on his female coworkers' physical appearance, saying things like "your butt's too flat," "you're very curvy," "I like how you look in your pants," "your boyfriend is lucky," "you would look like a skeleton having sex," or "she's a ten; she's a two."  (*Id.* at 85.)  Other employees could hear his comments because his voice was loud and because he often spoke them through a headset that other employees were also wearing.  (*Id.* at 86.)  Anibal's statements about the frequency and pervasiveness of Banks's verbal and physical harassment are supported by testimony and affidavits from many other employees who witnessed the same conduct.  (*See* Pls.' Hostile Work Environment Chart, ECF No. 263-2 (quoting statements from others).)

### 1. Notice of Physical Assault

Franchise Defendants focus on whether it had adequate notice that Banks might physically assault Anibal by pushing her up against a wall.  They contend that no other employees had reported to higher management that Banks had physically assaulted them before he assaulted Anibal.  And they contend that they were not aware of any propensity by Banks to commit such conduct.  For instance, there is no evidence that he had a criminal record.

Defendants rely on the following statement of the law regarding respondeat superior:

The general rule that an employer is not liable for acts of its employee outside the scope of its business, however, does not preclude vicarious liability in every instance.  This Court has consistently recognized that an employer can be held liable for its employee's conduct if the employer knew or should have known of [the] employee's *propensities and criminal record* before that employee committed an intentional tort.  This inquiry involves an analysis of whether an employer had (1) actual or constructive knowledge of prior similar conduct and (2) actual or constructive knowledge of the employee's propensity to act in accordance with that conduct. . . .

We applied this principle in *Brown v. Brown*, in which we held that the employer was not vicariously liable for a rape committed by its employee because, under the circumstances, the act was unforeseeable.  There, the defendant's employee repeatedly made sexually offensive comments to the plaintiff, a female coworker. The plaintiff reported the incidents to the defendant, yet it took no action, and the employee subsequently raped the plaintiff.  In concluding that the employer was

not vicariously liable, we noted that the employee had no prior criminal record and
had never threatened to rape the plaintiff. . . .

*Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 245 (Mich. 2011) (footnotes and quotation marks

omitted).  In *Hamed*, the court concluded that an employer was not liable under the ELCRA for a

criminal sexual assault by its employee because the employer could not have reasonably foreseen

that the employee would engage in such an act.

This case is distinguishable from *Hamed*.  Unlike the plaintiff in that case, Anibal does not

rely upon a single, unforeseen incident to support her claim of sexual harassment.  Instead, she

relies upon an apparently unceasing stream of verbal and physical harassment that occurred during

every shift of her work, directed at her and other female employees.  *See Perez v. Ford Motor Co.*,

No. 249737, 2006 WL 1540764, at *4 (Mich. Ct. App. June 6, 2006) ("[W]e find that the general

work environment is the key [to a harassment claim], not the specific acts directed toward

plaintiff.").  Defendants' knowledge of even a fraction of that conduct could permit a reasonable

juror to conclude that Defendants could foresee similar conduct against Anibal.  Furthermore,

some of the conduct at issue involves physical assaults, including pinching, pushing, grabbing, and

other forms of unwelcome contact.  A reasonable juror could conclude that knowledge of such

conduct would make a more forceful shove foreseeable.

## 2. Actual or Constructive Knowledge of Harassment

Next, Defendants contend that they did not have actual or constructive knowledge of

Banks's harassing conduct because no one told higher management about it while Anibal worked

there.  During that time period, Mike Dickerson owned Franchise Defendants, Nanette Bitner was

the Supervisor for the Mason Restaurant, and Todd Niezgoski and Dawn Blakesley were the

General Managers for the Mason restaurant.  They each deny that they had knowledge of

harassment by Banks during Anibal's term of employment. However, Plaintiffs' evidence suggests that they either knew or should have known about it.

It is true that Anibal did not formally report Banks's conduct to any of her supervisors.[4] (Anibal Dep. 143.) But she testified that Banks's behavior was "so common" that managers heard his remarks, including Blakesley. (*Id.* at 88.) Similarly, other employees assert that Niezgoski, who would sometimes work alongside the restaurant employees, heard Banks's comments and inappropriate jokes and would simply laugh at them. (Hoskins Decl. ¶ 28, ECF No. 90-5; Kassab Decl. ¶ 42, ECF No. 161-27.) In addition, Justine Kassab, who worked at the Mason restaurant at the same time as Anibal, told Bitner and Niezgoski that Banks had sexually harassed her. (Kassab Dep. 76-78, ECF No. 226-9; Kassab Decl. ¶ 26.) Although Kassab's testimony is vague on timing and details, it lends some support to the respondeat superior element of Anibal's claim.

