UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNA RIES, et al.,

      Plaintiffs,

                                      Case No. 1:20-cv-2

v.

                                      Hon. Hala Y. Jarbou

MCDONALD'S USA, LLC, et al.,

      Defendants.

_____/

## OPINION

      Plaintiffs Jenna Ries, Katlyn Barber, Joanne Bishop, and Emily Anibal bring this action against two entities that operated a McDonald's restaurant in Mason, Michigan.  Plaintiffs claim that a manager at that restaurant sexually harassed them, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, et seq.  (*See* 3d Am. Compl., ECF No. 142.)  Before the Court is Plaintiffs' motion to certify a class action and related motion to appoint class counsel.  (ECF Nos. 175, 181.)  Also before the Court is Defendants' motion asking the Court to conclude that class certification is not appropriate.  (ECF No. 160.)  The Court heard oral argument on the motions on December 17, 2021.

      For the reasons herein, the Court will grant Plaintiffs' motion for class certification and deny Defendants' motion opposing it.  The Court will also grant Plaintiffs' motion to appoint their counsel as class counsel (ECF No. 181).  Finally, the Court will deny Defendants' motion for leave to file a motion to disqualify Plaintiffs' expert (ECF No. 280).

# I. BACKGROUND

## A. Summary

Defendants MLMLM Corp. and M.A.A.K.S. Inc. (collectively, "Franchise Defendants") operated eleven McDonald's restaurants in Michigan, including one located in Holt, one in Mason, and one in Howell.  Shawn Banks worked for Franchise Defendants as a swing manager at the Mason restaurant from 2014 to March 2019, starting when he was 26 years old.  (*See* Banks Records, ECF No. 149-18.)

Plaintiffs worked as crew members at the Mason restaurant, so Banks had some supervisory authority over them.  He interviewed some of them before they were hired and could sometimes write them up for minor disciplinary issues or send them home for more major issues. (*See* Defs.' Answers to Reqs. for Admiss., ECF No. 183-6, PageID.4348-4349.)

Plaintiffs contend that Banks regularly and repeatedly harassed them, and that Defendants did nothing about it until March 2019.  Franchise Defendants deny any knowledge of this harassment until receiving a complaint from Plaintiff Ries that month.  Within a few days of that complaint, they suspended him and then he quit.  Plaintiffs worked at the Mason restaurant at different time periods but allege similar facts about Banks's behavior toward them and their female co-workers.

## B. Plaintiffs

### 1. Jenna Ries

Jenna Ries worked as a crew member at the Mason restaurant from September 2017 to mid-2018, when she was promoted to swing manager.  She continued working there until March 2019, when she transferred to a different restaurant operated by Franchise Defendants.  (*See* J. Ries Decl. ¶ 2, ECF No. 226-14.)  According to Ries, "immediately" after she started working at McDonald's, Banks started soliciting her for sex.  (*Id.* ¶ 6.)  He asked her so often that she finally

2

"gave in" and had sex with him two or three times.  (*Id.* ¶ 8.)  After she told him she did not want to continue doing so, he did not relent.  He threatened to have her fired if she did not agree to his demands.  He sent her a photograph of his penis and demanded to meet up with her.  He frequently called her derogatory names, including "bitch," "cunt," and "whore" in front of their co-workers. (*Id.* ¶ 11.)  He told her she was "fat" and "disgusting" and would get fired.  (*Id.* ¶ 13.)

He also frequently grabbed her body, including her crotch, breasts, and buttocks.  He rubbed himself against her.  He punched her, pushed her, and pulled her hair.  On one occasion, he followed her into the walk-in freezer and shoved her up against a wall.  On another occasion, he placed his penis into her hand.

According to Ries, Banks made sexual comments "[e]very shift" that she worked with him. (*Id.* ¶ 17.)  He made comments about women's bodies, bragged about his sexual exploits, demanded sex, and called women names like "bitch," "cunt," and "slut."  (*Id.*)

Ries also saw Banks "routinely" touch other women at the restaurant, tickling them, brushing up against them, and rubbing his groin on them.  (*Id.* ¶¶ 18-19.)  He would also hit them, give them "wet willies," hit them on the rear with a muffin paddle, and forcibly hold their hands. (*Id.* ¶ 18.)  According to Ries, managers at the restaurant heard or saw some of his conduct but did nothing about it.

Ries contends that she made "many" verbal complaints about Banks to restaurant managers, but they did nothing.  (*Id.* ¶ 27.)  For instance, she asked General Manager Stephanie Robertson for a transfer to "get away" from Banks in July 2018.  And in October 2018, she met with Robertson, complained about Banks's conduct and asked for a transfer to another restaurant. Robertson took no action.  Ries complained about Banks again on March 26, 2019, describing his harassment of her.  Defendants suspended Banks two days later and then he quit.

3

### 2. Emily Anibal

Emily Anibal worked at the Mason restaurant from April 2016 to June 2017, when she was

17 years old.  (Anibal Decl. ¶ 2, ECF No. 210-29.)  According to Anibal, Banks once grabbed her

shirt and pushed her up against a wall because he wanted to date her:

> He wanted to talk to me about another coworker.  He wanted me to date him and I
> didn't want to talk to him about that.  And he grabbed my shirt, pulled me back to
> him, pushed me up against a wall that had a cart on it, like, sauce and stuff, hurting
> my back and then he told me . . . whatever thing he wanted to say.  And then he let
> me go, pushed me, and I went into the back with Chloe.[1]

(Anibal Dep. 82.)[2]

Banks would also "nudge" Anibal or give her "small pushes" about once per shift, using

his shoulders up "really close" or using his hands from behind her.  (*Id.* at 83, 131.)  And he would

also grab her hand tightly and not let go when asked.  (*Id.* at 83.)  A few times he pinched her.  (*Id.*

at 131.)  He did similar things to other co-workers:

> Almost every shift throughout the shift he would make sexual comments, jokes,
> talk about having sex with other people, would grab people, push people – he
> pushed me – grabbed people's hands tightly, touched people in inappropriate
> places, [and] frequently date[d] much younger workers who he had superiority
> over.

(*Id.*)

Banks would make sexual comments and jokes "about 50 times a shift" when she was

working with him.  (*Id.* at 85.)  He would state who he would or would not like to have sex with

and would tell stories about his sexual activity, often involving their coworkers.  And he would

comment on his female coworkers' physical appearance, saying things like "your butt's too flat,"

"you're very curvy," "I like how you look in your pants," "your boyfriend is lucky," "you would

---

[1] Chloe Roodvoets (formerly Chloe Anderson) was another employee at the restaurant.