Employees who worked at the restaurant after Anibal left also claim that the general managers at the time, Stephanie Robertson and Heidi Pyers, heard Banks's frequent sexual comments toward other employees but did nothing about them. (*See, e.g.*, Ries Decl. ¶¶ 11-12, 33, ECF No. 226-14.) Robertson and Pyers also deny that they were aware of Banks's harassing conduct, but a jury looking at all the circumstances could conclude otherwise. And it could also infer that, if Robertson and Pyers witnessed Banks's conduct, the general managers before and during Anibal's term of employment likely witnessed such conduct as well. As indicated, numerous female employees have provided evidence of Banks's frequent harassing behavior toward them, occurring over several years. Thus, it appears that his behavior was consistent over time and he made no attempt to hide it.

---

[4] She did informally report some of Banks's behavior to Blake Roodvoets, an assistant manager, outside of work. (Anibal Dep. 143.) But Plaintiffs do not provide evidence that Roodvoets was part of "higher management" such that his knowledge could be attributed to Defendants.

Defendants argue for the first time in their reply brief that general managers were not part of higher management and thus their knowledge is not attributable to Defendants. In their initial brief, however, Defendants argued that neither Dickerson, Bitner, Niezgoski, nor Blakesley were aware of sexual harassment by Banks because no one reported it to them. (*See* Defs.' Br. 27, ECF No 183.) Defendants did not argue that general managers such as Niezgoski and Blakesley were not part of higher management. A reply brief is not the appropriate place to raise new arguments. *See Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived."). Because Defendants did not raise this issue in their initial brief, Plaintiffs have not had the opportunity to respond to it. Thus, the Court need not consider Defendants' argument about general managers.

In any case, Defendants acknowledge that general managers had the authority to hire new employees and to discipline them by temporarily suspending them. (Defs.' Reply Br. 5-6, ECF No. 265.) In fact, General Manager Robertson repeatedly disciplined Plaintiff Ries for various work violations. (*See* Ries Disciplinary Records, ECF No. 183-15.) Also, general managers were the ones to whom employees were supposed to report sexual harassment. (Bitner Dep. 160, ECF No. 175-33.) Defendants have not provided any case law supporting their assertion that this level of control is insufficient as a matter of law to exert "significant influence in the decision-making process" regarding discipline for the offensive employee. *See Sheridan*, 637 N.W.2d at 543.

Furthermore, even if Defendants did not have *actual* knowledge of the harassment, there is sufficient evidence of a pervasive pattern of harassment to permit an inference of *constructive* knowledge. In other words, a jury could reasonably conclude that Franchise Defendants *should have* been aware of Banks's conduct. Accordingly, Franchise Defendants are not entitled to

summary judgment on Anibal's harassment claim because Plaintiffs have presented sufficient evidence to create an issue of fact as to Franchise Defendants' liability.

### B.  Anibal, Barber, and Ries's Constructive Discharge Claims

Franchise Defendants ask for a ruling that Plaintiffs Anibal, Barber, and Ries were not constructively discharged and thus are not entitled to damages for lost wages and benefits. "Constructive discharge occurs where the discrimination suffered by an employee was so intolerable that a reasonable person would feel compelled to resign and the employee actually did so." *Townsend v. Rockwell Automation, Inc.*, 852 F. App'x 1011, 1016-17 (6th Cir. 2021).  "When determining whether a constructive discharge occurred, courts consider the same types of circumstances as for a hostile-work-environment claim."  *Id.* at 1017.