[2] Excerpts of Anibal's deposition are available at ECF Nos. 161-7, 175-38, 183-10, and 226-12.

look like a skeleton having sex," or "she's a ten; she's a two."  (*Id.* at 85.)  Other employees could

hear his comments because his voice was loud and because he often spoke them through a headset

that other employees were also wearing.  (*Id.* at 86.)

### 3. Katlyn Barber

Katlyn Barber worked as a crew member at the Mason restaurant from October 2017 until

"early-2018," when she was promoted to swing manager.  (Barber Decl. ¶ 4, ECF No. 226-13.)

She continued working there until September 2018.  (*Id.*)  She was about 18 years old at the time.

(*See id.* ¶ 2.)  Banks harassed her like he did the other plaintiffs.  According to Barber:

> He would hit me on the butt with a muffin paddle, he'd grab my butt and my boobs
> and my thighs and stuff with the tongs, he dry humped me from behind, he used to
> call me words like bitch, cunt, whore, etc.
>
> He used to hold my hand a lot, put his hand over my hand even after I would pull
> away or tell him to stop touching.  He was very hands on, so he would hug me
> whether that be from the front or behind. . . .

(Barber Dep. 221-22, ECF No. 175-39.)

> Barber witnessed similar conduct toward other employees:
>
> He was touching females, saying mean words like cunt, bitch, whore.  He was dry
> humping, he would hold hands of a lot of our females.  He would say things like I
> really want to get with you tonight or he used to make comments about a threesome
> with me and my sister.
>
> He would frequently just always be touching . . . any females that's around him,
> whether that just be his arm around them or holding their hand.
>
> He used to slap butts with a muffin tin. . . .

(*Id.* at 140-41.)

### 4. Joanne Bishop

Joanne Bishop worked at the Mason restaurant from December 2018 to February 2019

(Bishop Decl. ¶ 2, ECF No. 210-28), when she was in her late forties.  She worked with Banks six

times, for a total of about nine hours.  (Defs.' Chart Showing Hours Worked With Banks, ECF

No. 161-23.)  She contends that "every time" that she worked with Banks, he would rub his arms on her chest and rear.  (Bishop Dep. 100-01, ECF No. 175-40.)  She told him to stop and he would pretend that it was an accident.  He also called her "Jo Blow," beginning from the first shift she worked with him.  (*Id.* at 99.)  She heard him make "a lot" of sexual comments about others, such as, "look at her boobs."  (*Id.* at 94.)  At one point, she complained to General Manger Stephanie Robertson about all this conduct.  Robertson told her that she would talk to him, but apparently nothing changed.  (*Id.* at 89.)

### C. Other Female Employees

#### 1. Caitlyn Hunt

Caitlyn Hunt worked at the Mason restaurant from August 2017 to July 2018, when she was 17 years old.  (Hunt Decl. ¶¶ 4, 5, ECF No. 175-32.)  Banks interviewed her and hired her to be a crew member.  She asserts that she "was subjected to, and witnessed, verbal and physical harassment by [Banks]."  (*Id.* ¶ 14.)  On several occasions, he told her that he liked her hair and glasses.  And on other occasions, he grabbed her shoulders to show her something on the register.

Hunt noticed that Banks "frequently harassed" Jenna Ries.  (*Id.* ¶ 17.)  Hunt saw and heard him hit Ries on the bottom.  Once, he smacked Ries on the butt at the back of the store and it was so loud that Hunt could hear it at the front.  She also saw Banks put his wet finger in the ears of female co-workers.  And she saw him brush his body up against them and make comments about women's physical appearances.  His comments were "so frequent" that she cannot remember specific things he said.  (*Id.* ¶ 23.)  She tried to ignore his behavior, but it was "constant."  (*Id.* ¶ 27.)

#### 2. Michelle Ries

Michelle Ries worked at the Mason restaurant from June 2017 to August 2017, when she was 17 years old.  According to Michelle, Banks introduced female co-workers to Michelle as his

"work wife." (M. Ries Decl. ¶ 15, ECF No. 175-33.) When she first started working at her job, Banks asked Michelle for her phone number. She refused to provide it. He then asked for the name of her Instagram account. She refused to provide that as well. He looked it up anyway and then commented on her profile picture, calling it a "sexy picture" that was "inappropriate, but still looked good." (*Id.* ¶ 16.)

On multiple occasions, Michelle saw Banks poke female co-workers in their ribs or their stomach. He would also grab their shoulders and hips from behind in order to "shock" them. (*Id.* ¶ 20.) And he would put his wet finger in the ears of co-workers. He did this to Michelle on one occasion and he also grabbed her shoulders.

Michelle heard Banks make comments about women's appearances and tell crude jokes. Banks's behavior was "so frequent" that Michelle expected it when she came to work. (*Id.* ¶ 24.)

### 3. Robin Nealy

Robin Nealy worked as a crew member at the Mason restaurant from May 2016 to November 2016,[3] when she was 53 years old. She usually worked the morning shift, but sometimes her shift overlapped with one worked by Banks. She saw that he was "'touchy feely' with the younger girls." (Nealy Decl. ¶ 16, ECF No. 175-34.) She saw him rub his body against girls' backsides or come up from behind them, grab their shoulders and then pull them towards him. She once saw Banks snap a female coworker on the butt with a towel. Whenever she worked with Banks, he acted "inappropriately." (*Id.* ¶ 23.) She did not report Banks's behavior.

---

[3] It appears that Nealy would not be a class member because she did not work with Banks on or after November 12, 2016. Nevertheless, her testimony is relevant to show Banks's pattern of conduct.

### 4. Sarah-Jane Fountain

Sarah-Jane Fountain worked at the Mason restaurant from the spring of 2015 to November 2016,[4] when she was 34 years old.  (Fountain Decl. ¶¶ 4, 6, ECF No. 175-35.)  On several occasions, Banks rubbed his body against hers.  Once, he came from behind her and tried to "grind" against her body.  (*Id.* ¶ 18.)  Also, Banks often made "inappropriate" comments toward her.  (*Id.* ¶ 19.)  When she told him she was married, he said that "rings don't cover holes."  (*Id.*)

Fountain observed his physical and verbal harassment toward other female employees.  He "consistently" made "derogatory and sexual" comments about them, such as "I'd hit that," or "Check out that rack."  (*Id.* ¶ 21.) And she saw him hit female coworkers on their bottoms.  His inappropriate behavior was "frequent"; it occurred "multiple times a shift."  (*Id.* ¶ 29.)

Fountain once told General Manager Dawn Blakesley that Banks was sleeping with minors, but Banks and a teenager denied the behavior, so no further action was taken.  Fountain also spoke with Blakesley about Banks's harassing behavior.  Blakesley said she would "take care of it."  (*Id.* ¶ 38.)