Under Michigan law, "[a] constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." *Jewett v. Mesick Consol. Sch. Dist.*, 957 N.W.2d 377, 384 (Mich. Ct. App. 2021) (quotation marks and citations omitted).  Constructive discharge is not an independent claim; it is a defense raised by a plaintiff "to preclude the defendant from claiming that the plaintiff voluntarily left employment."  *Joliet v. Pitoniak*, 715 N.W.2d 60, 68 (Mich. 2006).  "A finding of constructive discharge depends on the facts of each case" and "requires inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee."  *Jenkins v. Se. Mich. Chapter, Am. Red Cross,* 369 N.W.2d 223, 229 (Mich. Ct. App. 1985).  "Where reasonable persons could reach different conclusions regarding whether these elements are established, the issue becomes a question of fact for the jury and not one properly decided by the trial court."  *Vagts v. Perry Drug Stores, Inc.*, 516 N.W.2d 102, 105 (Mich. Ct. App. 1994).

Franchise Defendants argue that any harassment Plaintiffs faced did not actually motivate them to quit their jobs because the evidence indicates that they had other reasons for leaving.

### 1. Ries

Ries worked as a crew member at the Mason restaurant from September 2017 to March 2019. (Ries Decl. ¶ 2, ECF No. 226-14.) Like other employees, she avers that Banks repeatedly harassed her during that time. He propositioned her for sex. He sent her a photograph of his penis. He frequently called her derogatory names. He told her she was "fat" and "disgusting." (*Id.* ¶ 13.) He grabbed her body, including her crotch, breasts, and buttocks. He rubbed himself against her. He threatened to fire her for not agreeing to his sexual demands. On one occasion, he placed his penis into her hand.

Ries claims that, in July 2018, she asked General Manager Robertson to transfer her to another restaurant so that she could "get away" from Banks. (*Id.* ¶ 28.) In October 2018, she met with Robertson again and explained how Banks was treating her and others. A day or two later, she sent a text message to Robertson; she contends that she complained about Banks and again asked for a transfer. Robertson apparently stated that she would investigate but nothing happened. (*Id.* ¶ 31.)

In March 2019, Ries complained to Area Manager Marty Haller and later texted him on March 26, 2019, about Banks's harassment. (*See* Text Message, ECF No. 161-16.) A few days earlier, Shift Manager Kaylyn McGuire had sent Ries home because Ries apparently made vulgar statements about her. The following day, Ries posted a statement on Facebook claiming that she was "going to throw everyone under the bus" because Banks had been harassing her and she was upset at McGuire. (Facebook Messages, ECF No. 161-12, PageID.3476.) Ries apparently followed up on that promise in her text to Haller. After that text, she never worked with Banks again.

11

On March 28, 2019, Haller and Operations Manager Bitner interviewed Banks and other employees regarding Ries's harassment claims.  They suspended Banks that day and he quit before his suspension ended.   Defendants also transferred Ries to a restaurant located in Howell, Michigan.  Almost three months later, Ries decided that she could not work at the Howell location. On June 11, 2019, she complained on Facebook about being suspended for "going home . . . on my day off and people were being dicks." (*Id.*, PageID.3472.)  She went to a Kroger's store that same day and was "hired on the spot."  (*Id.*)

Franchise Defendants argue that, by June 2019, sexual harassment could not have been the reason for her departure.  Ries had not worked with Banks for weeks, and she does not contend that she experienced sexual harassment at the Howell location.

Plaintiffs respond that Ries quit because General Manager Pyers mistreated her at the Howell restaurant, in retaliation for Ries's complaints about sexual harassment by Banks.  (*See* Ries Decl. ¶¶ 39-40.)  According to Ries, other managers followed Pyers's lead and gave Ries "unwarranted write-ups" and threatened her with "write-ups." (*Id.* ¶ 39.)  These assertions are somewhat dubious grounds for constructive discharge, but they are not obviously invalid. Franchise Defendants provide no valid response to them in their reply.

Franchise Defendants simply assert that the Court should not accept Ries's affidavit because it is inconsistent with her Facebook messages and with text messages that she sent to Banks in October 2018 "agreeing to have sex with [him]."  (Reply Br. 14.)  However, the Court must construe the evidence in the light most favorable to Plaintiffs.  Ries's messages arguably undermine her credibility, but credibility is a matter for the jury to decide, not the Court. Defendants are correct that a party cannot create a disputed issue of fact by filing an affidavit that contradicts her earlier deposition testimony, *see Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d

899, 906 (6th Cir. 2006), but Facebook messages and text messages are not deposition testimony. They are not statements made under oath in connection with litigation, so that rule does not apply.