### 5. Chloe Roodvoets

Chloe Roodvoets (formerly Chloe Anderson) worked at the Mason restaurant from the fall of 2015 to April 2017, starting when she was 16 years old.  (Anderson Decl. ¶¶ 4, 5, ECF No. 91-3.)  On "numerous occasions," Banks made rude comments about her body and physical appearance.  (*Id.* ¶ 17.)  Once, he grabbed her hand and began "crushing it"; he would not let go even after she told him to stop.  (*Id.* ¶ 18.) Another time, he refused to let her leave until she agreed to give him a "blow job."  (*Id.* ¶ 19.)

---

[4] It is not clear whether Fountain's term of work falls within the class period.

She also heard Banks talk about sleeping with her co-workers "multiple times." (Roodvoets Dep. 86, ECF No. 175-41.) He would make "comments about their bodies, comments about sleeping with them, comments about their ages, comments about his sex life and stuff[.]" (*Id.* at 88.) He also talked about "porn" and other "inappropriate topics" "at least 50 percent of the time" that she worked with him. (*Id.* at 89.) He made these comments over a headset that he and others were wearing, talking over customers.

She also saw him push Anibal and slap another female employee on the butt. (Anderson Decl. ¶¶ 21, 24.)

### 6. Emily Bacon

Emily Bacon worked at the Mason restaurant from January to March 2016 and from September to August 2016. (Pls.' Chart Showing Employment Dates, ECF No. 175-66.) At first, Banks flirted with her; then, he started touching her butt. (Bacon Dep. 74.)[5] Twice, he pulled her into the freezer and kissed her. (*Id.* at 81.) He grabbed her chest "more than 10 times." (*Id.* at 82.) He told her, "I can't wait until you're 18 so that we can have sex." (*Id.* at 83.) He called her "Undercooked Bacon" because she was under 18. (*Id.*) He repeatedly pressured her to have sex with him. (*Id.* at 83-84.) He wrote her up for not having enough money in her till and would use that to threaten her, telling her that he could report her to the police. (*Id.* at 78-79.)

### 7. Ke'landra Mackley

Ke'landra Mackley worked at the Mason restaurant from January 2017 to March 2019. (Pls.' Chart.) She saw Banks touching co-workers, including Jenna Ries, and when other female co-workers would walk by him, he would act like he was trying to touch them. (Mackley Dep. 93, ECF No. 175-43.) More than once a shift, he would make sexual comments about customers and

---

[5] Excerpts of Bacon's deposition are available at ECF Nos. 161-26, 175-46.

co-workers, sometimes over the headset.  (*Id.* at 99, 149.)  He acted the same way when General Managers were in the store, though she was not sure whether they heard his comments.  She contends that she complained to General Manager Robertson about Banks's conduct, and Robertson told her that "Shawn's got a girlfriend.  He wouldn't do that[.]"  (*Id.* at 101.)

### 8. Leighann Rice

Leighann Rice worked at the Mason restaurant from January 2016 to April 2017 and from August 2018 to August 2019.  (Pls.' Chart.)  The very first time she worked at the store, Banks told her about his sex life with one of her co-workers.  (Rice Dep. 74-75, ECF No. 175-44.)  Rice testified at her deposition that Banks would physically touch her and verbally harass her:

> He would try to hold my hand or just touch my arm or shoulder, my back.  He would try to lean in to kiss me with his eyes closed and his lips puckered and would continue leaning in until I had to push him away or walk away.
>
> . . . .
>
> [He engaged in] [c]onstant verbal harassment, talking about my body or other employees' bodies to me as well as talking about his sex life.  He would call me things like, you know, baby, . . . bitch[,] slut[,] and whore as well as talk about my weight . . . .

(*Id.* at 76-77.)

### 9. Justine Kassab

Justine Kassab worked at the Mason restaurant from August 2015 to August 2018, starting when she was 16 years old.  (Kassab Decl. ¶¶ 4, 7, ECF No. 161-27.)  On the day Banks interviewed her and hired her, he made comments about her pants.  (*Id.* ¶ 22.)  She contends that Banks harassed her and other women "the entire time" she worked at the Mason restaurant.  (*Id.* ¶ 23.)  He started by making comments about her butt, telling her she was fat and slapping her butt.  (*Id.* ¶ 24.)  He did this "almost every shift" that she worked with him.  (*Id.*)

10

After she turned 17, Banks repeatedly suggested that she sleep with him.  (Kassab Dep. 112, 121, ECF No. 175-45.)  He promised to get her more hours if she did so.  She eventually agreed because she was worried that she would lose her job or would receive fewer hours.  (*Id.* at 121-22.)

Kassab complained about Banks to multiple managers, including Supervisor Nanette Bitner.  (*Id.* at 131, 169.)  Specifically, Kassab complained to Bitner about "how he talks down to women and is making nasty remarks."  (*Id.* at 170.)  Bitner told her to ignore him.  (*Id.* at 171.) She contends that Bitner and another manager, Heidi Pyers, saw and heard Banks's conduct and comments but told those who were present, "Just ignore him."  (Kassab Decl. ¶ 36.)  Once, Kassab saw Banks "make a fake grab for" Pyers's butt and Pyers told him to "take it elsewhere."  (*Id.* ¶ 37.)

### 10. Nancy Kendle

Nancy Kendle worked as a crew member at the Mason restaurant from November 2017 to the fall of 2018, when she was 63 years old.  (Kendle Decl. ¶ 4, ECF No. 90-8.)  She contends that Banks subjected her to "extensive hostile verbal harassment."  (*Id.* ¶ 17.)  He told her she was "too slow," to "get a move on it," and to "hurry her [ass] up."  (*Id.* ¶ 21.)  He told her to "go back to Oklahoma."  (*Id.* ¶ 20.)  She saw him sexually harass "the younger girls," several times a shift. (*Id.* ¶ 24.)  He "constantly touched" them and his arm would "'accidentally' run up against them." (*Id.* ¶ 25.)  She saw him give "Kaitlyn" and "Justine" hugs, which appeared to bother them.  (*Id.* ¶ 27.)