In short, Franchise Defendants have not shown that they are entitled to summary judgment for Ries's constructive discharge claim.  Accordingly, the Court will deny that request.

### 2. Barber

Barber worked as a crew member at the Mason restaurant from October 2017 until "early-2018," when she was promoted to shift manager.  (Barber Decl. ¶ 4, ECF No. 226-13.)  She continued working there until September 2018.  (*Id.*)  Banks harassed her like he did the other plaintiffs.  (*See* Barber Dep. 140-42, 221-22, ECF No. 175-39 (describing the harassment).)

Barber states in her affidavit that she had a "number of reasons" for leaving her job at the restaurant, but the "biggest factor" was the harassment she received from Banks and the fact that there were no consequences; when she complained about it, "no action was taken."  (Barber Decl. ¶ 8.)

As with Ries, Franchise Defendants contend that Barber cannot claim that they constructively discharged her because statements that she made on social media suggest that she quit for reasons other than the harassment she received from Banks.  For instance, in September 2018, after Barber told Ries that she was quitting, Ries posted a message stating that General Manager Robertson is "over dramatic.  Maybe if she took the time to treat[] her employees better everyone wouldn't be jumping ship."  (Facebook Messages, PageID.3491.)  Barber affirmed this sentiment, stating, "Exactly."  (*Id.*)  Later that month, Barber told Ries "this is why I left" after Ries complained about "labor" issues at the restaurant.  (*Id.*, PageID.3488.)

As the Court discussed in the previous section, Barber's Facebook messages might undermine her credibility, but the Court is not permitted to assess her credibility at this stage; it must view the evidence in a light most favorable to Barber.  Moreover, Barber's messages do not

13

necessarily contradict her assertion that the main reason she left was the harassment and her managers' failure to correct it. In her deposition, she stated that the labor issues were only "one reason" why she left. (Barber Dep. 190, ECF No. 161-18.) Thus, the messages do not warrant granting summary judgment to Franchise Defendants.

### 3. Anibal

Anibal quit working at the Mason restaurant in May 2017. (Anibal Dep. 101.) She testified that it was hard to continue working at the restaurant without the support of Chloe Roodvoets, who left a few weeks before she did. (*Id.* at 101-02.) Three weeks after Anibal quit, she took a lower-paying job as a nanny. (3d Am. Compl. ¶ 108.) However, Franchise Defendants apparently contend that she cannot assert a constructive discharge claim because she did not work a full schedule during the summer months. She only worked for Franchise Defendants for a total of 58 hours during the summer of 2016. And during the three weeks after her departure in May 2017, she graduated from high school and attended graduation parties. And then she worked for only 35 hours per week in her nanny job, which lasted until she enrolled in college that fall. (Anibal Dep. 102.)

Franchise Defendants do not explain how or why these facts warrant summary judgment in their favor. They assert that Anibal's claim is "not as well supported" as the plaintiff's claim in *Jager v. Nationwide Truck Brokers, Inc.*, 652 N.W.2d 503 (Mich. Ct. App. 2002) and that, "when viewed in the totality of the circumstances," Anibal "was not harmed economically." (Defs.' Br. 35.) The first assertion is irrelevant and the second is conclusory. The Court need only determine whether there is sufficient evidence to raise questions of material fact about whether the conditions Anibal faced were so intolerable that they forced her to quit and whether she suffered damages. Plaintiffs have met their burden. Thus, Franchise Defendants are not entitled to summary judgment on Anibal's constructive discharge claim.

C.    **Injunctive Relief**

Franchise Defendants assert that Plaintiffs cannot obtain an injunction against them because they no longer run the McDonald's restaurants.  Plaintiffs agree; however, they assert that they can still obtain an injunction against McDonald's.  (Pls.' Resp. Br. 36, ECF No. 228.)  The Court has dismissed McDonald's, so injunctive relief is not available.  The Court will grant Defendants' motion on this basis alone.

## V. CONCLUSION

For the reasons stated, the Court will grant Franchise Defendants' motion for partial summary judgment in part.  Plaintiffs' request for injunctive relief is moot.  In all other respects, the motion will be denied.

The Court will enter an order consistent with this Opinion.


Dated:   December 6, 2021                        /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 UNITED STATES DISTRICT JUDGE