### 11. Ashley Hoskins

Ashley Hoskins worked as a crew member at the Mason restaurant from July to November 2016 and from the summer of 2018 to September 2018.  (Hoskins Decl. ¶ 4, ECF No. 90-5.)  When she first started, she was 16 years old.  On her first day, Banks told her that she was "cute."  (*Id.*

¶ 25.)   She recalls Banks frequently making "sexual jokes," calling women "bitches," and commenting on their butts and breasts.  (*Id.* ¶ 26.)  For instance, if he saw a female customer that he thought was attractive, he would comment on her body.  This happened "nearly every shift" that she worked with him.  (*Id.*)

According to Hoskins, one of the general managers of the restaurant, Todd Niezgoski, would hear his inappropriate jokes and would laugh and say, "Okay, Shawn, that's enough."  (*Id.* ¶ 28.)  When she asked Niezgoski if Shawn always acted like that, he told her, "Shawn was joking" or "that's just Shawn."  (*Id.*)

When she worked at the restaurant in 2018, Banks harassed her physically.  He pinched her on the side "nearly every shift" they worked together.  (*Id.* ¶ 35.)  As time progressed, he pinched her closer to her breasts.  Once, during an evening shift, when they were the only two employees in the restaurant, he stood close to her and breathed down her neck.  She left her job about a month later.  She did not report his conduct because she believed that another employee had been treated poorly after reporting similar conduct.

### 12. Breeana Adams

Breeana Adams worked as a crew member at the Mason restaurant from January to June 2018, when she was 18 years old.  (Adams Decl. ¶¶ 4, 5, ECF No. 90-9.)  Banks began verbally harassing her about a month into her employment.  (*Id.* ¶ 14.)  He "frequently" told her, "You're so hot, I want to have sex with you."  (*Id.*)  He also commented on her body.  And he "frequently" physically harassed her, kicking her butt or slapping it with his hand.  (*Id.* ¶ 16.)  Sometimes he would rub his body against hers.

She saw him harass others, including Jenna Ries.  And "[w]henever new young female employees" started working at the restaurant, he "migrated towards them."  (*Id.* ¶ 18.)  According to Adams, "there was not a single shift that [she] worked with [Banks] . . . without at least one

comment or several physical assaults from him towards [her] or other female employees."  (*Id.* ¶ 20.)  Adams contends that General Manager Robertson saw and heard Banks's verbal and physical harassment but did not do anything about it.  And Adams regularly complained to Robertson about his conduct, a total of 15 to 25 times.  (*Id.* ¶ 25.)  But Robertson simply said, "[T]hat's just how Shawn is; he's just joking."  (Adams Dep. 56, ECF No. 175-42.)

### 13. Tammy Pasch

Tammy Pasch worked as a crew member at the Mason restaurant from December 2018 to August 2019, when she was 51 years old.  (Pasch Decl. ¶ 4, ECF No. 91-11.)  Banks would often make comments about her breasts.  (*Id.* ¶ 19.)  He would also wet his finger and put it in her ear, and on several occasions, he brushed his hands against her breasts.  (*Id.* ¶¶ 25-26.)  She saw him frequently touch another female employee on the butt.

Pasch complained to Robertson about Banks putting his finger in her ear, but Robertson told her, "[T]hat is just something Shawn does," and walked away.  (*Id.* ¶ 33.)

### 14. Melissa Silva

Melissa Silva worked at the Mason restaurant from July 2018 to December 2019, when she was about 37 years old.  (Silva Decl. ¶¶ 2, 7, ECF No. 91-10.)  She was hired as a crew member and then became a swing manager at the end of 2018.  She saw Banks "touching people inappropriately almost every time" she worked with him.  (*Id.* ¶ 22.)  He would grab people around their waist and sides.  He did the same to Silva "at least once every shift" she worked with him.  (*Id.* ¶ 24.)  He also put his finger in her ear and frequently smacked her butt as he walked by.  Other male employees followed his example.  They would laugh when Banks harassed others and then they started doing the same thing, "making sexual comments and touching/grabbing coworkers."  (*Id.* ¶ 33.)  According to Silva, Robertson was often present when Banks harassed others, and was sometimes the focus of it, but she did nothing to stop him.

### 15. Abigail Teremi

Abigail Teremi worked at the Mason restaurant from July 2016 to July 2017, when she was 19 years old.  (Teremi Decl. ¶¶ 4, 12, ECF No. 91-6.)  She had a different schedule from Banks but they worked together a couple of times.  During one shift, he repeatedly reached out and tried to hold her hand.  She complained about it to General Manager Niezgoski, and he asked her if "just talking to Shawn would be 'enough for [her] to feel okay'" so that he would not have to take further disciplinary action.  (*Id.* ¶ 24.)

### 16. Hannah Evans

Hannah Evans worked as a crew member at the Mason restaurant from June 2017 to June 2018, when she was 17 years old.  (Evans Decl. ¶¶ 4, 8, ECF No. 161-29.) She states that Banks frequently talked about sex and about which women in the restaurant he would like to have sex with.  "Age did not matter to [him.]"  (*Id.* ¶ 18.)  A few times, he called her "jail bait."  (*Id.* ¶ 20.) He told her that meant "if he did anything to [her], it would be considered statutory rape."  (*Id.*) He often made negative comments about her body.  Several times, he tried to look down her shirt. He often bumped into her on purpose.  And on one occasion, he put his hands on top of hers so that he could hold her hand.  When she told him to stop, it only made him want to do it more.

Evans heard Banks make sexual comments about other female employees.  And some teenage boys who worked in the restaurant would copy his behavior, telling other girls that they were "hot" and that they wanted to "tap that."  (*Id.* ¶ 29.)

### 17. Alexandria Brown

Alexandria Brown worked as a crew member at the Mason restaurant from the fall of 2014 to May 2016,[6] starting when she was 16 years old.  Banks and another swing manager "verbally

---

[6] It appears that Brown would not be a class member because she did not work with Banks on or after November 12, 2016.

harassed" her and other girls throughout the entire time she worked there.  (Brown Decl. ¶ 19, ECF No. 91-2.)  She contends that Banks would tell her, "[W]hen you turn 18, I'm claiming your body[.]"  (*Id.* ¶ 20.)  Or he would ask her "to have sex in the back[.]"  (*Id.*)  And he "would also talk about what he would want to do to [her] if [she was] 18 and it [was] legal."  (*Id.*)  He made these sort of comments "every single shift" that she worked with him.  (*Id.* ¶ 21.)  And "nearly every shift" he physically assaulted Brown and other female employees, grabbing their butts, grabbing their hands, massaging their shoulders, tickling their backs, or sneaking up and grabbing them from behind.  (*Id.* ¶¶ 37-44.)  She did not report it because she worried that she would be fired or would lose hours.

### D. Defendants

Franchise Defendants were wholly owned by Michael Dickerson and he was the only officer of those entities.  (Dickerson Dep. 44-47, ECF No. 175-52.)  Dickerson signed a franchise agreement with McDonald's and then assigned the franchise rights to M.A.A.K.S.  M.A.A.K.S. received the restaurant revenues and paid rent and service fees to McDonald's.  (*Id.* at 144-45.) MLMLM hired and paid the employees who worked at the restaurants, including Plaintiffs. MLMLM "leased" these employees to M.A.A.K.S., which transferred money to MLMLM to cover the employees' payroll and benefits.  (*Id.* at 151-52, 154-55; Employee Leasing Agreement, ECF No. 175-15.)  Under the lease agreement between MLMLM and M.A.A.K.S., MLMLM was responsible for supervising employees.  Dickerson sold the restaurant business in August 2020. (*See id.* at 42.)

### II. SEXUAL HARASSMENT

Plaintiffs contend that they worked in an environment rife with sexual harassment caused by Banks and that their employer did nothing about it until March 2019.  They assert claims under

the ELCRA and Title VII, on behalf of themselves and on behalf of other female employees who worked with Banks at the Mason restaurant since November 2016.

**A. ELCRA**

The ELCRA prohibits employers from discriminating against individuals "with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex[.]"  Mich. Comp. Laws § 37.2202(1)(a).  "Discrimination because of sex includes sexual harassment."  Mich. Comp. Laws § 37.2103(i).  Relevant to this case, sexual harassment means "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature," where that conduct or communication "has the purpose or effect of substantially interfering with an individual's employment[.]"  Mich. Comp. Laws § 37.2103(i)*(iii)*.

A plaintiff-employee asserting a claim of sexual harassment must establish five elements:

(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior.

*Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993) (footnote omitted).

The last element, respondeat superior, is established by showing that the employer "had reasonable notice of the harassment and failed to take appropriate corrective action."  *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005).  "'[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring.'"  *Id.*

(quoting *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 919 (Mich. 2000)).  "[A]ctual notice to the employer is not required; rather, the test is whether the employer *knew or should have known* of the harassment." *Id.* (emphasis added).

"The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Sheridan v. Forest Hills Pub. Schs.*, 637 N.W.2d 536, 542 (Mich. Ct. App. 2001) (quoting *McCarthy v. State Farm Ins. Co.*, 428 N.W.2d 692, 695 (Mich. Ct. App. 1988)).  Higher management is "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Id.* at 543.  In other words, it is someone who has "actual authority to effectuate change in the workplace." *Id.*

### B. Title VII

The standard under Title VII is similar to the one under the ELCRA.  To establish discrimination based on sexual harassment, a plaintiff must show that:

> (1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex[]; (4) the harassment created a hostile work environment; and (5) employer liability.

*Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009).  Regarding the fourth element, "[t]he conduct must be objectively hostile or abusive and the victim must also subjectively perceive the environment to be abusive." *Stewart v. Esper*, 815 F. App'x 8, 20 (6th Cir. 2020).  "[T]he alleged incidents of unwelcome harassment are to be considered together to determine whether, under the totality of circumstances, they constitute a hostile work environment." *Id.*  Relevant factors include

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

An important distinction between Title VII and the ELCRA is that, under Title VII, there are different standards for employer liability depending on whether the harasser is a supervisor or a co-worker. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021). A supervisor is "an employee that has the power 'to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 413 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (internal quotation marks omitted)).

A "more stringent standard" applies if the harasser is a supervisor; if the harassment "'culminates in a tangible employment action, the employer is strictly liable.'" *Id.* at 412 (quoting *Vance*, 570 U.S. at 424). If there was no tangible employment action, the employer can escape liability by asserting an affirmative defense "under the *Faragher-Ellerth* framework." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

Under the *Faragher-Ellerth* framework, the employer can defend itself by showing that "(1) it 'exercised reasonable care to prevent and correct any harassing behavior' and (2) that [the plaintiff] 'unreasonably failed to take advantage of the preventive or corrective opportunities' that [the employer] provided." *Id.* at 414 (quoting *Vance*, 570 U.S. at 424). "The first element involves evaluating whether [the employer] had a 'reasonable sexual harassment policy' and whether such policy 'was effective in practice.'" *Id.* (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349-50 (6th Cir. 2005)).

If the harasser was a co-worker, then the plaintiff "must show that the employer's response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008)).  In other words, the plaintiff must show that "the employer 'knew or should have known of the harassment' and 'failed to take prompt and corrective action.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 311 (6th Cir. 2016) (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005)).

## III. CLASS RELIEF

Plaintiffs seek to certify the following classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure:[7]

> All women who worked in a position below the level of Assistant Manager at Defendants' McDonald's restaurant located at 730 North Cedar Street in Mason, Michigan during at least one shift with Shawn Banks since November 12, 2016 (the "Class")

> All members of the proposed Class who worked during at least one shift with Shawn Banks since January 12, 2019 (the "Title VII Subclass").

(Pls.' Br. in Supp. of Class Cert., ECF No. 184, PageID.4408-4409.)

## IV. CLASS CERTIFICATION

The purposes of class-action suits are judicial economy and the opportunity to bring claims that would not be brought absent the class action, because it might not be economically feasible to bring them as individual claims. *See Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 650 (6th Cir. 2006).  Federal Rule of Civil Procedure 23, which governs class certification, provides that:

> One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder . . . is impracticable; (2) there

---

[7] Plaintiffs initially sought injunctive relief under a Rule 23(b)(2) class, but injunctive relief is no longer available to them.

> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four prerequisites for class certification are referred to as "numerosity,

commonality, typicality, and adequacy of representation."  *Shady Grove Orthopedic Assocs., P.A.*

*v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).

If the requirements of Rule 23(a) are met, Plaintiffs must also establish that the class

satisfies one of the three types of class actions set forth in Rule 23(b).  *Alkire v. Irving*, 330 F.3d

802, 820 (6th Cir. 2003).  Plaintiffs seek certification under Rule 23(b)(3), which requires them to

show "predominance" and "superiority," i.e., that "the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3); *see also Alkire*, 330 F.3d at 820.

Finally, courts have held that "'the class definition must be sufficiently definite so that it

is administratively feasible for the court to determine whether a particular individual is a member

of the proposed class.'"  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012)

(quoting James W. Moore et al., *Moore's Federal Practice* § 23.21 (3d ed. 2007)).

"Rule 23 does not set forth a mere pleading standard"; "[a] party seeking class certification

must affirmatively demonstrate his compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011).  "[C]ertification is proper only if 'the trial court is satisfied, after a

rigorous analysis,'" that all prerequisites have been satisfied.  *Id.* at 350-51 (quoting *Gen. Tel. Co.*

*v. Falcon*, 457 U.S. 147, 160 (1982)).

## V. ANALYSIS

### A. Rule 23's Requirements

#### 1. Numerosity

Plaintiffs assert that there are 95 members in the overall Class and 22 members in the Title VII Subclass.[8] A total of 99 class members is sufficient to make joinder of all plaintiffs impracticable. There is no strict numerical test, but courts in the Sixth Circuit agree that classes exceeding 40 people generally satisfy the numerosity requirement. *See Young*, 693 F.3d at 542 (approving a class of 69 members); *In re Am. Med. Sys.*, 75 F.3d 1069, 1076 (6th Cir. 1996) (noting a case in which 35 members was sufficient).

The McDonald's Defendants, who are no longer part of the case, argued that the Title VII Subclass is too small to satisfy the numerosity requirement and that the Court should not certify that class. However, "substantial" numbers are sufficient. *Young*, 693 F.3d at 541. Moreover, "if the subclass members are also members of the larger, already certified, class, . . . the subclass may not be required to satisfy independently the numerosity requirement." William B. Rubinstein, *Newberg on Class Actions* § 3:16 (5th ed.). That is the case here. The members of the Title VII Subclass are also members of the Class, which satisfies the numerosity requirement.

#### 2. Commonality

Commonality requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs' "'claims must depend on a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 458 (6th Cir. 2020) (quoting *Young*, 693 F.3d

---

[8] The latter apparently has fewer members because it is based on a shorter time period than the ELCRA class.

at 542).  "What matters . . . [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Dukes*, 564 U.S. at 350 (quotation marks omitted).

Plaintiffs assert that their case raises the following common factual and legal questions:

1. Was there an objectively hostile work environment in the Mason McDonald's during shifts when Banks was working?

2.  Did Defendants have actual or constructive knowledge of the hostile environment?

3.  Did Defendants take systemic steps to address the problem?

4. [Was] Banks a "supervisor" for whose actions Defendants are strictly liable under Title VII, and, if so, is there a valid *Faragher-Ellerth* defense?

5.  Are General Managers and Assistant Managers "higher management" whose knowledge of harassment can be imputed to Defendants under [the] ELCRA?

6.  Are MLMLM and M.A.A.K.S. an integrated enterprise or joint employer?

. . . .

[7.] Did Defendants act with malice or reckless indifference entitling the Subclass to punitive damages under Title VII?

(Pls.' Mot. for Class Cert. 24, ECF No. 190.)

Defendants argue that there is not sufficient commonality because the circumstances faced by each class member were different.  Regarding the existence of an objectively hostile work environment, Defendants note that Plaintiffs worked at different times and likely experienced different degrees or types of harassment.  Some members of the class worked with Banks for only one shift or for only a few hours.  And some, like Nealy, may not have experienced any direct

22

physical harassment.[9]  A jury will have to consider the totality of the circumstances at each point in time throughout the relevant period, from the perspective of each female employee working with Banks, to determine whether a hostile work environment existed for the entire class.

Nevertheless, the Court is satisfied that the class members' circumstances are sufficiently similar that the Court can resolve issues that are common for the class.  As Plaintiffs conceded at oral argument, their burden will be to prove that *every shift Banks worked*, even if he only worked one shift with a class member, created a hostile work environment for the female employees around him.  That will not be an easy showing to make, but given the consistency, frequency, severity, and visibility of Banks's conduct according to Plaintiffs' evidence, there is sufficient overlap between the class members' experiences to render the existence of an objectively hostile work environment one that can be resolved on a class-wide basis, in addition to the other six issues listed above.

Importantly, this is not a case in which the putative class members faced significantly different work environments at different times.  The plaintiffs here did not work in different locations with different individuals contributing to a hostile work environment in different ways.  Instead, the class members worked in the same restaurant, in the same confined space, and experienced direct or indirect harassment by the same individual whose conduct was apparently consistent and unrelenting over an extended period of time.  In addition, this is not a case in which managers responded to the source of the harassment in different ways, addressing it in some instances for some individuals and ignoring it in others.  Instead, Defendants were consistent in their response to Banks's behavior.  They apparently did almost nothing about it until March 2019.

---

[9] Conduct and comments direct at others are considered "less severe," but they can still contribute to a hostile work environment. *Watkins v. Wilkie*, 815 F. App'x 1003, 1004 (6th Cir. 2020); *see also Ladd*, 552 F.3d at 500 (noting that conduct learned by the employee "second hand" is relevant).

Thus, this case is not like those in which courts have denied certification of a hostile-work-environment class due to the variability of the harassment experienced by the class members and/or the responses by the defendants to complaints about that harassment.  *See, e.g.*, *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896, 898 (7th Cir. 2012) (class certification not appropriate where "[d]ifferent sites had materially different working conditions"; some were "discrimination-free, while others were marked by severe racial hostility"); *Van v. Ford Motor Co.*, 332 F.R.D. 249, 277-78 (N.D. Ill. 2019) (denying certification where the plaintiffs' and the class members' experiences likely varied due to "the size of the Plants and the fact that named Plaintiffs have not worked in many of the Plants different departments and crews during all relevant time frames"); *Sellars v. CRST Expedited, Inc.*, 359 F. Supp. 3d 633, 678 (N.D. Iowa 2019) (denying certification where harassment occurred "in trucks and by one individual against another" and "each person in the class may have been subject to only one of those instances and unaware of the others"); *Goodwin v. Conagra Poultry Co.*, No. 03-CV-1187, 2007 WL 1434905, at *13 (W.D. Ark. May 15, 2007) (denying certification where the nature of the work environment varied according to "the area and department that individual worked and the comments and actions taken by his or her individual supervisor"); *Elkins v. Am. Showa Inc.*, 219 F.R.D. 414, 424 (S.D. Ohio 2002) (denying certification where the harassment varied "among the various areas of the plant, among the employees supervised by different supervisors and working with different co-workers, and among the employees on different shifts," and where the defendant's responses "ranged from determining to take no action to terminating the offending employee").

Rather, this is a case like those in which "[c]ourts have . . . approved of hostile work environment class actions [because] the work environment is localized, for example, where the proposed class members worked under a single supervisor or at a single site."  *Lamarr-Arruz v.*

24

*CVS Pharmacy, Inc.*, No. 15-CV-04261 (JGK), 2017 WL 4277188, at *5 (S.D.N.Y. Sept. 26, 2017) (citing cases).  "Employees that work in close proximity hear, see, and thus experience the same discriminatory acts.  Where they do not do so first-hand, they may do so second-hand."  *Id.* In addition, "[t]he link to a single supervisor [and] site reduces individualized issues that differentiate the environments experienced by class members, and provides the 'glue' that holds the class together."  *Id.* (quoting *Dukes*, 564 U.S. at 352).

### 3. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re Am. Med. Sys.*, 75 F.3d at 1082.  A plaintiff's claim is not typical if the "named plaintiff who proved [her] own claim would not necessarily have proved anybody else's claim."  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).  "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class."  *Id.*  "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members."  *In re Am. Med. Sys.*, 75 F.3d at 1082.

Here, the named Plaintiffs worked with Banks at different time periods, but their experiences are remarkably similar to one another and to those of other potential class members. Also, Plaintiffs' collective work histories cover the entire relevant timeframe for the Class and the Title VII Subclass.  And like the various class members, Plaintiffs worked with Banks for different lengths of time.  Plaintiff Bishop, for instance, worked with Banks for a total of only nine hours, over six shifts, which makes her claim more similar to those class members who might have

worked with Banks for only one shift or for only a few hours.  Furthermore, to the extent Banks may have treated younger employees differently than older ones, the named plaintiffs represent different age groups.  Bishop, for instance, was somewhat older than Banks, whereas Anibal was 17 years old.[10]

Defendants point to evidence that some women may have welcomed Banks's conduct.  For example, Jenna Ries acknowledges that she had a sexual relationship with him for a time, and some texts that she sent to friends in July and August 2018 indicate that she had mixed feelings about him.  She thought he was "toxic" but she "love[d]" him.  (*See* Ries Messages, ECF No. 240-3.)  However, Ries worked with Banks for longer than a few months.  Of all the named plaintiffs, she worked with him the longest.  There is no evidence that she welcomed all of his conduct, or that she was in a relationship with him for her entire employment with Defendants at the Mason McDonald's.  And if anything, evidence that she or any other class member had a relationship with Banks goes more to the subjective element of their hostile-work-environment claims than to the objective element common to the class.  It speaks more to their personal perception of his conduct than to what a reasonable woman would have perceived as abusive or hostile.  The subjective component is one that the Court can resolve on an individual basis, after the common questions are decided.

Defendants also point to evidence that Jenna Ries was once suspended for calling a female swing manager a "cunt" and telling her to "shut the fuck up" while working.  (*See* J. Ries Dep. 163-64, ECF No. 161-5.)  Defendants argue that this incident makes her claims atypical and that she has a conflict of interest with the class because she engaged in misconduct similar to that of

---

[10] Bishop's age does not appear in the record, so far as the Court is aware, but Plaintiffs' counsel represented that she was in her late forties when she worked for Defendants.

Banks.  However, one of the primary issues in this case is whether there was an objectively hostile

work environment for women at Plaintiffs' workplace.  The fact that Ries used offensive language

toward another employee on one occasion would not have meaningfully contributed toward such

an environment and does not significantly distinguish her claim from that of the class members.

*Cf. Van*, 332 F.R.D. at 283 (denying class certification where some of the named plaintiffs

*repeatedly* "contributed to the sexually hostile work environment that [they] challenge[d]" and

were identified as harassers by class members).

Defendants also raise the fact that Jenna Ries was a swing manager from January 12, 2019

to March 28, 2019, meaning that Banks was not her supervisor for this period.  Even if true,

however, that fact would impact only a portion of her claim.  At most, it might impact her ability

to obtain damages for that time period, but it would not nullify the rest of her claim or make it less

subject to resolution by litigating the issues common to the class.

Defendants fault Plaintiffs for failing to provide statistical evidence to support the

typicality of their claims according to the pattern-or-practice model for proving discrimination set

forth in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).  However,

the Court agrees with Plaintiffs that statistical evidence is not necessary here.  Like the *McDonnell

Douglas* standard, the *Teamsters* framework provides a method for proving "intentional

discrimination through circumstantial evidence" instead of direct evidence.  *Serrano v. Cintas

Corp.*, 699 F.3d 884, 892 (6th Cir. 2012).  Under *Teamsters*, a plaintiff has the initial burden of

establishing "'that unlawful discrimination has been a regular procedure or policy followed by an

employer or a group of employers.'"  *Id.* at 893 (quoting *Teamsters*, 431 U.S. at 360).  And that

burden can be met, in part, by producing statistical evidence of discrimination by the employer.

*Teamsters*, 431 U.S. at 337-38.  When the plaintiff satisfies this burden, the burden shifts to the

employer "'to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.'"  *Serrano*, 699 F.3d at 893 (quoting *Teamsters*, 431 U.S. at 362).  In other words, the statistics provide a basis for a jury to infer discriminatory intent for a particular employment decision, where direct evidence of that intent is not available.

In contrast, Plaintiffs' harassment claims do not require a fact-finder to infer discriminatory intent from circumstantial evidence.  Banks's discriminatory intent was, for the most part, apparent from the content and context of his conduct; many of his comments and actions were clearly based on Plaintiffs' sex.  Moreover, individual employment decisions are not at issue.  Plaintiffs' claims rest upon harm caused by many actions that together created a hostile work environment for women, not upon harm resulting from discrete decisions about their jobs.  Thus, statistical evidence is not necessary here, and its absence does not prevent Plaintiffs from meeting the requirements for class certification.

In short, the Court is satisfied that Plaintiffs' claims are typical of the class.

#### 4. Adequacy of Representation

Next, the named Plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This inquiry "'serves to uncover conflicts of interest between named parties and the class they seek to represent.'"  *Young*, 693 F.3d at 543 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  The Court looks at two criteria:

> 1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.

*In re Am. Med Sys.*, 75 F.3d at 1083 (quoting *Senter v. Gen. Motors*, 532 F.2d 511, 525 (6th Cir. 1976)).

Here, the interests of the named Plaintiffs are aligned with the interests of the class; there is no indication that they will not vigorously prosecute the case.  In addition, Plaintiffs' filings in

the case thus far, including their motion to appoint class counsel, provide evidence that their counsel is qualified, experienced, and able to conduct class litigation.  (*See* Exhibits to Pls.' Br. in Supp. of Mot. to Appoint Class Counsel, ECF No. 182.)  Given that experience, counsel's work identifying potential claims, counsel's knowledge, and counsel's apparent resources, the Court is satisfied that counsel is adequate under Rule 23, and the Court will grant Plaintiffs' request to appoint their counsel as class counsel.  *See* Fed. R. Civ. P. 23(g).

### 5. Predominance

For a Rule 23(b)(3) class, the common questions must predominate over individual ones.  To meet this requirement, Plaintiffs "'must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof.'"  *Hicks*, 965 F.3d at 460 (quoting *Young*, 693 F.3d at 544).  "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting Rubenstein, *Newberg on Class Actions* § 4:49).  "'[T]he fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'"  *Hicks*, 965 F.3d at 460 (quoting *Young*, 693 F.3d at 544).  In addition, predominance can be satisfied "'even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'"  *Id.* (quoting 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1778, at 123-24 (3d ed. 2005)).

Here, the Court finds that the common questions predominate over the individual ones.  Although there is some variation in the experiences of individual class members, there is sufficient in common that predominance is satisfied.  As indicated above, Defendants point to evidence that

some of the plaintiffs had sexual or romantic relationships with Banks.  Consequently, they may have welcomed some of his conduct or perceived it differently from other class members.  However, the class members' subjective perceptions of the work environment can be litigated individually.[11]  Each class member will have to present evidence that Banks' conduct was unwelcome and that they perceived it as abusive.  Where there is evidence suggesting otherwise for a particular class member, Defendants will have an opportunity to present it.  At present, however, the Court expects that the evidence necessary to adjudicate individual claims will be less central to the case and less prevalent than the evidence applicable to all of them, such as evidence of the existence of an *objectively* hostile work environment, Defendants' actual or constructive knowledge of Banks's conduct, and the steps taken by Defendants (or not taken) in response to that conduct.  Indeed, if Plaintiffs can show that the work environment was objectively hostile for the entire class, it should not require much for most class members to prove that they subjectively perceived it as such.  And even if it turns out that there is some overlap between a class member's evidence of her subjective perception of Banks's conduct as unwelcome or abusive and the Plaintiffs' class-wide evidence of an objectively hostile work environment, the Court believes that the common issues nevertheless predominate.

Defendants argue that the parties will have to litigate what facts Ries actually reported about Banks's conduct in July and October 2018, and that this is an individualized issue.  To the contrary, the details about Ries's reporting are not absolutely necessary for the claims of any of the class members, who can show that Defendants are liable because they knew about the harassment through other means or because they should have known about it.  Moreover, to the

---

[11] To aid in the management and efficient resolution of the case, the Court has authority to bifurcate the proceedings and start with a trial and verdict on the common liability issues before proceeding to issues requiring individualized proof.  *See Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004).  And "if done properly, bifurcation will not raise any constitutional issues."  *Id.* at 509 n.6.

extent Ries's reporting is relevant for Defendants' actual knowledge of that conduct, it may be relevant for other class members as well, particularly those who did not report Banks's conduct. And to derive an answer applicable to the class, the Court could ask the jury to specify a date when Defendants knew or should have known of Banks's harassing conduct.  Thus, the Court disagrees with Defendants that uncertainties about the content of Ries's reporting undermine Plaintiffs' request for certification.

### 6. Superiority

Rule 23(b)(3) requires Plaintiffs to show that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  That rule aims to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods.*, 521 U.S. at 615.  The Court considers the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The superiority of a class action follows from much of what the Court has said regarding commonality and predominance.  Defendants contend that class members should litigate their claims individually or in smaller groups, but that method would lead to unnecessary repetition in the presentation of evidence and the possibility of inconsistent verdicts.  For instance, testimony

about Banks's persistent course of sexually harassing conduct in 2015 and 2016, as well as complaints about that conduct during that time period, might be relevant to show that Defendants knew or should have known that a similarly hostile work environment existed for female employees who worked with him in November 2016 and beyond.  And that same evidence might also be relevant to show Defendants' reckless indifference for purposes of punitive damages. Almost every class member (or group of members, assuming they could be consolidated into smaller groups) would likely benefit from that evidence and presenting it multiple times in different proceedings would waste court resources.

Furthermore, the class does not appear to be so large that proceedings focused on an individual class member's right to relief would be unmanageable.  *Cf. Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998) (denying certification where "manageability problems [were] exacerbated by the fact that th[e] action . . . involve[d] more than a thousand potential plaintiffs," requiring "multiple juries . . . [to] pass on issues decided by prior ones, introducing potential Seventh Amendment problems and further decreasing the superiority of the class action device").

In addition, it appears that members of the class would be unlikely to proceed with individual claims.  Many of the class members were only teenagers when they worked with Banks and had little prior work experience.  As such, they are less likely to be aware of their legal rights today or to have the resources to enforce them.  Indeed, it appears that no individuals other than the named Plaintiffs have filed claims regarding Banks's conduct.  In addition, several individuals who worked with Banks before 2016 may have already forfeited potentially valid claims because the deadline for filing them has passed.  Thus, the class members' interests in individually controlling separate actions does not appear to weigh against certification.

Defendants object that it would be unfair to certify a class action because certification would prevent them from challenging claims by particular class members who did not report any harassing conduct.  Defendants contend that a class member's failure to report Banks's conduct would justify summary judgment in Defendants' favor as to that person's claim.  But Defendants are mistaken.  As discussed in Section II, the relevant question is whether Defendants *knew or should have known* of Banks's harassing conduct and the hostile work environment it created. Individuals are not required to report harassment to their employer to be entitled to relief under Title VII or the ELCRA.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).  An employer can learn about the harassment from another source or it can have constructive knowledge of pervasive harassment.  *Id.* (discussing Title VII); *Sheridan*, 637 N.W.2d at 542 (discussing the ELCRA).

Defendants also object that they will be prejudiced because Plaintiffs purportedly seek to have punitive damages decided on a class-wide basis.  According to Defendants', their net worth is relevant evidence for determining the amount of punitive damages, but that same evidence would be prejudicial to them when a jury is considering their liability.  However, the Court understands Plaintiffs to be arguing that, at a minimum, a legal *prerequisite* for punitive damages (i.e., a finding that Defendants were recklessly indifferent to the hostile work environment) could be decided on a classwide basis, before assessing the *amount* of damages.  Defendants' net worth is not relevant to deciding that preliminary issue.  And in any case, if evidence of Defendants' net worth is necessary, the Court could take steps to minimize the prejudicial impact of that evidence, through jury instructions or other means.  Thus, Defendants' objections are not persuasive.

### B. Definition

Finally, the Court notes that the Class and Title VII Subclass are appropriately defined in such a way that it is possible to determine who is and is not a member of the class.

In summary, Plaintiffs have satisfied the prerequisites for class certification and the Court believes that class certification is appropriate in this matter.

## VI. CONCLUSION

For the reasons stated, the Court will grant Plaintiffs' motion to certify a class and deny Defendants' motion opposing class certification.  The Court will also grant Plaintiffs' motion to appoint class counsel.

Defendants have also filed a motion for leave to file a motion to exclude the testimony of Plaintiffs' expert, Dr. Louise Fitzgerald.  (Mot. for Leave, ECF No. 280.)  The Court did not rely on that testimony, however, so Defendants' motion was unnecessary and will be denied.

The Court will enter an order consistent with this Opinion.


Dated:    December 29, 2021                           /s/ Hala Y. Jarbou
                                                      HALA Y. JARBOU
                                                      UNITED STATES DISTRICT JUDGE